```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF WISCONSIN
 3  - - - - - - - - - - - - - - - - - - - - - - - - - - - -
    ATHENA E. TIMMS,
 4
                        Plaintiff,
 5
          vs.                        Case No. 16-cv-1056
 6
    AMAZON, INC,
 7
                        Defendant.
 8
    - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9
              DEPOSITION OF:  MS. ATHENA E. TIMMS
10
              TAKEN AT:  LITTLER MENDELSON, P.C.
11
       LOCATED AT:  111 East Kilbourn Avenue, Suite 1000
12                  Milwaukee, Wisconsin
13                   February 17, 2017
14                   10:00 a.m. to 4:33 p.m.
15          REPORTED BY:  VICKY L. ST. GEORGE, RMR.
16  - - - - - - - - - - - - - - - - - - - - - - - - - - - -
17
18
19
20
21
22
23
24
25  JOB NO. 2539792
```

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 1 of 63   Document 28

1       A P P E A R A N C E S
2
    LITTLER MENDELSON, P.C., by
3   MS. SUSAN FITZKE
    1300 IDS Center
4   80 South 8th Street
    Minneapolis, MN 54402
5   (612) 630-1000
    sfitzke@littler.com
6      and
    MR. MATTHEW KURLINSKI
7   111 East Kilbourn Avenue, Suite 1000
    Milwaukee, Wisconsin 53202
8   (414) 291-5536
    mkurlinski@littler.com
9   Appeared on behalf of the Defendant.
10
11       I N D E X
12 WITNESS                     PAGE
13 MS. ATHENA E. TIMMS
14 EXAMINATION BY MS. FITZKE        6
15
16       E X H I B I T S
17 NUMBER     DESCRIPTION          PAGE
18 Exhibit 1   Letter Dated 3-6-2016 from Jason    83
19        Griffin of Amazon to Athena Timms
20        offering full-time employment, Bates
21        Amazon2325
22 Exhibit 2   Amazon Owner's Manual and Guide to   94
23        Employment, Bates Amazon60-91
24 Exhibit 3   Amazon Supportive Feedback Document, 112
25        Productivity, Documented Verbal,

1        Bates Amazon53-54
2 Exhibit 4   Integrity Supportive Feedback     113
3        Document, Quality, Documented
4        Verbal, Bates Amazon2
5 Exhibit 5   5-5-5 Stow Audit Dated 2-19-16,    123
6        Bates Amazon21
7 Exhibit 6   Amazon Supportive Feedback Document, 129
8        Quality, Final Written Dated
9        3-10-2016, Bates Amazon3
10 Exhibit 7   Re-Train Results (RTR) Form Dated   134
11        2-26-17, Bates Amazon17
12 Exhibit 8   5-5-5 Stow Audit Dated 2-29-16,    137
13        Bates Amazon22
14 Exhibit 9   Letter Dated 5-17-2016 from Amazon   145
15        HR to Athena Timms Confirming Date
16        of Involuntary Termination of
17        Employment, Bates Amazon26-29
18 Exhibit 10   Termination Summary, Bates Amazon1 145
19 Exhibit 11   MyTime Payroll Records for Athena   146
20        Timms, Bates Amazon35-46
21 Exhibit 12   Re-Train Results (RTR) Form Dated   158
22        3-11-16, Bates Amazon19
23 Exhibit 13   Amazon Supportive Feedback      161
24        Document, Productivity, Coach, Bates
25        Amazon47-48

1 Exhibit 14   Re-Train Results (RTR) Form Dated   162
2        3-18-16, Bates Amazon18
3 Exhibit 15   Amazon Supportive Feedback Document, 165
4        Quality, Termination, Bates Amazon6
5 Exhibit 16   Amazon Supportive Feedback Document, 177
6        Quality, Final Written Dated
7        4-6-2016, Bates Amazon9
8 Exhibit 17   Re-Train Results (RTR) Form Dated   179
9        4-13-16, Bates Amazon20
10 Exhibit 18   Amazon Supportive Feedback Document, 181
11        Quality, First Written, Bates
12        Amazon11-12
13 Exhibit 19   Amazon Supportive Feedback Document, 183
14        Quality, Termination Dated 5-16-16,
15        Bates Amazon16
16 Exhibit 20   MKE1 PEP Process, Bates Amazon94-96   192
17 Exhibit 21   Charge of Discrimination Form,     194
18        Wisconsin Equal Rights Division
19        Dated 5-18-2016
20 Exhibit 22   Attachment 1, Complaint Form     197
21 Exhibit 23   Amazon Com DEDC LLC Earnings     203
22        Statement for Athena Timms Dated
23        4-17-16
24 Exhibit 24   Wisconsin Unemployment Insurance   208
25        Summary for Athena Timms

1 Exhibit 25   Handwritten Discovery Responses    212
2 Exhibit 26   ProCare Medical Group Statement    213
3        Dated 11-18-16 For Office Visit
4 Exhibit 27   Handwritten Note and Receipts     213
5 Exhibit 28   Email Dated 1-6-2017 From Athena   216
6        Timms to Matthew Kurlinski
7 Exhibit 29   Handwritten Answers to        218
8        Interrogatories
9 Exhibit 30   Handwritten Answers to        224
10        Interrogatories
11 Exhibit 31   Tweets on Twitter with Replies by   239
12        Athena Timms
13
14
15       R E Q U E S T S
16 REQUEST                 PAGE   LINE
17 Resume                   49   16
18 Amazon W-2 Form          207    7
19 W-2 From State of Wisconsin      207   14
20 Amount of Company Provided Match for 401(k) 219   25
21 Program
22
23
24 (Original exhibits attached to original transcript.)
25 (Original transcript was delivered to Attorney Fitzke.)

2 (Pages 2 - 5)

1      TRANSCRIPT OF PROCEEDINGS

2      MS. ATHENA E. TIMMS called as a witness

3  herein, after having been first duly sworn on oath,

4  was examined and testified as follows:

5      EXAMINATION

6 BY MS. FITZKE:

7 Q.  Ms. Timms, my name is Susan Fitzke.  We met briefly

8  off the record before we got going here this morning.

9  I'm an attorney for Amazon that's been retained to

10  represent the company in conjunction with the lawsuit

11  that you filed here in Wisconsin.  And we've asked

12  you to come down here today and give a deposition in

13  conjunction with your case.  Do you understand that?

14 A.  That's of my testimony or my explanation of the --

15  why I'm suing?

16 Q.  Correct.  So I'm going to guess you've never given a

17  deposition before?

18 A.  No, I haven't.  This is my first time suing.

19 Q.  So let me give you just a little bit of information

20  about the process that we're going to follow here

21  today.

22 A.  Okay.

23 Q.  You might have noticed before we got started the

24  court reporter swore you in and administered an oath

25  to you.  That's the same oath that you might be given

1  in a court of law and it has the same effect in terms

2  of requiring truthful testimony.  And if you are

3  untruthful, the same consequences could apply as

4  could apply in a court of law.  Do you understand

5  that?

6 A.  Yes, I do.

7 Q.  And we're going to be here for a few hours today.

8 A.  Okay.

9 Q.  And depending on how it goes, maybe a little longer.

10  But we'll move through things as efficiently as we

11  can.

12 A.  Okay.

13 Q.  But if you find that you need any breaks in the day

14  before I've indicated it's time to break, just let me

15  know.  And as long as you've answered whatever

16  question is in front of you, I'll be happy to

17  accommodate you, okay?

18 A.  Okay.

19 Q.  It's also -- you can see the court reporter, she's

20  going to get down everything that you and I say here

21  today.

22 A.  Okay.

23 Q.  To do that, she's got to type fast to keep up, and it

24  also means she can only take down one of us at a

25  time.

1 A.  Okay.

2 Q.  So I need you to wait for me to finish my full

3  question before you start answering, and I'll do the

4  same for you with respect to your answers, okay?

5 A.  All right, okay.

6 Q.  And even some of the okays that you're acknowledging

7  that you're understanding me while I'm talking, that

8  interrupts the court reporter.  So I don't want you

9  to focus too much on that.  I would rather have you

10  focus on my questions.  But if you're mindful of that

11  and can try to wait for the full question, that's

12  going to help make sure the court reporter gets

13  everything we say, especially since I'm a little bit

14  of a fast talker.  So I'll try to slow down too,

15  okay?

16 A.  All right.

17 Q.  It's also important to me that you understand my

18  questions before you answer them.  I'm not here to

19  trick you.  I don't want to confuse you.  I want to

20  make sure that I get your best evidence and

21  information in response to my questions.  So if you

22  find any of my questions confusing or you're not sure

23  what I'm asking, please let me know that, and I'll

24  try to rephrase it in a way that might make better

25  sense to you, okay?

1 A.  All right.

2 Q.  One more thing we need to do to help our court

3  reporter here is that when we're in normal

4  conversation and in the same room face-to-face like

5  we are, we can say things like um-hum and uh-uh or

6  shake our head and we're going to understand one

7  another.  But when we try to read that back later on

8  in the transcript, it's not going to make any sense

9  at all.  So I would ask that you answer with a yes or

10  no or whatever other verbal answer might be

11  appropriate to my questions, okay?

12 A.  All right.

13 Q.  Because we do want to make sure that your testimony

14  is captured and that we don't have any problem

15  understanding it later, all right?

16 A.  Yes.

17 Q.  You're here by yourself today, and you have been

18  representing yourself in conjunction with this

19  litigation.  And I just want to confirm before we get

20  going here that you are not currently represented by

21  an attorney; is that right?

22 A.  Yes.

23 Q.  Did you do anything to prepare for your deposition?

24 A.  No, I did not.  Well, I just -- I went to -- I been

25  going to counseling to a tutor to ask questions in

3 (Pages 6 - 9)

1     terms of my case. But that's it.
2  Q.  Who -- from whom are you receiving this counseling or
3     tutoring?
4  A.  Marquette University law students, volunteers.
5  Q.  So you have obtained some advice from a law student
6     clinic; is that right?
7  A.  It's held at the -- their office is held at the state
8     city court here in Milwaukee. They have volunteers
9     that are retiring attorneys and graduated and
10     undergrad Marquette University students.
11  Q.  So you've received some advice from them, but they
12     have not undertaken your legal representation; is
13     that right?
14  A.  Yes.
15  Q.  Did you review any documents in order to prepare for
16     your deposition today?
17  A.  Yes, I did. All my documents are at home.
18  Q.  But you did review them in order to prepare for
19     today?
20  A.  Yeah, sort of studied and read and things that -- of
21     the nature of the court, the last court telephone
22     conference I had with the judge and Mr. Kurlinski.
23  Q.  And so the documents you're talking about are the
24     same documents that you've sent to Mr. Kurlinski in
25     conjunction with the case?

1  A.  And to the judge, yes.
2  Q.  And other than this pro bono or free clinic that you
3     mentioned, have you spoken to anybody else about your
4     deposition here today?
5  A.  No, I haven't.
6  Q.  Did you review any documents to prepare for your case
7     that were different or in addition to the documents
8     you provided to Mr. Kurlinski and the Court?
9  A.  No, I haven't.
10  Q.  Have you ever gone by any other name than
11     Athena Timms?
12  A.  My full name is Athena E. Timms. No.
13  Q.  And the E is Elaine?
14  A.  Elaine.
15  Q.  Stands for Elaine?
16  A.  Um-hum.
17  Q.  Can you give me just a little bit of information
18     about like where were you born and raised?
19  A.  I was born in Chicago, Illinois, raised in Chicago,
20     Illinois and moved here because there is more -- my
21     parents are here and my relatives are here later on
22     in my adult life, early adult life.
23  Q.  How old were you when you came to Milwaukee?
24  A.  I was 22 years old.
25  Q.  Did you go to high school in Chicago?

1  A.  No, I didn't. I went to high school in -- it was
2     first in Nauvoo, Illinois but it's now Rhode Island
3     Illinois. My high school that I graduated from, they
4     relocated to Rhode Island.
5  Q.  And what year did you graduate high school?
6  A.  1987.
7  Q.  Did you after graduating high school obtain or attend
8     any post-secondary education at college, community
9     college, trade school, anything like that?
10  A.  Yes, I have. I went to Harold Washington College
11     right after.
12  Q.  Which college?
13  A.  I'm sorry, Harold Washington College. It's spelled
14     like the late mayor of Chicago, Harold Washington
15     College. And then I went to Marquette University for
16     a short time after I came here and UWM after moving.
17     Then --
18  Q.  UWM, that's University of Wisconsin Madison?
19  A.  I'm sorry, University Wisconsin Milwaukee. Then I
20     went to MATC. Off and on I went to MATC some years
21     throughout me living still here in Wisconsin,
22     Milwaukee, Wisconsin.
23  Q.  So did you -- you said you graduated high school in
24     1987. Did you start at Harold Washington College in
25     1987 in that fall?

1  A.  Right away, yes. And then I took a break in between
2     years and then went back and got a degree, an
3     associates in applied sciences at Harold Washington
4     College.
5  Q.  What year did you obtain your associate degree from
6     Harold Washington?
7  A.  I bought -- I paid for everything in 1981, but my
8     graduation was in 1992. And that's the same year I
9     moved here to Milwaukee, Wisconsin.
10  Q.  Okay. So were you attending Harold Washington
11     College on a full time basis in 1987 into '88 and
12     then took some time off or were you part-time? How
13     did you complete that program?
14  A.  It was full time, then part-time because I was in
15     between -- I was doing in-between jobs out in Chicago
16     of temp agency jobs and jobs that were like home
17     style like maid service or -- for somebody or mow
18     their lawn or shovel their snow, clean their house up
19     or something, or babysit for them. And then I did
20     some work for my parents to help reimburse the
21     tuition off and on. So, yeah, it was like part-time,
22     then full time, then I took a break, then part-time,
23     then full time.
24  Q.  And then when you came to Milwaukee you mentioned
25     that you started at Marquette. Did you start there

4 (Pages 10 - 13)

1    then right in 1992?
2 A.  Yes, I did.
3 Q.  And how long did you attend Marquette University?
4 A.  For a short time, until about 1994 I think or was it
5    '5.  It might have been 1995.  I'm sorry, 1995.
6 Q.  Did you obtain a degree from Marquette?
7 A.  No, I did not.
8 Q.  Were you seeking a degree?
9 A.  Yes, I was.
10 Q.  And what were you going to school for?  What kind of
11    degree were you hoping to obtain?
12 A.  Pre-engineering.  I was accepted into the
13    pre-engineering department.
14 Q.  Why did you leave Marquette?
15 A.  Because of -- I could not meet the academic
16    availability requirement, that's why.  So I dropped.
17 Q.  Was that based on your GPA?
18 A.  Yes, so the school dropped me.
19 Q.  What did the program require in terms of a GPA to
20    continue?
21 A.  You needed to keep -- maintain at least a 2.8, and
22    that's about it.
23 Q.  Do you know what your GPA was at the time?
24 A.  No, I really don't at this time.  But it was a little
25    over 2.0, 2.0.

1 Q.  And then when you left Marquette, you said in '95
2    roughly?
3 A.  Yes.
4 Q.  It's not a memory test so you don't have to be exact,
5    but --
6 A.  Well, sort of because I was on financial aid and
7    scholarships and stuff, and I put myself really
8    through Marquette.
9 Q.  And then when did you go to UW Milwaukee?
10 A.  I went right after -- right when I moved here.  So
11    basically it was '92 to '93 -- I'm sorry, 1993 I was
12    at UWM because I was doing work for my mother in
13    exchange of tuition payment.  And then in '93 to '95
14    basically, that's what it was, '93 to '95 was when I
15    was in Marquette.
16 Q.  That makes sense.  Okay.
17 A.  Yeah.
18 Q.  And were you seeking any kind of a degree from UW
19    Milwaukee?
20 A.  Yes, I was also accepted in the College of
21    Engineering.
22 Q.  And why did you transfer?
23 A.  I didn't transfer my credits.  They dropped me from
24    school again because my GPA was -- didn't meet the
25    requirement to stay in there.

1 Q.  So you got dropped from the programs at both UW
2    Milwaukee and at Marquette because of the GPA
3    requirements?
4 A.  Um-hum, yes.
5 Q.  Gotcha.  And then you said you've gone to MATC off
6    and on?
7 A.  Yes, I did.
8 Q.  When did you first start taking classes at MATC?
9 A.  It was in year 2000.  I was working at QuadGraphics
10    at the time, and then I thought well, maybe I'll take
11    some -- I'll take some college courses, one or two in
12    a printing press degree program but to just go as a
13    non-degree status student.  And that's it.
14 Q.  So from MATC you weren't seeking any kind of degree,
15    you were just furthering your education?
16 A.  Yeah, taking college courses.
17 Q.  And did you -- did I hear you correctly that you took
18    one or two classes from them or were there others?
19 A.  There were others.  After that I took a break from
20    MATC.  Then between that time I was applying for jobs
21    and working at jobs.  And then I went back to MATC.
22    And again, I -- partially some of the money I saved
23    from some of my previous jobs I just, you know, paid
24    for tuition.  And again my mother, I did some work
25    for my mother to reimburse her for tuition.  And that

1    was it.
2        And then I was in -- the last time I went
3    it was the year 2000 and -- let me think.  I think it
4    was 2011 I think, somewhere in there, 2011, beginning
5    of this decade.  But I only stayed for only two
6    semesters.  But it was in the surgical tech program.
7    I was accepted in surgical tech degree program.
8 Q.  And why did you not continue with that?
9 A.  Because I did not have enough money to go back.
10 Q.  And what other areas, in which other areas did you
11    take classes from MATC over time from 2000 to 2011?
12 A.  That's about it.
13 Q.  Okay.  Have you gone to any other college or had any
14    other kind of post high school education or training?
15 A.  No.
16 Q.  Where do you currently live?
17 A.  I live at 2470 North 44th Street, Milwaukee,
18    Wisconsin 53210.
19 Q.  How long have you lived there?
20 A.  I lived there for about -- since year 1992, since I
21    moved here.
22 Q.  Who lives at that address with you, if anyone?
23 A.  Just -- it's just my parents' estate, but it's --
24    it's like self okay because under the table I give
25    them money to live there.

Veritext Legal Solutions
www.veritext.com                                                888-391-3376

1 Q. To your parents?

2 A. Yeah, um-hum. But that's their building, you know.

3 It's a house complex, but it has two addresses. So

4 sometimes when I came here to live here in Milwaukee,

5 I also used their address for certain things which is

6 2468 North 44th Street. So it's really the same

7 place.

8 Q. Do your parents live in the other half of that

9 duplex?

10 A. Yes.

11 Q. And they currently live there still?

12 A. Yes.

13 Q. And does anybody live with you in your unit

14 currently?

15 A. No.

16 Q. How much do you pay your parents in rent?

17 A. Off and on when I have the money they help me out.

18 And it's an IOU, and they let me do that. But when I

19 do pay rent, it's anywhere between $100 to $200 every

20 other week, in between $100 to $200.

21 Q. Are you currently paying rent?

22 A. No. Now it's an IOU because I'm in between jobs.

23 I'm still looking for work.

24 Q. Do your parents still keep a record of the IOU?

25 A. No, they really don't.

1 Q. Do you?

2 A. No, I really don't.

3 Q. It's great to have supportive parents.

4 A. Yes, it is. I'm blessed.

5 Q. And your parents own that property?

6 A. Yes, they do. I don't know which one. I have a

7 stepfather and a mother, biological mother. I don't

8 know which one that really owns it. But as far as I

9 know from what they told me, and I ask questions,

10 it's a joint ownership so both of them.

11 Q. Are you married, Ms. Timms?

12 A. No, I'm not. I'm single.

13 Q. Have you ever been married?

14 A. No, I haven't.

15 Q. Do you have any children?

16 A. No, I don't.

17 Q. Is there anyone for whom you are responsible for

18 their financial upkeep, if you will?

19 A. No, not at this time.

20 Q. Have you ever served in the US military?

21 A. Yes, I have.

22 Q. And when was that?

23 A. When I was in between jobs, it was the year 2003 to

24 year 2005 I was in the -- here in Milwaukee, US Navy

25 Reserves.

1 Q. Were you honorably discharged from that service?

2 A. Yes, I was, due to academics they say. So that's

3 why. Because you got to take a test for them every

4 year, and for some reasons my scores was a little low

5 in the last quarter, however they go, every three

6 months or six months.

7 Q. Have you ever been diagnosed with any kind of

8 learning disability?

9 A. No, I haven't.

10 Q. Is that something that you've ever been evaluated for

11 to your knowledge?

12 A. I did for a little while. That's when I was in

13 Harold Washington College in Chicago. But I was sort

14 of okay. It was like all right of my academics while

15 some things I was lacking of reading or whatever.

16 But I always had a tutor. And other than that it

17 wasn't so, you know -- I didn't have a big problem.

18 Q. Okay. So do you know whether you've ever

19 participated in an evaluation with an educational or

20 medical professional to try to determine if you have

21 a diagnosable condition in terms of learning

22 disability or something?

23 A. Not a learning disability.

24 Q. Do you have other diagnosed mental health conditions?

25 A. I have been going to a doctor, and I will soon be

1 going to get analysis, starting to get analysis. I

2 haven't been getting analysis, but I've been going to

3 the doctor to talk about emotional distress and on

4 the job, and that was the past two years. But that's

5 only after I'd been working at Amazon. But I'm on

6 sort of medication for emotional distress, they put

7 me on, my doctor put me on.

8 Q. What medication is that?

9 A. Zoloft.

10 Q. Do you know what your dose is?

11 A. I don't know right off the bat.

12 Q. Is that your doctor at Pro Care?

13 A. Yeah. That's one of my doctors at Pro Care.

14 Q. Okay.

15 A. I have another one.

16 Q. Is Pro Care the only clinic with which you have

17 treated for your claimed emotional distress as a

18 result of the case?

19 A. Yes, because I don't have money for regular health

20 care, so I have to depend on Food Share service

21 health care which is Medicaid. And Medicaid provides

22 for -- and plus one of my doctors I have to see for

23 -- my blood pressure been going up, and it's been

24 going up off -- even before I went to -- worked at

25 Amazon.

6 (Pages 18 - 21)

Veritext Legal Solutions
www.veritext.com                                                                 888-391-3376
Case 2:16-cv-01056-WED   Filed 06/13/17   Page 6 of 63   Document 28

1     But I monitor my blood pressure. And
2  that's when I started applying for jobs again, after
3  my doctor told me two years ago yeah, you can go out
4  and work because my blood pressure used to be so
5  high. And I don't understand, it's still going up,
6  off and on goes up and down. And then after last
7  year, sometime last year, it just kept going up after
8  they fired me.
9  Q.  Have you ever been on a medical disability as a
10    result of your blood pressure condition?
11 A.  No, I haven't. But I have applied for a disability.
12    And I did go to a court hearing, and the court, the
13    judge told me that I didn't have a disability. He
14    felt that I'm able to work.
15 Q.  Was that Social Security Disability that you applied
16    for?
17 A.  Yes.
18 Q.  Was that after you were separated from Amazon or
19    before that you applied for the disability benefits?
20 A.  It was -- no, it was both. It was after -- it was
21    afterwards but also it was before. It was really
22    before, I'm sorry, it was before.
23    But I applied for disability sometime the end of last
24    year. But as far as the court date went, that was
25    before I was hired at Amazon.

1 Q.  Okay.
2 A.  So that was before.
3 Q.  So did you submit a second application for Social
4    Security benefits after your termination from Amazon
5    and your blood pressure increased again?
6 A.  Yeah, yeah. But with Social Security Administration,
7    they denied my application.
8 Q.  Okay.
9 A.  They felt I didn't have any disability problems.
10 Q.  Okay.
11 A.  So now I'm just going to Pro Care, and I'm just --
12    I'm seeing two doctors, my Doctor Vicki which she's
13    really a practitioner but she acts as a doctor, and
14    another doctor which is Ms. Maisee. Her name is
15    Maisee. She is a doctor. That's the one who gave me
16    the prescriptions for the blood pressure pills and
17    some of my deficiencies and the Zoloft, the mental
18    health pill.
19 Q.  Has any doctor or medical care provider ever told you
20    that your blood pressure condition has been
21    exacerbated or made worse because of what happened at
22    Amazon?
23 A.  One of my doctors, Vicki, she mentioned that well,
24    you know, try not -- because I talked to her about
25    this, and she assigned me to Maisee so I could get a

1  psychologist. But I haven't been going to that
2  psychologist. I've been going to Maisee. And
3  Maisee just now telling me well, now since you still
4  not working, go in, she recommend I still go to a
5  hospital and get a psychologist to do analysis.
6  But -- also this case, for the situation, I think
7  that's another reason why I was fired from Amazon,
8  because of emotional distress.
9  Q.  You think that Amazon was aware of your emotional
10    distress and fired you for that reason?
11 A.  No, they weren't.
12 Q.  I'm sorry?
13 A.  Because I used to -- I've been telling Maisee, my
14    doctor, that when I go -- for this past two years and
15    Vicki that when I go to work, they always have me
16    evaluated. And I always ask my -- my supervisor
17    which was Mr. Griffin, why am I keep getting
18    evaluated every week because that just doesn't seem
19    right. And I told him and explained to him about my
20    work history and that on some jobs I used to work at,
21    they only gave me three months evaluation, every
22    three months.
23 Q.  And what did Mr. Griffin tell you when you asked him
24    why you were being evaluated every week?
25 A.  He told me that because he gets two departments that

1  always complain to him about my job performance, my
2  job performance which was stowing and making sure
3  things were in there right and then the count, the
4  number of things they needed to count in each bin of
5  a stower which is -- it's a bin, it's a thing, a cart
6  like and you stow things which means you put things
7  in a cart, in the bin.
8  Q.  So we'll talk about that more in a minute. I'm going
9    to have you describe it again for me so I make sure I
10    really get it. But with regard to the complaints Mr.
11    Griffin told you he was getting about other
12    departments about your -- from other departments
13    about your performance, do you know whether that's
14    true, that Mr. Griffin was in fact receiving
15    complaints from others about your performance?
16 A.  No. But the reason why the emotional stress kept
17    coming and I was telling my two doctors, especially
18    Ms. Maisee, was because every time he come, he would
19    warn me, okay, you might get fired next time or they
20    may tell me I have to fire you, and I don't want to
21    do that. And I would get just stressed out and --
22    Well, Maisee says it's anxiety. That's
23    why she diagnosed me with those medical pills. But I
24    told -- I told her that that's what it is. I get
25    fearful whenever he comes to -- came to my station of

7 (Pages 22 - 25)

Case 2:16-cv-01056-WED    Filed 06/13/17    Page 7 of 63    Document 28
Veritext Legal Solutions
www.veritext.com                                                          888-391-3376

1     work.
2 Q.  Did you think Mr. Griffin was being honest and
3     genuine with you when he said he didn't want to have
4     to fire you?
5 A.  I sort of believed him, but then again, I didn't
6     after the day that he fired me because the day that
7     he fired me, he told me that, you know, well, I -- I
8     was trying to explain to him that -- because every
9     week, this is the thing, every week Mr. Griffin came
10     to me of evaluations. I asked him okay, Mr. Griffin,
11     I don't want to get fired. I even told him, I fear
12     to get fired. My life is on the line for this
13     because I'm depending on this job, and I love this
14     job a lot.
15         He said well -- he gave me suggestions of
16     what to do to improve my performance. I said okay.
17     Can I write them down? And he said yeah. He would
18     pause for a minute and allow me to go to my locker,
19     because we had lockers, to get me a pen and a paper
20     to write down, and I would write down things that I
21     want to go up to my station to tell -- for him to
22     tell me what it is I should do to improve my job
23     performance.
24         So I've done that. And that lasted three
25     weeks I believe personally, three weeks. And the

1     third week, that's when in that third week which was
2     March 16th, that's when he came up to me and told me,
3     you know, I have to let you go. I have to fire you.
4         And when we went to the office, I was
5     explaining to him of why, I don't understand, and why
6     I believe he should keep me as a stower and he should
7     keep me here because I'm a hard worker and explained
8     to him I'm punctual, I'm on time, I'm a good worker,
9     I get a long with a lot of people. He just didn't --
10     he stopped me in 10 minutes and just like well, you
11     know what, we're going to keep going on and on and on
12     in this.
13         And this was just me, him and another -- I
14     think she was a supervisor head, supervisor over him
15     that was in one office at Amazon, their Kenosha
16     County headquarters. And I was like well, I was
17     surprised because he never acted like that on the
18     floor. He always heard me out, and I always
19     explained to him why every time he came to me with
20     evaluation, why I'm a hard worker, why he should keep
21     me working here at Amazon. And the weeks that we
22     were on the floor and I talked to him, we talked, me
23     and Mr. Griffin talked almost 40 minutes.
24 Q.  40 minutes?
25 A.  Almost for 40 minutes.

1 Q.  Before -- on the day that you were terminated or on
2     other days?
3 A.  No, the days -- evaluation days, yup.
4 Q.  So Mr. Griffin would spend almost 40 minutes talking
5     to you about --
6 A.  Yeah. And he be like --
7 Q.  Hold on. I need to finish my question and then you
8     can answer.
9 A.  I'm sorry.
10 Q.  So Mr. Griffin when he would address you about your
11     performance on the floor and talk to you about how
12     you could do better and try to improve, he would
13     spend almost 40 minutes talking to you?
14 A.  Yes. And then he would tell me now, you know, keep
15     on doing what you're doing. And I would work and
16     listen to him.
17 Q.  In the days --
18 A.  And I would be telling him yeah, I'm listening, Mr.
19     Griffin.
20 Q.  On the date that he allowed you time and spent time
21     with you explaining and let you go get your pen and
22     paper so you could come back and write down his
23     helpful tips.
24 A.  Yes.
25 Q.  You mentioned that was three weeks, and I think you

1     said it was three weeks before March 16th, but did
2     you mean that was three weeks before your May 16
3     termination?
4 A.  No, I mean three weeks where March 16th was the third
5     week within that third -- the three weeks which was
6     February -- yeah, around that time of me -- the
7     transition, right.
8 Q.  Okay.
9 A.  He was coming while I was still Integrity, working
10     for Integrity.
11 Q.  Before you were hired on as a permanent?
12 A.  Even before I was hired permanent, yeah.
13 Q.  All right.
14 A.  Because I think the reason why is because Amazon
15     would give all their workers before we go to our
16     stations a warm-up meeting. And that would be the
17     first thing you do of the day, of a day of work. And
18     then he came and he was like um, I'm the new -- I'm
19     your new supervisor, your new boss. Because I had a
20     boss before him. So my boss left, my first boss
21     left, and I had no problems with him. And I forgot
22     his name.
23 Q.  You don't remember his name?
24 A.  I don't remember his name but he's gone.
25 Q.  When did Mr. Griffin become your supervisor?

Veritext Legal Solutions
Case 2:16-cv-01056-WED   Filed 06/15/17   Page 8 of 63   Document 28
www.veritext.com                                                    888-391-3376

1 A. I don't remember, but I saw him say I'm accepting the
2 job the last week of February. That's how I knew. I
3 didn't find out until the last week because when he
4 stated hello, kept introducing himself and stuff on
5 the -- it's like the meeting of the first day of
6 work.
7 Q. So it was shortly after Mr. Griffin became your
8 supervisor that you had that meeting with him where
9 he gave you some helpful tips and you wrote notes?
10 A. Right.
11 Q. Do you still have those notes by the way?
12 A. No, I don't.
13 Q. Okay.
14 A. I sure don't.
15 Q. On how many occasions did Mr. Griffin talk with you
16 about your performance? And you mentioned he spent a
17 good deal, 30 to 40 minutes of time talking with you
18 about how you could do better.
19 A. Could you repeat the question?
20 Q. Yeah. You mentioned there were occasions where
21 Mr. Griffin helped coach you on your performance,
22 gave you tips on how you could do better, spending up
23 to 40 minutes of time with you. On how many
24 occasions did Mr. Griffin do that, give you helpful
25 tips to try to help you improve your performance and

1 spend 30 to 40 minutes with you coaching you?
2 A. It was just those three weeks.
3 Q. During that three weeks?
4 A. Um-hum.
5 Q. And how many -- was that a yes?
6 A. Yes.
7 Q. And on how many occasions during that three weeks did
8 he spend that amount of time with you?
9 A. Just those days of evaluation when he came to my
10 station.
11 Q. Do you know how many times that was that you received
12 those evaluations?
13 A. I remember only maybe that time, the last week of
14 February and then March 16th week. And then there is
15 two, there was two weeks before March 16th week last
16 year of that month, right, of that year. Those are
17 the only times.
18 Q. So was it one time during the last week of February
19 or more than one time?
20 A. Just one time of February.
21 Q. And during the March 16th week how many times did Mr.
22 Griffin come and spend up to 40 minutes with you
23 describing how you could perform better?
24 A. Just one time. Oh, no -- yeah, yeah, that was on a
25 Monday I believe, a Monday. Because the 16th was

1 like a Thursday or a Wednesday or something. But
2 yeah, that was like the day -- that was the day
3 before the last evaluation he gave me of that week of
4 March 16th.
5 Q. Have you ever -- let me just close the loop. I was
6 asking you about your military service. For the time
7 that you were enlisted in the US Navy Reserves, what
8 did you do with them?
9 A. Have fun. No --
10 Q. What was that?
11 A. Have fun. F U N. But they gave us -- it was
12 something that I didn't know about. I went and
13 enlisted because I was looking for -- I was in
14 between jobs. I wanted to look for some income while
15 I'm still looking for a job. Because I went to a
16 recruiter. And at the Milwaukee headquarters, I
17 don't remember the address, but it's somewhere down
18 here downtown or so. But anyway, it's -- I forget, I
19 used to memorize the address.
20 But anyway, only thing is that we did --
21 every six months they did a three months evaluation,
22 like a regular job, of your performance of you being
23 a Navy reserve sailor. And that's what I started
24 with, being a sailor, just working out, doing track,
25 running test and swimming test. And then that was

1 every six months. But every three months it was for
2 the fact that it was two days of -- sometimes three
3 days a month there was drills. And during the drills
4 you had to, as a reserve, Navy reserve, you had to
5 prove that you liked to be in the military, being in
6 the Navy. And they give you chores or duties to do.
7 Mine was to be in chow and to serve, which
8 was fun, to serve chow which is like lunch or dinner
9 or breakfast. But in our case it was lunch. And I
10 also -- they gave me that duty plus the duty to clean
11 up classrooms because in drills we had to be in
12 classrooms. So I, you know, I had the duty to clean,
13 help clean up the classroom, mop floors, sweep the
14 floor, clean desks and whatever.
15 Q. Do you know what kind of test it was that you didn't
16 pass? Was it like a pen and paper test or was it
17 a -- like a physical fitness test?
18 A. Yes, I do know. A captain and two pay officers told
19 me it was a test that I took they wanted to give me
20 again that I took at boot camp. Because at boot camp
21 they told me I had a low score, but it shouldn't
22 be -- the pay officers at my boot camp told me it was
23 a low score, but it shouldn't affect me of
24 graduating, and I did graduate from boot camp. But I
25 didn't get any other certificates which I thought I

9 (Pages 30 - 33)

Veritext Legal Solutions
www.veritext.com                                                888-391-3376
Case 2:16-cv-01056-WED   Filed 06/15/17   Page 9 of 63   Document 28

1      was supposed to get.  I think that's why.  And they
2      told me that's what it was.  It was an academics
3      test, reading, writing, arithmetic, common sense in
4      the Navy questions-and-answer test.
5  Q.  Did you see -- I assume that you did not experience
6      any combat while you were in the reserves?
7  A.  No, they didn't send me to war.
8  Q.  Have you ever been involved in a lawsuit before this?
9  A.  No, I haven't.
10  Q.  Have you ever sued anybody else or filed a complaint
11      with the Department of Workforce Development alleging
12      discrimination or harassment in the past?
13  A.  I did try to sue QuadGraphics because I worked for
14      QuadGraphics for five years from 1997 to year 2001.
15      They let me go July of 2001.  But I didn't follow
16      through it because I didn't have enough money to
17      continue suing QuadGraphics.  And it hurt me to sue
18      them because I liked that job, too.  And it really
19      hurts me to sue Amazon because I loved that job.
20  Q.  Did you file -- did you actually file a lawsuit
21      against QuadGraphics?
22  A.  I did, but I didn't follow through because, again,
23      like I said, I didn't have enough money to follow
24      through to continue doing all that I need to do.
25  Q.  Did you have a lawyer for that case?

1  A.  I didn't have a lawyer.
2  Q.  Was that also in the Eastern District of Wisconsin?
3  A.  Yes.  And again, like QuadGraphics and this case, I
4      wanted to get a lawyer, but all the lawyers kept
5      telling me they couldn't take my case because they
6      couldn't get evidence for every job that I took,
7      pictures, get investigators, hid investigators in
8      there or someone to try to get a job there to be an
9      investigator.
10  Q.  So with regard to your prior suit against
11      QuadGraphics, what was the allegation?  Were you
12      alleging race discrimination in that case, too?
13  A.  Yes, race discrimination but not age discrimination.
14  Q.  Were you terminated from your employment with
15      QuadGraphics?
16  A.  Yes, I was.
17  Q.  Why did the company say you were terminated?
18  A.  They didn't give me a good -- they didn't give me any
19      reason.  They just said we have to let you go.  We're
20      downsizing right now.  But I asked well, why am I
21      getting fired?  And they stated well -- one of the
22      supervisors there stated, I can't think of his name,
23      Bob, Bob was his name, he said it's just that we
24      don't need you anymore.  That's what he stated.  And
25      I didn't understand that.

1  Q.  Why did you believe it to be your race?
2  A.  I believe because QuadGraphics have, just like
3      Amazon, have a lot of Caucasian women and Caucasian
4      men working there.  It's very few -- Amazon does have
5      more Blacks working for them than QuadGraphics.  We
6      had -- it was only a handful you could count.  It was
7      -- at that time it was about only like 200, 200
8      Blacks.
9  Q.  Is there any other reason you thought you were let go
10      from QuadGraphics because of your race other than the
11      demographics of the workforce there?
12  A.  No.  It's just that that's the only thing I could
13      think of because I was a hard worker there.  I was
14      always on time, never missed a day of work, never
15      called in sick.
16  Q.  Did you get in that case as far as giving a
17      deposition like you're doing here today?
18  A.  No, I didn't, because I couldn't get a lawyer, and I
19      didn't have enough money to continue it further, the
20      case.  So I -- it closed.
21  Q.  Have you ever been a part of any other lawsuit?
22  A.  No, I haven't.
23  Q.  Have you ever been arrested?
24  A.  No, I haven't.
25  Q.  So you've never been convicted of a crime?

1  A.  No, I haven't.
2  Q.  Have you ever testified in court for any other reason
3      like as a witness to somebody else's case?
4  A.  Well, Wells Fargo sent me a postcard last year, well,
5      which was a few months ago, December, but it was
6      where the customers would fill out a coupon, I mean
7      like a -- it was like a little --
8  Q.  Oh, I --
9  A.  You got one?
10  Q.  I'm guessing you were part of the class action.  And
11      if you wanted to sign it, you could collect some
12      small amount of money potentially?
13  A.  Um-hum, yeah, that's the only thing.  That's the
14      only -- other than that, I haven't had -- been a
15      witness for anybody.
16  Q.  So I want to talk to you a little bit about what you
17      did work wise before coming in to work at Amazon.
18      And I want to kind of just go back and get a picture
19      of your full employment history even coming out of
20      high school.  So what was the first job you had
21      coming out of high school?
22  A.  It was like a communications telephone call-in 1-800
23      number service.  That was the first job I've ever had
24      with AJT.
25  Q.  What was that, AJT?

10 (Pages 34 - 37)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 10 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                     888-391-3376

1  A.  AJT.
2  Q.  Was that the name of the company?
3  A.  No, the name of the company is Call Connections.
4      It's no longer around.  And it was located in
5      Chicago, Illinois.
6  Q.  And for how long did you work in that kind of
7      customer service telephone answering role?
8  A.  It was for about -- about a year from 1990 -- sorry,
9      it was 1987 to 1988.  Somewhere around -- they hired
10     me in September '87, and then it shut down.  That's
11     why I no longer worked there in '88, 1988.
12 Q.  And what did you do next in terms of employment?
13 A.  Then I did -- I went to apply for temp jobs, and I
14     worked as maid service, did maid service work, did
15     housekeeping work and did office clerk work.
16 Q.  Was that all through the same temp service?
17 A.  It was a variation.  No, two -- no, two or three temp
18     agencies.  I don't remember their names right now.
19 Q.  Was that in Milwaukee here?
20 A.  That was in Chicago, Illinois.
21 Q.  Were you ever fired from any of those temp jobs?
22 A.  No, never was fired from any temp job, no.
23 Q.  What did you do next in terms of your employment?
24 A.  Then when -- after I moved here with my relatives to
25     Milwaukee, Wisconsin, I did some more temp jobs which

1      was working in factories, doing factory work of
2      packing boxes, lifting boxes, assembly line work.
3  Q.  Do you recall which temp agencies you worked through?
4  A.  One was Crown, one was -- and there were two others I
5      don't recall right now and banquet service.  I was a
6      banquet server for Hatch Staffing.
7  Q.  For who?
8  A.  Hatch Staffing Service.
9  Q.  There is a fan behind me.  So if I don't hear you
10     sometimes -- Hatch Staffing.  Okay.  Were you ever
11     terminated or asked not to return to any of those
12     temporary assignments?
13 A.  No, I wasn't.
14 Q.  How long did you perform those various temporary
15     roles that you've identified?
16 A.  Sometimes they say -- they need me for a week,
17     sometimes they need -- they would need me for a day,
18     you know, and that was it.  And then they would say
19     they would call me.
20 Q.  For what period of time were you performing temporary
21     work of that nature, from what year to what year
22     would you say?
23 A.  It was off and on the years from 19 -- when I came
24     here in 1993 though, a year after I moved here, 1993
25     to year 2007.

1  Q.  And what did you do next in terms of your employment?
2  A.  Well, in between those years, 1997 to year 2001 I
3      worked for QuadGraphics full time.  I was a finisher
4      factory worker, magazine feeder, machine feeder.  And
5      then I joined the military.  And while I was in the
6      military, I applied for a job at one of the Pick 'n
7      Save grocery stores here in Milwaukee.
8  Q.  Did you get that job?
9  A.  Yes.  It was part-time so I was able to -- that's why
10     I was able to be in the military reserves because I
11     had time to work part-time with them.
12 Q.  And what did you do for Pick 'n Save?
13 A.  I just did bakery clerk work and utility service
14     work.
15 Q.  What is utility service work?
16 A.  That's to clean the washrooms and to mop the grocery
17     store floors and sweep the grocery store floors and
18     clean the grocery store shelves.
19 Q.  What years did you work for Pick 'n Save?
20 A.  I worked for Pick 'n Save from the year 2005 to year
21     2006.
22 Q.  And why did your employment with Pick 'n Save end?
23 A.  I'm sorry, 2004 was the first year of Pick 'n Save to
24     2006.  They said the job ended.  They didn't need --
25     they were downsizing.  Again, they didn't give me a

1      reason why.  They just didn't need me anymore.
2  Q.  What did you do next after leaving Pick 'n Save?
3  A.  Then I was just honorably discharged from the
4      military.  Then I was just applying for jobs.  And I
5      went back to MATC and did work for my mother in
6      exchange of tuition reimbursement for going back to
7      MATC.
8  Q.  What kind of work did you do for your mom?
9  A.  I just did household chores, work, mopping her
10     kitchen floors and cleaning her living room, dining
11     room and her bathrooms and washing her dishes.
12 Q.  When was the next employment that you had then?
13 A.  Then I worked -- I didn't work at all, I kept
14     applying for jobs.  And then the last one was Amazon,
15     worked for Amazon.  That was the very last job.  And
16     that started from year -- I'm sorry, year 2015 to
17     year 2016.
18 Q.  So between your separation from Pick 'n Save in 2006
19     sometime until you started with Integrity, placed at
20     Amazon in October of 2015, you didn't have any
21     outside employment other than what you might have
22     done for your mother?
23 A.  Right.
24 Q.  Is that right?
25 A.  Yes.

11 (Pages 38 - 41)

Veritext Legal Solutions
Case 2:16-cv-01056-WED   Filed 06/15/17   Page 11 of 63   Document 28
www.veritext.com                                                        888-391-3376

1  Q.  Did you have any other source of income?  Were you on
2  public assistance or anything of that nature?
3  A.  Yes, I was on -- I've been on Food Share since
4  year -- off and on, whenever I wasn't working from
5  year 2001 to now.  So whenever I'm not working,
6  wasn't working, in between those gaps, I was provided
7  Food Share food stamps and their health care, Food
8  Share's Medicaid.
9  Q.  And that's Medicaid?
10  A.  Yes.
11  Q.  Since leaving Amazon, I understand, at least at the
12  time you did your discovery answers, that you have
13  not been able to find alternative employment; is that
14  right?
15  A.  Yes.  I've been still looking.
16  Q.  Okay.  Have you been offered any jobs that you turned
17  down?
18  A.  I haven't turned any down.  I'm still waiting.  I've
19  been going to job interviews, but they haven't
20  contacted me yet.
21  Q.  You produced to me through Matt, as you know, Matt
22  and I work together, a lot of pages of documents
23  reflecting jobs that you have applied for, records
24  showing your communications with other employers.
25  Probably one of the more complete records I've

1  obtained regarding a job search in a litigation like
2  this.
3  A.  Okay.
4  Q.  So I didn't want to take the time today to review all
5  of those with you.
6  A.  It's a lot.  I applied for a lot of jobs.
7  Q.  So my question to you is with regard to all of those
8  applications, what criteria are you applying to
9  decide whether or not it's a job that you'll go ahead
10  and apply for?
11  A.  Well, I am looking for work that is in relation to my
12  future goals because I do want to own something of my
13  business, self-employment one day.  It will be in
14  Food Share or it will be food service -- I'm sorry,
15  food franchising or it will be in terms of involving
16  something that I've always wanted to own or do based
17  on my business plans.  Because on my free time, I
18  forgot to tell you, I get -- I'm also in ResCare
19  Program.
20  Q.  What's that?
21  A.  It's a program that's linked to Food Share, but it
22  helps people who are unemployed try to get them back
23  on their feet in terms of help give them some advice
24  of resume doing and resume format and some advice of
25  tips of job seeking as well as being on interview,

1  job interview.  And they also give credit if you go
2  and apply for work, you get free transportation.
3  That's where my transportation come from, ResCare.
4  That's like an income, but I don't see it because
5  they give you just an M card.  But also the fact that
6  I've been writing on my free time business plans, so
7  that's like credit that's given to me from them to
8  give me like an M card or -- and you have to see them
9  in order to also keep your food stamps, Food Share.
10  Q.  So all of the job search records, for example, that
11  you were able to provide in conjunction with this
12  case, is that something that you also submit then to
13  this ResCare Program to support for them that you're
14  searching for work so that they can give you those
15  benefits like the car share, et cetera?
16  A.  Yes.  But also it's for my benefit personally to
17  know, okay, there may be two or three categories I
18  may want to do the rest of my life in terms of my
19  business plans, like own my own factory or own my own
20  McDonald's or that type.  So those are the jobs I
21  apply for based on that.
22  Q.  And is that your goal, to own your own McDonald's or
23  own your own did you say factory?
24  A.  Factory, yeah.
25  Q.  What kind of factory are you thinking of?

1  A.  I was thinking like a pie/cake factory because I know
2  how to cook.  Like I told you, I was in -- and showed
3  you that I applied for Pick 'n Save.  I was a bakery
4  clerk.  They had me do a lot of baking and a lot of
5  cooking in the store.  So it would be that.
6  Q.  I did see that you applied for some management jobs
7  at McDonald's.  Have you also applied for like a cook
8  position or a cashier position or anything like that?
9  A.  Yes, I have.  And I also was a cashier for Pick 'n
10  Save as well as a clerk.
11  Q.  And let me ask --
12  A.  That's different.
13  Q.  Let me ask a more specific question.  I want to talk
14  about after you were terminated by Amazon.
15  A.  Okay.
16  Q.  I saw in your records that you gave me that after
17  your separation from Amazon, you applied for several
18  management level jobs at a McDonald's, for example?
19  A.  Okay.  Yeah.
20  Q.  Did you also apply at any McDonald's franchise or
21  corporate-owned store for a cashier position or a
22  cook position or anything like that?
23  A.  No, I haven't, because those -- oh, yeah, I know what
24  you mean.  Because it's only what they have provide
25  for you to apply for online.  They don't have cooks

12 (Pages 42 - 45)

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 12 of 63   Document 28
Veritext Legal Solutions
www.veritext.com
888-391-3376

1    or the cashier position available.
2 Q.  Have you looked at other fast food restaurants to see
3    if they have any kind of entry level job?
4 A.  Yeah, I did.  But I really was thinking management
5    because -- the reason why I only apply now for
6    management jobs is based on my age basically.
7    Secondly, my credentials, you know, I believe that
8    they would accept me because I'm more advanced than
9    the younger person that would apply for that job.
10 Q.  Have you ever worked in a fast food restaurant
11    before?
12 A.  No, I have not.
13 Q.  Are you applying for nonmanagement level positions in
14    other industries?
15 A.  Well, actually, a CNC operator, that's an entry level
16    position in a factory.  I've been applying for that,
17    too, because I'm sort of familiar with -- I worked at
18    QuadGraphics, and I knew two people that were CNC
19    operators over there.  I don't know if they're still
20    working there.  But I observed when I was on my break
21    or one break or whenever I was working as a feeder, I
22    saw how they did -- operated the machines.
23 Q.  Did you ever work on one of those machines?
24 A.  They wouldn't allow it, no.  I tried to, but they
25    wouldn't allow it, no.

1 Q.  You have to be a trained CNC operator, right?
2 A.  Yes, yes, licensed.
3 Q.  And you don't have that?
4 A.  And I don't have that.
5 Q.  Do you have the license?
6 A.  Not yet.  You have to be certified, not really so
7    much licensed, but you could be certified, and I
8    don't have that yet.
9 Q.  Okay.  So you've been, since leaving Amazon, applying
10    for management level positions with fast food?
11 A.  Yes.
12 Q.  And you've been applying for CNC operator positions.
13    Are there any other types of positions that you've
14    said these are kinds of positions I am seeking or
15    that you have in fact submitted applications for
16    since leaving Amazon?
17 A.  The basic ones that I have some background experience
18    in like assembly work, that might pop up online that
19    would be available for work, open for --
20 Q.  And you would apply for it?
21 A.  Yeah.
22 Q.  How have you been going about identifying jobs?  Are
23    you looking on any kind of job boards or message
24    boards to figure out or in the paper or where are you
25    determining, what are you doing to look for work I

1    guess is the better question?
2 A.  Yeah, I go to the YWCA all the time and sometimes to
3    the main library, I go online, and I go on Job Center
4    Wisconsin or I go on Monsters or I go on any other
5    job seeking website to apply for jobs.  It's
6    basically only online.  Or I will go walk in foot to
7    foot, whenever I go into a fast food place and ask
8    them, you know, how do I apply for a job.  Can I
9    apply for a job as a manager trainee or a manager
10    assistant.  They would tell me which websites to go.
11    So it would be basically company restaurant websites,
12    fast food websites I'd go and apply online for those
13    jobs.
14 Q.  Anything else that you're doing to look for work?
15 A.  Basically that's it.
16 Q.  Did you mention to me earlier that you have been on
17    some recent interviews?
18 A.  Yes, I have.  I've been on two job interviews, and
19    they would just tell me well, we'll call you if we
20    have something available.
21 Q.  How long ago was that?
22 A.  That was about -- it was last year, but it was like
23    in the summer time.  It was only two interviews I got
24    a call back.
25 Q.  Okay.

1 A.  One of them was -- one of them involved a temp
2    agency.  It was to work at -- I thought it was
3    automatic, she was automatically for Harley-Davidson.
4    But she wasn't, she was through a temp agency.  And
5    then there was another one where it was a telephone
6    interview with Hatch Staffing again.  I called Hatch
7    Staffing again.
8 Q.  Do you have a current copy of your resume?
9 A.  Not on me.
10 Q.  But you have one at home?
11 A.  Yes, I do.
12 Q.  That you could produce to us?
13 A.  Yes.
14 Q.  I'm going to ask that you do that, and we can talk
15    off the record about how to make that happen.
16 A.  Okay.
17    MS. FITZKE:  Why don't we go ahead and
18    take a short break so we can give the court reporter
19    a little break here, and we'll come back in a few
20    minutes.
21    (Recess taken.)
22 BY MS. FITZKE:
23 Q.  Before we get -- kind of dive back into the
24    substance, I just want to confirm a couple things for
25    the record.  One, in part you've alleged age

13 (Pages 46 - 49)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 13 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1 discrimination, and I have some documents confirming
2 your age but I just want to get it on the record
3 here. It's my understanding that you were born in
4 March of 1969; is that right?
5 A. March 2nd, 1969, yes.
6 Q. And that you were then 46 years old when you started
7 working for Amazon and 47 when your employment with
8 them was terminated; is that right?
9 A. Yes.
10 Q. And I think it's probably pled in your complaint but
11 just for purposes of the record, you're a Black
12 woman, right?
13 A. Yes, I am African American.
14 Q. And -- okay. Tell me how it was that you came to
15 work for Amazon initially through Integrity Staffing,
16 like how did you learn that there was a job
17 available? How did you go about applying and things
18 like that?
19 A. Well, one day I was watching TV and on the
20 commercial, there was a commercial that said
21 Integrity Staffing is hiring, no experience required.
22 It's in the Kenosha location for stowers and other
23 types of job entries, to apply. And they stated it
24 would be located -- recruiters in Milwaukee and other
25 parts of Wisconsin. So that's basically how I found

1 out about them.
2 Q. And then did you go to like a job fair to apply, or
3 did you apply online? How did you do that?
4 A. It was like, sort of like a job fair, but they had a
5 set-up in Milwaukee, Wisconsin which I knew I could
6 go to. Because if they didn't advertise Milwaukee, I
7 wouldn't have been able to go. I didn't have access
8 to transportation in Kenosha at the time.
9 So they were located in O'Hare. They said
10 it was going to be located -- not O'Hare but Mitchell
11 airport, Mitchell airport area. So I went out there
12 by bus, and they were in the hotel. But it was a
13 hotel ballroom. So it was like -- I guess you could
14 say it was a banquet, like a job fair. It was more
15 than 10 people that always came.
16 Q. And did you complete an application there onsite?
17 A. Um-hum, yes.
18 Q. And then did you have an interview there onsite?
19 A. Yes.
20 Q. And were you offered a job that day there onsite at
21 the job fair?
22 A. No, they told me to come back because they had to get
23 the results of my drug test. They gave me a drug
24 test onsite.
25 Q. Did you also have to do like a criminal background

1 check?
2 A. Yes, they did that right on the -- right after I
3 applied, filled out the application.
4 Q. And did you understand, was it communicated to you
5 that you would have a job conditional on the drug
6 screen and the background check coming back okay?
7 A. Yes. They -- they told me come back a certain day of
8 the following week because first day I applied was
9 like on Friday, so yeah. That second week of the day
10 I had to report back to them when they was out there
11 by Mitchell airport in the hotel again, they said
12 yeah, I was okay, my drug screen was excellent.
13 Q. And I had a question I wanted to ask and it just
14 escaped me. Give me a moment. When you were
15 applying, you understood that your employer at that
16 time would be Integrity Staffing and that Integrity
17 planned to place you at the Amazon facility so long
18 as your screens came back okay?
19 A. Yeah. They explained the process, the job process of
20 hire through Integrity Staffing, and that there is no
21 guarantee I'll be hired with Amazon, but they gave me
22 some like, I don't know, how do I say it. One
23 recruiter gave me like an example of how they would
24 go about doing it to get me hired. Because I asked
25 them how can I get hired through Amazon, through you

1 all since, you know, I can only apply for this job
2 working at Amazon only through you. And then he told
3 me well, you know, there is a method, there is a
4 process, there is a certain time limit. Then if they
5 like you, then they will go through an orientation
6 with you and they will talk to you about it. But you
7 have to be currently working in the Amazon plant, one
8 of their plants.
9 Q. What did you understand the process was going to be
10 to be hired on by Amazon once you started working
11 there through Integrity?
12 A. Yeah, I understood, you know, the recruiter told me,
13 you know, just be on time all the time, do your job
14 right, try to do a good job doing whatever you have
15 to do and never call in sick, you know, always be on
16 time. And that's all he told me. Because I guess
17 it's all he could -- really knew because he was just
18 a recruiter, interviewer.
19 Q. And did you have any understanding, were you given
20 any understanding of how long the period of time was
21 that you would have to work through Integrity before
22 Amazon would consider you as a full time employee?
23 A. Yeah, he explained it to me. He said that it might
24 be six months, it might be three months before
25 they -- and it's up to them to decide if they want to

14 (Pages 50 - 53)

Case 2:16-cv-01056-WED Filed 06/15/17 Page 14 of 63 Document 28
Veritext Legal Solutions
www.veritext.com 888-391-3376

1    tell you that the job is okay temporary or it's going
2    to turn permanent. That's what he told me. It could
3    be temporary or turn permanent.
4  Q. And was that recruiter, do you know if he worked for
5    Integrity Staffing or --
6  A. I asked him. I asked him do you work for Integrity
7    Staffing? He said yeah, but the Amazon -- I'm like
8    well, how is it that if I'm applying for an Amazon
9    job, I have to go work for a temp job again? He said
10    because Amazon is working with them, with Integrity.
11    Integrity Staffing works with Amazon. That's how
12    they get their permanent employees. You can only be
13    an Integrity Solution or another temp agency, they
14    hire for us recruiters to get to work on their
15    jobs -- on their job site rather, in order for them
16    to say okay, that person can be an Amazon employee.
17    So he explained it to me. So I really was a temp
18    before I became an Amazon employee. And he said it
19    could be three months or six months.
20  Q. Okay.
21  A. The job was temporary. But it may go permanent.
22    That's what he told me.
23  Q. Okay. And it's my understanding that you started
24    working at the Amazon facility as an Integrity
25    associate on October 26th of 2015, does that meet

1    with your recall?
2  A. Yes.
3  Q. And when you came to Amazon, what was the position
4    that you first started in? What was the job you were
5    doing?
6  A. I was first, they first had me --
7  Q. You mentioned being an associate. Is that the first
8    thing that you did?
9  A. Yeah, I was a sorter.
10  Q. And you kind of described it earlier but for the
11    judge who might not be as familiar --
12  A. It's called stower.
13  Q. Stower. For the judge who is not as familiar with
14    the layout of the Amazon facility as you certainly
15    are and as I might be, can you describe, can you try
16    describing again what a stower does? And then where
17    I think we need to add some additional detail, I'll
18    ask some follow-up questions.
19  A. Okay.
20  Q. So what does a stower do for Amazon?
21  A. A stower puts retail items that Amazon is -- company
22    is doing business with that are stores, different
23    stores, different companies, different home-based
24    companies, retail items into bins. And the bins are
25    like -- it's like a box. It's like a box with input

1    opening. Like a -- it's hard to describe. It's like
2    a basket, there it is, a basket. And you put items,
3    retail items inside each input opening of the bin.
4  Q. And do you know where the items go after they go into
5    that bin?
6  A. Yeah, they go inside each opening accordingly to what
7    a computer have to follow. Because they have to
8    follow a computer as a stower, and the computer tells
9    you where that items has to go in the bin.
10  Q. So if I'm understanding you correctly, the computer
11    tells you which bin to put which item in, right?
12  A. Right, yes.
13  Q. There is not a particular place within the bin that
14    you have to put each item, right, it's just in the
15    right bin?
16  A. It's in the right bin. And the computer tells you
17    based on a code that the item has along with a code
18    that is on -- that is labeled on the bin.
19  Q. Do you know where -- once a stower like you had put
20    items into a bin, do you know where that bin goes or
21    what happens to those items next?
22  A. When I first worked there, they gave us orientation,
23    and they explained to us how it goes, how the process
24    goes after -- if we become a stower. Because in
25    orientation when I first worked for Amazon through

1    Integrity, they had us all in a big room, employees
2    in the big room. And they explained if you were a
3    stower that it goes to a department -- dang, I can't
4    remember the name of the department. But it's a
5    department that counts the bins and checks the bins
6    which is one of the departments Mr. Jeff Griffin was
7    informing me that complaint to him all the time of
8    my -- each of my evaluation.
9         And they count, and it's supposed to be
10    the right number of items in each bin opening as well
11    as the right label towards the label that's on the
12    bin. So they have people check our work after.
13  Q. Kind of a quality control, if you will?
14  A. Yeah.
15  Q. Were they called -- is that the SPQR? Does that
16    sound right?
17  A. Yeah, it's like SPQ --
18  Q. No, that's the wrong one. Is it the ICQA counters?
19  A. Yeah, ICQA, that's it.
20  Q. I knew there was an acronym out there somewhere. So
21    after the stowers put the items in the bin, the bins
22    next go to the ICQA counters to be quality checked,
23    if you will, counted and quality checked to make sure
24    that the stowers got the right items in the right
25    bin, correct?

15 (Pages 54 - 57)

1 A.  Right.

2 Q.  And then after they're quality checked, do you know

3     what happens next to the items?

4 A.  From what I can remember during orientation, the ICQA

5     checks every stower's work, it goes to another

6     department where they check to see if there is any

7     damages, any other type of issues for retail item, if

8     it's an item that is against Amazon's policy of

9     selling, that type of thing.  I can't think of the

10    name of that department, but that's also the other

11    department also that Mr. Jeff Griffin told me had a

12    complaint for each of my evaluations.  Such as --

13    example would be that Amazon would not want to sell

14    would be batteries with ion or fireworks or gasoline,

15    bottles of gasoline.

16 Q.  And so as a stower, was it part of your

17    responsibility to identify those items as they came

18    in initially and try to flag them earlier in the

19    process?

20 A.  Yes.  And when we flagged them, we would take -- we

21    were supposed to take them out and put them in a --

22    on the side of -- on a conveyor belt in a basket.

23    And then we were supposed to go to the computer and

24    click onto function or feature where we click onto

25    call, what's the name, it's like publics, they're

1     like public safety, but we called them to ask them

2     hey, is this -- this is not what should be in here.

3     And it's another department of people that check

4     those type of items.  It's like dangerous items sort

5     of Amazon don't want to sell.

6 Q.  Are the stowers, like as items come into the Amazon

7     facility, are the stowers the first step in sort of

8     getting those items into the Amazon process, if you

9     will?  Does that make sense to you?

10 A.  What do you mean by --

11 Q.  So as the different retail goods that are going to be

12    sold out of the Kenosha facility come into the Amazon

13    facility, if you will, are the stowers the first

14    group of people or the first department of people

15    that really handle those items?

16 A.  We are, yes, the stowers, we are supposed to be,

17    yeah, they -- is what from orientation, that's what

18    they told me, and that's what they tell employees

19    that, yeah, stowers are supposed to be first

20    department to stow.

21 Q.  And so did you understand that it was important to

22    the company that you accurately stowed the goods and

23    put the goods in the right bins?

24 A.  Yeah.  But during orientation they also mentioned

25    when items come into Amazon plant before we get --

1     have to stow anything, the boxes and everything are

2     supposed to be opened up and re -- and checked from

3     another department before we -- before we stow.  So

4     we really -- we're the first person -- people to --

5     the first department or the first employees, yes, to

6     stow the product.  But we're not the first department

7     to check what goes into Amazon's plant before we stow

8     any items.

9 Q.  Okay.  And in terms of the items that you do stow in

10    the bins that you do put them in, did you understand

11    that it was very important to Amazon that those items

12    go in the correct bins?

13 A.  Yes.  And in orientation they told us, we're the most

14    important people, employees to do, to make sure the

15    Amazon items are well taken care of and sold right

16    because we check -- we actually got -- we're like the

17    second checker of people to take stuff out of the

18    bins or to check if the label is right and to put it

19    into the other bins with the same label to see if

20    there are any damages.  We are the ones that do that.

21         And I was doing my job.  I was doing that.

22    Every time I put anything in there, in a bin, a

23    retail item in a bin, I would check the whole from

24    top to bottom, around it, the item before I put it

25    in.  And if it was damaged -- and yes, I've had

1     damages.  I've had a lot of damaged items -- I did

2     not stow and put in like I told you, we have to

3     put -- stowers had to put in a basket on the conveyor

4     belt and click on feature on their computer to call

5     the people who we have to ask or tell them look, this

6     is damaged, item is damaged.  I did it every time,

7     every workday.

8 Q.  When you -- describe for me for non-damaged items,

9     okay, the process that you would follow in terms of

10    how you would go about stowing an item in a bin and

11    how you would go about recording that in the computer

12    system.

13 A.  Okay.  Step one, I would look at the bin.  And then

14    there is a conveyor belt of boxes we get, we would

15    get where another department is supposed to just give

16    us the boxes.  Their thing, their job is only to

17    place them on a conveyor belt, boxes of items, retail

18    items that us stowers have to stow.  So I would --

19         That first step, I would have to look at

20    the bin, see what bin I have, what openings I have.

21    Then I would go on my conveyor belt, step two, go on

22    my conveyor belt, look at my boxes, open them up,

23    check each -- step three, I would check each item,

24    retail item, and make sure that they were all

25    correct, nothing was damaged, nothing was broken,

16 (Pages 58 - 61)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 16 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                          888-391-3376

1　nothing was open and nothing was of harm of what I
2　memorized that -- Amazon gave every person in
3　orientation which I guess they are ordered to do to
4　give us a list of what Amazon items Amazon would not
5　sell to the public.
6　　　　　And I memorized that list at home. And I
7　would -- whatever it looked like, I had damages at
8　times, I would put in the end of the conveyor belt, a
9　big opening, open cart I think it's called or a
10　crate, they would give us so that we could put items
11　in that were damaged, items that Amazon wouldn't sell
12　or items that I had a question about. They also
13　stated if you had a question about an item and it was
14　unusual and you never seen it before and at
15　orientation they never showed it for Amazon to sell,
16　to also put it in the box. And I had those type of
17　items, too.
18　Q. So what about the items that were non-hazardous, in
19　good shape and they were good to go, good to stow,
20　how would you go about then process wise stowing
21　those items?
22　A. I would then go ahead, look at the item itself, look
23　at the label. I would go on the computer, I'm
24　supposed to check to see what the computer say where
25　that item is supposed to go and the number. The

1　number is right according to the item as well as the
2　number of the item supposed to also be on the box
3　where we really ain't supposed to be looking at the
4　item, just the box and oh, okay. But sometimes it
5　was always mishaps. And there were mixed up items
6　with the label of a different label of a different
7　bin.
8　　　　　But anyway, with a good item, I would go
9　in the box, go on my computer, the computer I'm in
10　will show okay, that item is supposed to be in bin
11　whatever. So I go and I put it in bin whatever. And
12　it would be -- they used to give us a gun, a laser
13　gun to laser the item label and the item bin. That's
14　how I would go about it. That's how the computer
15　reads it.
16　Q. And that's how the company would know which bin you
17　stored which item in?
18　A. Yes. You would get the -- their laser gun and laser
19　gun first the item. Then the computer then would
20　tell you where it should go, which bin opening it
21　should go.
22　Q. Okay. And it's through that process of scanning the
23　item and scanning the bin, the company could also
24　tell how many items you were sorting, if you will, or
25　stowing, right?

1　A. Yes.
2　Q. When you say there were some mixed up items, you said
3　there were some where the number on the item and the
4　number on the box didn't match, is that what you were
5　trying to say?
6　A. Yes, there had been times where on the job -- and it
7　would be days where I also worked overtime and days I
8　didn't have to work where I -- it happened to me
9　again where there were items in boxes where the item
10　label is supposed to be on there. In orientation
11　they tell us that. Because the purpose of being a
12　stower is to be a quick stower and time consuming.
13　Amazon loves to have their shipment in fast or
14　something, so we had -- and whenever Mr. Griffin
15　would evaluate me, one thing he did tell me, your
16　timing is excellent. You do stow fast, and that's
17　what we -- you still have to keep doing that. He
18　told me keep doing that.
19　　　　　So that's the thing. We really can't keep
20　having the time to okay, let's check the item, each
21　individual item because that's time consuming. But I
22　do it, I did it anyway for the fact that if it's not
23　right, something is wrong. If it's this item in this
24　box, and I've had a complaint by a department through
25　Mr. Griffin about that. He told me one day if you --

1　because, you know, I thought that every item of a
2　label that was supposed to be the same was in the
3　same box. And there were like three of them that
4　were different labels, same items, same physical item
5　they usually are, but it would be like two or three
6　different labels. Three different labels and all the
7　rest of the items had the same label.
8　　　　　So I mean in orientation they tell us, you
9　know, we got to be quick about it. And when we put
10　that gun laser on the item, automatically it's
11　supposed to be the same. For some reason it been
12　many times I've had that problem, many times.
13　Q. Okay.
14　A. And I would tell Mr. Griffin in advance.
15　Q. So when you found the different --
16　A. I'm sorry, I'm sorry, my bad. I would tell
17　Mr. Griffin after I have told the people that you
18　call, that we supposed to call, public people, I
19　forgot the name of them, but there is a department
20　that we call when they have to check if we have a
21　question to ask about about the items before we stow
22　them. And I told them many times, I keep getting
23　boxes of items with three different labels or items
24　with four different labels, but they all the same
25　physical item.

17 (Pages 62 - 65)

Veritext Legal Solutions
www.veritext.com　　　　　　　　　　　　　　　　　888-391-3376
Case 2:16-cv-01056-WED　Filed 08/15/17　Page 17 of 63　Document 28

1  Q.  So did you stow those items correctly according to
2      the label on the box?
3  A.  Yes, I have, all the time.  And then I would put the
4      ones I seen that were mismatched in the little carton
5      on the end of the conveyor belt that we supposed to
6      put it in.
7  Q.  And you said Mr. Griffin received a complaint about
8      you from another department?  What department was
9      that?
10 A.  It was -- sometimes it was ICQA and the other
11     department that also checks ICQA's work.  And I'm
12     like, my goodness, I've been doing this.  I've
13     been telling you this.  And they come back to you
14     about the complaint.  And he said yeah.  They still
15     come back to me about that.  I'm like oh, my
16     goodness.
17 Q.  What did Mr. Griffin convey to you was the nature of
18     the complaint that was made about your performance
19     from the ICQA department?
20 A.  That items, some items were missing like always
21     because, like I told you before, ICQA's job is to
22     check our stowers' work, all stowers' work.  And one
23     of the things they check is the number of items
24     supposed to be in each bin and the labels have to be
25     correct, all of them got to be the same.  And the

1      physicality, the way -- the image has to be perfect,
2      no damage.
3  Q.  So ICQA complained to Mr. Griffin or at least it was
4      conveyed to you that ICQA complained to Mr. Griffin
5      that there were items missing out of the bin that you
6      sorted?
7  A.  Yeah, that would be one of the complaints.  And then
8      a second complaint was always one or two items they
9      found damaged.  And I used to tell Mr. Griffin how
10     could that be because I'm always taking them out and
11     I'm always -- and I asked Mr. Griffin every time he
12     gave me an evaluation, you can ask the P people, I
13     can't think of the name of them, but they're
14     called -- some people called them P people where they
15     come -- PR or PG people, they come and they ask a
16     question of any problems stowers have.  That's their
17     job.  And they have it on record.
18         And all departments are supposed to have
19     on record what the PG people or PR people that come
20     to us stowers rescue for answering our questions, the
21     problems all the time they supposed to have known,
22     they come to us.  Because we push a button on the
23     computer.  And anything that is stated on the
24     computer, they told -- they meaning people who
25     welcome, orientation people, orientation supervisors.

1      When we first worked for -- when I first worked for
2      Amazon, during orientation they would say, you know,
3      everything that is done on the computer is going to
4      be always in the computer and it's our records.  So
5      every -- and then they stated, every department has a
6      record of everything that the stowers do and that
7      every other department does.
8  Q.  And so on how many occasions did Mr. Griffin tell you
9      that he had received complaints from the ICQA
10     department that items were missing from your bins?
11 A.  It was -- I counted every -- two times.
12 Q.  So Mr. --
13 A.  I counted two times.
14 Q.  Did Mr. Griffin tell you that only on two occasions
15     he received complaints from ICQA that items were
16     missing from your bins?
17 A.  That plus they complained to him I still -- I am
18     still stowing, I was still stowing damaged items.
19 Q.  And how many times did the ICQA department complain
20     to Mr. Griffin that he shared with you that you were
21     still stowing damaged items?
22 A.  Again, about two or three times.
23 Q.  Okay.  And when did Mr. Griffin tell you that he had
24     received these complaints from the ICQA department?
25 A.  It was every time he came to me for evaluation day,

1      for the evaluation day, for each evaluation day.
2      Whenever he wanted to come to me and say I have to
3      give you an evaluation.  Yup.  That was the only
4      time.  But then he would say -- whenever though he
5      say ICQA said some items were missing, he would say
6      okay, I'm going to get back to you in terms of what
7      they found if they didn't find the items.
8          Usually he used to come back to me, or
9      when he did come back to me for -- it would be the
10     second evaluation he come back to me telling me that
11     they found nothing was missing.  It was in a
12     different other bin or something he said they found
13     them in.
14 Q.  So they found the items, but the items had been
15     improperly stowed in the incorrect bin?
16 A.  Right.  It was always that.
17 Q.  Okay.  And it was your job to make sure that the
18     items were stowed in the correct bin?
19 A.  Yes.  And I was doing my job right at all times.
20 Q.  Then how would they find them in the wrong bin?
21 A.  Because I don't -- and I told them, I don't know.  I
22     stow what I see.  And I always told Mr. Griffin I
23     stow what I see and what was all in the box.
24 Q.  So you don't believe you made any errors?
25 A.  No, because after -- and that's another thing, too.

18 (Pages 66 - 69)

Veritext Legal Solutions
Case 2:16-cv-01056-WED   Filed 06/15/17   Page 18 of 63   Document 28
www.veritext.com                                          888-391-3376

1  I just thought about it. After each box is empty, I
2  broke them and put them in a recycle box they give us
3  to put them in. We break the boxes once they're
4  empty. But also the fact that the computer states if
5  it's stowed right. So once -- and we have to -- we
6  stowers also had to wait until the computer say yes,
7  you have stowed it correctly, move on to the next
8  bin. That's what the computer says. That's how I
9  know I stowed all those items correct because of what
10 the computer said. We had to go by the computer.
11 Q. So if you, for example, scan an item and then scan
12    the bin that you intended to put it in but then put
13    it in a different bin, then it would be showing on
14    the computer that you did it correctly, but it would
15    still be stowed in the wrong bin; correct?
16 A. I told them -- Mr. Griffin explained to me that's how
17    it might have been. But I told him no, I never
18    stowed an item, scanned with the laser gun the item
19    label on the item, put it in and then put it in the
20    wrong bin when the computer says it should be in the
21    bin of the right bin. I always put them in the right
22    bin. And why it does that, I don't know. That's
23    what I told him.
24       But there have been times where it did do
25    that, yes. To answer your question, yes. There have

1  been times the computer did do that to me.
2  Q. What did the computer do to you?
3  A. Was saying yes, correct, bin is stowed correctly,
4    stowed, go to the next bin. It would not -- the
5    computer would not go to the next bin, would tell you
6    to go to the next bin unless that item you laser gun
7    and put in the bin correctly.
8  Q. At least you had laser gunned the correct bin, right?
9  A. Yes. But that was my problem I was telling
10    Mr. Griffin about. We shouldn't even really -- I
11    told him we really shouldn't even follow sometimes
12    the computer. But he said no, you have to go by what
13    that computer says.
14 Q. So you understood from what Mr. Griffin was telling
15    you that Mr. Griffin was getting reports from the
16    quality department, the ICQA department, that some of
17    your items were being found in the incorrect bins?
18 A. Yes.
19 Q. And you understood from what Mr. Griffin was telling
20    you that he believed the quality department that some
21    of the items that you had stowed were found in the
22    incorrect bins?
23 A. Yeah.
24 Q. And you don't have any reason to believe that the
25    quality department believed that your items were

1  stowed in the incorrect bin?
2  A. Well, the ICQA, the only thing they know is what they
3    count and what was all stowed in. So I mean I
4    understood that. But I was trying to tell
5    Mr. Griffin we have to go by the computer at all
6    times. When the computer is wrong, that shouldn't be
7    right.
8  Q. Okay. So it's your testimony that the only reason
9    your items may have gotten into the incorrect bin is
10   because the computer told you to incorrectly stow
11   them?
12 A. Yes.
13 Q. Okay. And did you understand from Mr. Griffin and
14   how he addressed his performance concerns with you
15   that Mr. Griffin did not believe there to be anything
16   wrong with the computer system?
17 A. He just didn't explain to me why he -- everyone goes
18   by what the computer says when that computer may have
19   a default. The computers may have a default. Amazon
20   computers may have a default.
21 Q. Are you aware of any other employee, any other stower
22   that the computer was telling them to stow items in
23   the --
24 A. I don't know --
25 Q. Hold on, I have to finish my question. I'll start

1  over for purposes of our record only.
2       Are you aware of any other Amazon employee
3    who -- for whom the computer told them to stow items
4    in the incorrect bin?
5  A. I don't know their names correctly, but I went to --
6    I've been going -- I was going to meetings with
7    the -- some of the owner head -- head -- I called
8    them head but the owner of Amazon, you know,
9    according to the headquarters of Kenosha where I
10   worked, his plant, and he would -- there would be
11   like 20 people in the meeting telling him the same
12   thing that I would be explaining to Mr. Griffin about
13   of the computer, yeah. There was like 20 people had
14   the same problem.
15 Q. But you don't know who any of those people are?
16 A. I don't know their names.
17 Q. Did Mr. Griffin tell you that he had received similar
18   complaints to yours from other people, that they were
19   being directed to stow items in a different or
20   incorrect bin?
21 A. He said no. But he mentioned to me, you know, I'm
22   going to talk to some other stowers about this. When
23   I first informed to him the computer kept -- keeps
24   saying stowed to the other bin where it's telling me
25   to stow in -- two items or three items of the same

19 (Pages 70 - 73)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 19 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                    888-391-3376

1    physical item in a different bin, yeah.
2 Q.  So did you understand that Amazon had a policy about
3    how many different mistakes you would be allowed to
4    make before you would be subject to corrective
5    discipline and ultimately discharged?
6 A.  No.
7 Q.  Were you aware of their progressive discipline that
8    they were following at the time?
9 A.  No, I was not.
10 Q.  Have you ever heard of the PEP process?  Is that
11    something you've heard about?
12 A.  The PEP process?  I heard a little bit about.  But I
13    didn't think it would be in connection with my
14    position up there.
15 Q.  Why not?
16 A.  Well, for one, I was a new worker.  And then
17    secondly, I wasn't in seniority.  I thought they only
18    do that in seniority.
19 Q.  So you understood that Amazon was looking for a
20    couple things in terms of your performance?  I think
21    one you mentioned was speed?
22 A.  Yes.
23 Q.  Another one would be quality, making sure that you're
24    doing your job correctly and stowing the items in the
25    correct bin, right?

1 A.  Yes.  And by the way, that last meeting I went to, I
2    went to three meetings where people had the same
3    problems of anything I did as a stower that -- my
4    evaluation with Mr. Griffin, the last meeting was in
5    March.  That was like a week before the week
6    Mr. Griffin fired me.
7 Q.  What was at these meetings?
8 A.  It was like Amazon had a way, each year, each month,
9    to have a birthday meeting.  People who were -- who
10    had birthdays in that month of that meeting, they
11    come to the meeting.  And the head owners of Amazon
12    would show up and talk to us about if there is any
13    problems with the company, do you all have any
14    questions, they would ask us employees.  And some
15    were stowers, some people were from ICQA, some people
16    were from two or three other departments at Amazon.
17    And those were the people that were there at the
18    meetings.
19 Q.  Just people that had birthdays in that month?
20 A.  Yeah.
21 Q.  Then why did you go to three different ones?
22 A.  I went to three different -- three of them weren't --
23    one of them were the birthday ones.  The other three
24    were in the cafeteria.  There would be other meetings
25    other than the birthday meetings.  But the last one I

1    went to was the birthday meeting where it came up the
2    question about the computers telling us to stow, us
3    stowers to stow something in a different bin and tell
4    us to go and move on to the next bin.
5 Q.  Okay.
6 A.  So the other ones were cafeteria meetings where they
7    would talk -- it was the same thing.  They had some
8    head people from Amazon would be there and all
9    people, all employees who would show up of Amazon at
10    certain plants, in that plant that I worked in in
11    Kenosha that would be there.
12 Q.  And other people would complain at that meeting as
13    well in the cafeteria --
14 A.  Yeah.
15 Q.  -- about computers telling them to incorrectly stow
16    items?
17 A.  Yes.  But the last, the last meeting was where the
18    20 -- that particular problem I always had that
19    Mr. Griffin kept getting from two or three
20    departments about me, my performance, job
21    performance, was at the birthday meeting.
22 Q.  I'm sorry, I don't understand your answer.  You're
23    saying at the birthday meeting was the meeting --
24 A.  That was the only one really.
25 Q.  Was the only one where the issue of computers telling

1    you to incorrectly stow items came up?
2 A.  Yes.
3 Q.  Okay.  So the other meetings in the cafeteria, those
4    were employee meetings, but it wasn't discussed at
5    those meetings that people were told to incorrectly
6    stow items?
7 A.  Right.
8 Q.  Okay.
9 A.  It was other problems.
10 Q.  But you can't tell me any of the other people that
11    were at the birthday meeting that were expressing
12    similar concerns to your own?
13 A.  I can't tell you the -- who they are.  I don't
14    know -- right off the bat, I don't know their names.
15 Q.  Do you know what race the individuals were?
16 A.  Oh, yeah, I could tell you that.  There were three of
17    us Black women, there were I think -- see, I'm not --
18    that look like they were Arab, two young men that
19    looked like they were Arab, and there were a lot
20    of -- there were like maybe a few Caucasian young
21    females, a few Caucasian males, yeah.  Oh, there was
22    also, I saw two Black men that were at the meeting as
23    well.  Those are the -- that's how I estimate 20,
24    about 20.
25 Q.  And all of those people that you described all had

Veritext Legal Solutions
www.veritext.com                                                                    888-391-3376

1   the same concern about being directed to improperly
2   stow items by the computer?
3 A.  Yeah. Because when I head -- when one person asked
4   them about that, it was one white guy, one young
5   white guy. He looked like he was in his 20s. And he
6   told one of the head owners of Amazon that -- of the
7   headquarters of Kenosha, one of the head managers.
8   And then I saw some people shake their head yes and
9   responded back yes.
10      Because he asked everybody else in the --
11   that were employees in the room do you all have that
12   problem, too, that stow or are temps? There were
13   some that were temps, temp agency employees. And
14   everybody said yeah. So I estimate about 20 people,
15   20 employees. Some of them were walking in and out.
16 Q.  And you keep saying owners of the facility. But
17   there were no actual owners there, right? They were
18   company managers?
19 A.  Well, the company managers explained that they own
20   the plant. I mean they gotta put money to -- they
21   got to put money in to buy the computers and money in
22   to --
23 Q.  You think it was their personal money?
24 A.  I'm thinking that's what he -- they meant because
25   they was talking like that. Head managers there were

1   talking like that. They got to put their money into
2   the computers to improve it all the time. And they
3   spent over -- it's like over $100 million dollars a
4   year. One head manager said that they got to do, him
5   and other managers at other plants of Amazon got to
6   put in to upgrade the computers. So he said that's
7   why it's important you tell us guys, employees, you tell
8   us what the problems are with our computers.
9 Q.  So you believe it was their personal money that they
10   were putting in to upgrade that?
11 A.  I believe it. I believe it. But they didn't say
12   that exactly. They just said our money.
13 Q.  So when it was expressed at this meeting that the
14   computers were telling you guys to stow items in the
15   incorrect bins, how did the managers at the meeting
16   or owners or whomever they were, how did they
17   respond?
18 A.  They complained. One of the head managers sounded
19   like he was complaining. He said you know -- that's
20   when I was telling you the statement. He then stated
21   the statement, you know, we got to put almost -- we
22   managers have to put in almost $100 million dollars
23   to upgrade our computers of Amazon plants in order to
24   keep it going or to make it right. And he said it is
25   frustrating.

1      But you employees, we need you all to keep
2   coming to the meetings and keep telling us what the
3   problems are of the computers. Then he said
4   personally if you all have to tell us on our office
5   hours, come to our office hours.
6 Q.  Who was that manager? What's his name?
7 A.  I can't think of his name. He's a nice guy. One of
8   them was Michael. That one I remember. His name was
9   Michael or Mike. People called him Mike all the
10   time.
11 Q.  Can you tell me any of the other managers that were
12   at that meeting?
13 A.  There were two other men. There was another male
14   manager. Well, Mike is Caucasian, and there were two
15   other -- there was a male Caucasian manager that came
16   and there was another one, but I don't know -- I'm
17   thinking he was a manager. They were all Caucasian.
18   They were all young men though. They looked like
19   they were in their 30s.
20 Q.  Okay. Eventually after working at Amazon through
21   Integrity for awhile you became a full time Amazon
22   employee?
23 A.  Yes.
24 Q.  How did that occur?
25 A.  Okay. I worked a little -- let me see. I worked

1   graveyard shift which my graveyard shift started from
2   6:00 p.m. to 4:30 a.m. But after a week of working
3   for Integrity my supervisor, our Integrity employee
4   supervisor, because all Integrity Staffing employees
5   had one supervisor that wasn't Amazon, that wasn't a
6   supervisor for Amazon employees. And he was saying
7   that I would work then from 7:00 p.m. to then two
8   hours after 4:30 a.m. because we have to -- there was
9   overtime, mandatory overtime. And I worked four days
10   a week.
11      Some -- the third and fourth week of me
12   working for Amazon which might have been in November
13   to December, they asked around Integrity Staffing,
14   "they" meaning the Amazon supervisors, the regulars,
15   could we work an extra day or two due to the fact it
16   was the summer -- I mean the Christmas rush. So I
17   would always say yeah, I could come in. They would
18   ask me, they would say can you come in Saturday? Can
19   you come in Sunday? Can you come in both days? Or
20   can you come in Friday? And usually I was asked if I
21   could work Friday or if I could work Friday and
22   Saturday or if I could work Friday and Sunday. So
23   that's how that came about.
24      And the number of hours -- I was told when
25   I had a question that asked one Amazon employee how

21 (Pages 78 - 81)

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 21 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                      888-391-3376

1    many hours I have to work to become permanent here?

2    And they told me you just do as much overtime as you

3    can. So that's what I did. I did a lot of overtime

4    as I could to become an Amazon permanent employee.

5 Q.  So we're a little bit off track, but I want to go

6    back and ask you, I think you nicely described for me

7    the hours you were working. How much did you get

8    paid while you were working for ISS or for Integrity

9    Staffing?

10 A.  I was getting paid -- from what I've seen, I was

11    getting paid $14, $15 an hour. It was between $14

12    and $15 an hour.

13 Q.  Do you know were you receiving any benefits?

14 A.  No.

15 Q.  And then when you were hired on by Amazon, do you

16    recall your rate of pay?

17 A.  My rate of pay I thought was going to be $16, $17 an

18    hour, but it wasn't. It was $12 and a little

19    roughly -- I give it $12 something an hour. I don't

20    know exactly how much, but it's $12 and some cents an

21    hour.

22 Q.  So you actually made less per hour as an Amazon

23    employee?

24 A.  Yeah. But the reason why, they mentioned it during

25    orientation when I became permanent was that

1    benefits, I received benefits. And they would take

2    that -- I seen that out of my payroll paycheck. They

3    would take certain money out of my check each week

4    for benefits. And it was biweekly, so every two

5    weeks I would see that.

6        MS. FITZKE: Can we mark that, please?

7        (Exhibit 1 marked.)

8 BY MS. FITZKE:

9 Q.  Ms. Timms, showing you Exhibit 1 to your deposition

10    which is a copy of a letter dated March 6th, 2016 to

11    you from Amazon. I understand that this letter sets

12    forth the terms of your employment offer that you

13    received with Amazon?

14 A.  Yes.

15 Q.  And if you look at the last page, there is an

16    electronic signature on the last page. Do you recall

17    going into the computer system and typing in your

18    name or electronically acknowledging receipt of this

19    letter?

20 A.  Yeah, I believe I did. Yeah, I did do this.

21 Q.  Okay.

22 A.  It was during orientation.

23 Q.  I see that Jason Griffin's name is listed as the

24    signature to the letter although I see that he didn't

25    personally sign it. But at the time that you were

1    brought on as a full time Amazon associate, was

2    Mr. Griffin your manager at that time?

3 A.  He was -- yeah, he was because the last week of

4    February was when he announced to everybody in the

5    beginning of a meeting before each day of work, you

6    know, that he was our new supervisor. So yeah.

7 Q.  Do you know what role Mr. Griffin played in the

8    decision of Amazon to bring you on as a permanent

9    employee?

10 A.  No, I do not know.

11 Q.  But anyway, from the date of this letter it looks

12    like you became at least on paper a full time Amazon

13    employee then effective March 6th of 2016?

14 A.  That's right, yeah.

15 Q.  And during your employment with Amazon were your

16    duties and responsibilities as a stower basically the

17    same throughout your employment?

18 A.  Yes, it was.

19 Q.  From this letter it looks like under start day and

20    compensation it looks like that you were paid as you

21    recall $12 an hour plus a 50 cent per hour shift

22    differential for working that graveyard shift. So

23    you got $12.50 an hour, does that sound right to you?

24 A.  Yes.

25 Q.  And then the other benefits outlined in that letter,

1    right?

2 A.  Yes.

3 Q.  Okay. Did you also -- you said something a moment

4    ago about orientation. Did you also attend an

5    orientation when you became a full time Amazon

6    employee?

7 A.  Yes, I did.

8 Q.  And what was -- what did that orientation consist of?

9 A.  Well, it was a requirement or else it was an

10    automatic termination of Amazon if you didn't show

11    up. They did the same thing they did when I ran

12    Integrity Staffing and went to orientation as

13    Integrity Staffing employee, temp agency. They went

14    through the do's and don'ts of Amazon, how to be a

15    good employee and the benefits that Amazon has to

16    offer and the wages and all of the different

17    positions and departments and an example of what each

18    position is supposed to do.

19 Q.  Did you also review Amazon's policies in terms of

20    harassment and discrimination?

21 A.  Yes. In orientation they talked about that, too,

22    yes.

23 Q.  You understood that it was Amazon's policy not to

24    discriminate or treat people unfairly based on their

25    race or age or gender, for example, correct?

1 A. Yes. And I believed them.
2 Q. And you understood from your training that if you had
3    concerns or complaints that you were being treated
4    inappropriately or unfairly because of any protected
5    class, age, race, sex, you know, anything like that,
6    disability status, that you could raise those
7    complaints and should raise those complaints with
8    human resources, your manager, a hotline number. You
9    understood there was multiple ways that you were
10    expected to report those kinds of issues?
11 A. Yes.
12 Q. And prior to your termination did you have any
13    concerns or complaints that you were being treated
14    unfairly because of your race or age at Amazon?
15 A. I went to one of the head managers to explain that,
16    that the reason why -- my third week, after my third
17    week with Mr. Griffin giving me evaluation because
18    I -- and it was the week of March, and it was before
19    the week that he fired me. I was really being scared
20    about getting fired. And I went to him, Mike, the
21    head manager, one of the head managers I told you
22    about that I met at one of the birthday meetings, I
23    went to his office because he told everybody in each
24    b-day meeting, employees, if you got any problems or
25    anything, we could come to his office.

1      So that's why I went to his office before
2    -- it was a day, one day before work to explain to
3    him that I believed them not -- I'm getting a lot of
4    evaluation from Mr. Griffin, and I am fearing that he
5    may let me go. And I explained to him in his office
6    what we all have to do. What is it that I do and
7    what is my job at Amazon? And I told him, I'm a
8    stower. Then he explained to me, okay, go by the
9    steps of what a stower is supposed to do. What do
10    you do on the floor.
11      And I told him. I told Mr. Mike that I
12    told exactly what I do step-by-step. I explained
13    it to him. I went step-by-step on how to stow a bin
14    which is my job. And I explained to him what all the
15    things I have to look for and not look for and all
16    the precautions and what all I have to do if I have
17    questions.
18      Then Mr. Mike said okay, you know, he told
19    me take it easy, take a deep breath, inhale, exhale,
20    then, you know, just be calm. He don't think -- he
21    didn't think I was going to get fired. He said I
22    don't think you're going to get fired. Just keep
23    doing what you've been doing. From what you're
24    telling me, you're doing your job right. That's what
25    Mr. Mike said in his office.

1 Q. Did you tell Mr. Mike that you thought Mr. Griffin
2    was treating you unfairly because of your race or
3    your age?
4 A. Yeah. I also mentioned to Mr. Mike could it be that
5    I'm getting picked on? Is Mr. Griffin picking on me
6    because I'm way older than a lot of employees here at
7    Amazon? And then I said especially the stowers. He
8    said to me, he said to me no, I don't think that's
9    it. He don't think so. But he laughed a little bit
10    and he said well, I don't think that might be it
11    but -- he didn't know. He didn't know. He said he
12    didn't know. But he don't think that's it. He just
13    think that I should calm down and just keep doing the
14    job I've been doing. And if I have anymore questions
15    or, you know, a fearness of issues, come -- go back
16    to his office.
17 Q. So --
18 A. So that was it.
19 Q. Okay. Did you tell -- other than to question whether
20    you might be treated different because you're older
21    than other stowers, did you tell Mike that you
22    thought you were in fact being treated unfairly
23    because of your age?
24 A. Yeah, I told him I really think I might be -- I think
25    Mr. Griffin -- he said -- yeah, when he laughed a

1    little bit and he said no, I don't think so. I said
2    you know, I think he is picking on me because I might
3    be older than a lot of stowers that are here.
4    Because I told Mr. Griffin -- I told Mr. Mike, this
5    is when I was in the office with Mr. Mike, I also
6    told Mr. Mike because I see -- I told Mr. Mike, I see
7    other stowers, him going to other stowers' stations
8    and just walk past them and they don't get an
9    evaluation. I get an evaluation.
10 Q. Do you know the other stowers that Mr. Griffin was
11    walking past, do you know if they were having any
12    kind of performance troubles or counseling or having
13    complaints made from other departments about how they
14    were stowing items?
15 A. Sometimes there be two or three stowers I could see
16    from my station of him walking past and just saying
17    hi, whatever, that I did personally know but didn't
18    know their names by heart and would talk to them, say
19    hi, conversate before our meeting of the day start.
20      And they would -- I would tell them, you
21    know, I think I'm going to get fired. I really think
22    so. And then I told -- used to tell them, seriously,
23    they would not -- they would think I'm kidding. I'm
24    older than all you all. I might be getting fired
25    soon because he keeps going to my station. He keeps

23 (Pages 86 - 89)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 23 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1    going to y'all -- he don't go to your station.  They
2    all said -- there is always three or four young
3    people that I was sort of friends with that were
4    stowers that I would see and tell them yeah, I think
5    I'm getting fired.  Mr. Griffin keep coming to my
6    station and keep giving me evaluations.  He's not
7    doing that to y'all.  And I think it's because I'm
8    way older than you are.  I'm going to leave.
9         And they would be like well, we don't --
10   I'm like y'all don't have no problems?  And they're
11   like no, we don't get any -- we get evaluated, but
12   there is nothing he tells us that -- to warn us that
13   we might get fired.  I told them that that's what he
14   be telling me.
15 Q.   And my question to you is do you have any information
16   that any of the other stowers that you're claiming
17   Mr. Griffin would walk by, if Mr. Mr. Griffin was
18   receiving complaints from ICQA or other departments
19   about their performance or if they -- their
20   performance was otherwise subject to counseling or
21   discipline because of the way they were stowing
22   items?
23 A.   See, I don't have nothing on tape.  I don't have
24   nothing of a voicemail.  I don't have a text message.
25   Only by what the conversation at the time.

1 Q.   Okay.  That's my question to you.  Did those
2    employees, those other stowers, did they tell you
3    that Mr. Griffin had also indicated he received
4    complaints about their performance from ICQA or any
5    other department?
6 A.   They told me that they don't know.  They told me they
7    don't have complaints like mine.
8 Q.   And did those employees tell you that they were
9    receiving verbal counselings or written or final
10   warnings as a result of any of their improper
11   stowing?
12 A.   Like I said before, they say no, we didn't -- we
13   don't get that.  When I tell them that he does this
14   to me when I get evaluated, they say no.  So they
15   do they -- does he do that to you all when you all get
16   evaluated?  They said no.
17 Q.   Are you aware of any facts that would indicate that
18   those other employees were improperly stowing items?
19 A.   No, I don't have any evidence or --
20 Q.   And the other employees, the other stowers that
21   you're referencing that you spoke to you that you
22   referenced as people you were presently with, who are
23   they?  What are their names?
24 A.   See, I don't know their names by heart.
25 Q.   What race are they?

1 A.   One of them is -- one of them I think she's mixed,
2    one is African American.  And they're real cool.  And
3    another one, she was -- she was like -- she was like
4    new.  She was like real new at the time.  This was
5    the first week in March, and it was a day -- it was
6    one day of the week before our meeting of the day.
7    And it was one that was just new, just got hired from
8    Amazon, just got hired.
9 Q.   Do you know what race she was?
10 A.   She's African American.  She was skinny, African
11   American young girl.  All of them young, younger than
12   me.  In their 30s.
13 Q.   So that's three people.  You described two African
14   American women and one woman you thought might be
15   mixed.
16 A.   Um-hum.
17 Q.   What race was the fourth person?
18 A.   There was -- he was White, but he was an employee
19   before -- two of them, by the way, were employees
20   before I was.  They were permanent -- they were there
21   a whole year before I was at Amazon.  Whole two, two
22   years.
23 Q.   You don't know their ages?
24 A.   I don't know them exactly, but they are in their
25   early 30s.  Because I asked them when I first met

1    them oh, are you all in your 40s?  And they said no.
2    You're all my generation X.  They was like generation
3    X, what's that?  It's like they're 40 years or older,
4    40 to 58.  They said oh, no.  And you're not that --
5    and then they said girl, you're not that old.  I said
6    yes, I am.  How old do you think I am?  And they were
7    like oh, my goodness.  I think you old as us and 30
8    something, 31, 32.  I'm like no, I'm not.  But thank
9    you.  Yeah.
10 Q.   Okay.
11 A.   But yeah.  The fourth one was a guy, and he was from
12   New York.  I don't remember his name.  I tried to
13   memorize it because it's so simple, but he was there
14   for a year-and-a-half, too.
15 Q.   So I want to go back to your meeting that you had
16   with Mike.
17 A.   Um-hum.
18 Q.   Did you tell the manager Mike that you thought
19   Mr. Griffin was treating you unfairly because of your
20   race?
21 A.   I didn't mention race.
22 Q.   You didn't?
23 A.   No.  I mentioned my age.  My age.
24 Q.   Did you make any complaints or reports to any other
25   member of management or human resources before your

24 (Pages 90 - 93)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 24 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1  termination that you thought you were being treated
2  unfairly because of your age or race?
3  A.  No, I didn't, didn't do that.
4  Q.  Okay.  Did you receive as part of your orientation
5  with Amazon a copy of an employee handbook or
6  something called an owners manual?
7  A.  Yes.  I got two of them, one when I was hired with
8  Integrity in the orientation of that time and last
9  year, and then one with Amazon.
10  Q.  And when you received those policies as part of the
11  orientation, were the policies reviewed with you?
12  A.  Yeah.  They explained it, after they gave -- before
13  they -- it was after they handed us the manual in
14  orientation, they went page to page to page.  And
15  they had a, I don't know what you call it, a big
16  screen to show page to page to page.
17  Q.  Okay.
18      MS. FITZKE:  Can we go ahead and mark
19  that.
20      (Exhibit 2 marked.)
21  BY MS. FITZKE:
22  Q.  Showing you Exhibit 2 to your deposition, Ms. Timms.
23  Is that a copy of the owners manual that you received
24  following your hire by Amazon?
25  A.  Yes.

1  Q.  And did you also through the computer system, did you
2  acknowledge some of the policies that you received?
3  A.  Yes.  I'm familiar with the policies I received from
4  what they stated, yeah.
5  Q.  And you did in fact acknowledge some of those.  Do
6  you recall doing that, acknowledging some of them in
7  the computer system?
8  A.  Yes.  Because during orientation they had us also,
9  because we would one-by-one go to a computer during
10  the orientation while a supervisor was explaining
11  from the head, I guess it's a -- I don't know, a
12  video, video, the video screen or something with the
13  manual, physical manual to show everybody in big
14  screen page-by-page.  They had each of us employees
15  go on the computer to look at this also, back again,
16  read this again and electronically sign --
17  Q.  Um-hum.
18  A.  -- certain documents we had to do.
19  Q.  Okay.  Great.  You can set that aside then.  With
20  regard to Mr. Griffin, did you believe you had a good
21  working relationship with him?
22  A.  I believed I did until he started evaluating me every
23  week.
24  Q.  Okay.  And do you know why he was evaluating you
25  every week?

1  A.  I asked him.  I didn't know.  Before I asked him, why
2  am I getting evaluated every week?  Aren't we
3  supposed to get evaluated every three weeks?  And I
4  told him, I asked him, isn't that the process of a
5  regular job to get evaluated every three months or,
6  you know, every six months, you know?  And those were
7  my exact words to him.  And then he told me that he
8  has to come to me whenever he has a complaint with
9  two or three departments.  And it happens to be every
10  week.
11  Q.  And so did you understand that he was reviewing you
12  more often because he had been receiving complaints
13  about you?
14  A.  Yeah, he -- and I was trying to tell him that -- I
15  couldn't tell him anything actually.  I was just
16  trying to ask him can it be three months or four
17  months where it prolonged -- I did ask him that like
18  the third week he evaluated me.  Could the next one
19  be in three months to evaluate me or four months so I
20  could prolong my job.  Because I don't want to get
21  fired.
22  Q.  And did Mr. Griffin tell you that wasn't an option,
23  that he needed to keep evaluating you until there was
24  either no more complaints or demonstrated
25  improvement?

1  A.  Yes.
2  Q.  And in terms of Mr. Griffin, did he ever make any
3  comments to you, any inappropriate comments to you
4  about your age or your race?
5  A.  No, he didn't.
6  Q.  And did you ever hear Mr. Griffin make comments at
7  all or hear about him having made comments that were
8  inappropriate as it pertains to age or race?
9  A.  No.
10  Q.  And did you ever hear any other member of Amazon
11  human resources or management make any comments that
12  you believe to be inappropriate, race related or age
13  related comments?
14  A.  In terms of my job?
15  Q.  While working in the Amazon facility did you hear any
16  member of management or HR, human resources, make
17  comments that you believed to be inappropriate due
18  to -- inappropriate age related or race related
19  comments?
20  A.  Not by -- no, no, not by anybody supervisor.  But I
21  would see people leave Amazon, a lot of older people
22  leave Amazon, leave their station that were my
23  generation, looked like they were in their 40s or
24  looked like they were in their 60s or older.
25  Q.  What do you mean you would see them leave Amazon?

25 (Pages 94 - 97)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 25 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                              888-391-3376

1  Are you saying they were fired?
2  A.  Yeah.  Yeah.  Because how they do it, how supervisors
3  at Amazon do fire people is that they don't -- no one
4  knows.  The person comes, gets off their -- a
5  supervisor will come to a person's station and would
6  take them to the office or say can you come to my
7  office.  Or you would just see them -- see a
8  supervisor point them to follow them.  And you don't
9  see that person no more.  Then I would hear other
10  people talk about did you hear so and so, he got
11  fired.
12  Q.  Are you claiming that --
13  A.  She got fired.
14  Q.  Are you claiming that there are other Amazon
15  employees who were fired because of their age?
16  A.  Yes.
17  Q.  And who are those employees?
18  A.  I don't know them personally, by person.
19  Q.  And what, if anything, do you know about the
20  circumstances of their termination?
21  A.  Only thing I know is that of what I have heard a
22  person say that so-and-so in station 2 or so-and-so
23  in station 3, and my station would be probably in
24  station 5 --
25  Q.  And do you know --

1  A.  -- were gone.
2  Q.  Those older individuals that you claim were
3  terminated, do you know anything at all about their
4  job performance?
5  A.  No, I don't.
6  Q.  And in terms of being -- you were a stower your
7  entire time for Amazon.  And is there a certain area
8  of the facilities where all of the stowers work?
9  A.  There is not -- you mean a particular section or
10  floor?
11  Q.  A particular place, yeah.  One area.  Are all the
12  stowers in the same area?  Are they spread about the
13  facility?  Where are stowers located in the building?
14  A.  They are stow -- I mean the stations of stowers are
15  in certain areas.
16  Q.  Okay.  And where are those areas?
17  A.  Fixed areas.  They're in -- Amazon has two buildings.
18  One is the old building, their first building they
19  built.  It's a small building.  There is a few
20  stowers on one floor I believe, yeah, one floor in
21  that building.
22  Q.  Did you ever work in that building?
23  A.  Yes, I have.
24  Q.  And the stowers that work in that building all work
25  in the same area?

1  A.  They work -- no, they worked in different areas,
2  different section, area of one main level.
3  Q.  Okay.
4  A.  But it's very few.  It's like 10 or so.  And the big
5  building, that's where I worked a lot where I asked
6  too, requested and begged HR if I could stay working
7  in that building because it was a nice building and
8  it was a big building and I liked working there.  Our
9  stowers are stationed in floor levels of different
10  sections, again, of different areas of the building.
11  Q.  Okay.  And --
12  A.  Different side, side of -- parts of the building,
13  yeah, different side.
14  Q.  When you said you wanted to keep working in the big
15  building, were you allowed to keep working in the big
16  building?
17  A.  Yes, I was.
18  Q.  And do you know how Amazon management would decide
19  where they were going to assign the various stowers
20  that were on any given shift?
21  A.  Yeah.  We know in advance.  We stowers know in
22  advance.  We know on the -- during our -- the meeting
23  of the day, the meeting of the day.
24  Q.  I guess my question was something slightly different.
25  Do you know how management decides where they're

1  going to place each one of the stowers and how they
2  make the decision about which area you're going to be
3  put into?
4  A.  No, I don't know that.
5  Q.  Are all of the areas where the stowers work, are they
6  typically towards the back end of the buildings?
7  A.  Yes, yes.  And I was always in the back end of the
8  building.
9  Q.  Because that's where the stower function is
10  performed, right?
11  A.  Yes.
12  Q.  Okay.  Because as the merchandise comes into the
13  building, one of the -- as we talked about, one of
14  the first areas it goes through is the stower area,
15  correct?
16  A.  Yes.
17  Q.  So -- okay.
18  A.  They're located in the front end of the building,
19  too, though, and the back end of the building.  It's
20  like wings, a wing side, a part of the building, wing
21  one, wing two, wing back, wing front.
22  Q.  Okay.
23  A.  The front would be like where the entrance is where
24  people come in.
25  Q.  Is there any difference in the kind of items that are

26 (Pages 98 - 101)

Veritext Legal Solutions
www.veritext.com
888-391-3376
Case 2:16-cv-01056-WED  Filed 08/15/17  Page 26 of 63  Document 28

1    stowed from the back end of the building versus the
2    front end of the building?
3 A.  Sometimes. It depends on -- it depends on the
4    product. There are different products. And stowers
5    don't always have the same products to stow. There
6    are different boxes from different -- and different
7    companies and different items.
8 Q.  Did you notice that most people had a normal area, if
9    you will, where they worked, a normal job assignment
10    that they would typically be assigned as a stower to
11    work in the same area shift and shift?
12 A.  No, because that's not Amazon -- that's not how the
13    managers worked. That's now how it go because they
14    told us in orientation, every employee was told in
15    orientation, and they say that in orientation when
16    they first hire you, every employee may have to work
17    in a different area of the building as a stower if
18    you were a stower.
19 Q.  And did that happen for you? Did you work in
20    different areas of the building?
21 A.  Yes. They assigned me to different buildings,
22    different areas, all the time.
23 Q.  So one of your allegations in this case is that
24    because of your skin color you were assigned to work
25    in the back of the building.

1 A.  Most of the -- most of the time I was working in the
2    back, their back section, back of the building.
3 Q.  And is that where most of the stowing is performed?
4 A.  No. Most of the stowing is performed in the middle,
5    middle area of the building. Sometimes in the front
6    of the building.
7 Q.  Okay. And do you know --
8 A.  No, not in the back because I would not have -- they
9    would -- I would sometimes have stall 5 or 10 minute
10    time to wait for some more product to come to me,
11    boxes and stuff to come to me.
12 Q.  Do you know why -- how the company made the decision
13    to place you in the spot you were placed on each
14    shift?
15 A.  No, I do not know why. And sometimes I was asked --
16    I asked the supervisor. I would ask Mr. Griffin.
17 Q.  And what did he tell you?
18 A.  He would tell me well, you know, we can only -- us
19    managers can only assign you according to where we
20    got places to -- that we need help in right away. We
21    need the work, the job done right away.
22 Q.  Okay.
23 A.  But it was all -- but most of the time, 80 percent of
24    the time, I was always in the back.
25 Q.  Okay. So Mr. Griffin explained to you that you would

1    be assigned back there because that's operationally
2    where the company needed help?
3 A.  One of the, yeah, one of the places, yeah.
4 Q.  And what facts do you have that would support your
5    conclusion that you were in fact assigned to the back
6    of the building or in an upstairs location because of
7    your race?
8 A.  I don't have any physical fact, no video, no pictures
9    or none of that.
10 Q.  Well, and not just videos or pictures but are there
11    any facts that you have, information of any kind that
12    would support a conclusion that your job assignment
13    in the back of the building was based on your race?
14 A.  I don't have anything physical to state that.
15 Q.  And do you have any facts or evidence that would
16    support a conclusion, any information of any kind
17    that you were assigned to the back of the building or
18    an upstairs location because of your age?
19 A.  No, I don't.
20 Q.  Okay. And one of the allegations in the complaint is
21    that you would be placed there in the back of the
22    building or in the upstairs because the company had
23    the CEO or famous people come through, they wouldn't
24    see you, for example. Do you recall making that
25    allegation?

1 A.  Yes, I do.
2 Q.  You understand the CEO of the company is Jeff Bezos?
3 A.  Yes, I do.
4 Q.  Did Mr. Bezos ever come through the facility on your
5    shift?
6 A.  He did, but I would never see him.
7 Q.  Did he come through -- you said you worked the
8    overnight graveyard shift?
9 A.  Yes.
10 Q.  Was Mr. Bezos in the Amazon facility in Kenosha,
11    Wisconsin during one of your shifts?
12 A.  I heard he was. I heard he was, but I never saw him.
13 Q.  Who told you Mr. Bezos was there?
14 A.  It was -- like I -- two or three girls that I used to
15    talk to on the day of the -- each -- before, whenever
16    I -- I only see them the beginning of the shift, you
17    know, during the meeting.
18 Q.  Fair to say that you heard a rumor that Mr. Bezos was
19    there?
20 A.  Yeah, right.
21 Q.  But you don't know if it's true or not?
22 A.  Right.
23 Q.  Are you aware of any other famous people who were at
24    the Kenosha, Wisconsin Amazon facility during one of
25    your overnight shifts while you worked there?

27 (Pages 102 - 105)

Case 2:16-cv-01056-WED    Filed 08/15/17    Page 27 of 63    Document 28

1 A. Yeah, I heard that the governor was there, came, and
2 but I wasn't -- I didn't know. I didn't see, again.
3 Somebody told me.
4 Q. So you don't know one way or the other whether the
5 governor was actually there?
6 A. Oh, you know what, the governor, yeah, because one of
7 the meetings, two or three of the managers of the
8 cafeteria meeting mentioned he was there.
9 Q. And --
10 A. So that's a fact, yeah.
11 Q. Well, and he may have gone to the facility. Do you
12 know if he was there during the overnight hours that
13 you worked?
14 A. That I do not know. They didn't say what time
15 actually he was there. He came to one of the
16 buildings.
17 Q. Okay. And did any of the -- any other famous people
18 come to the Amazon facility during one of your shifts
19 while you worked there?
20 A. Not that I know of.
21 Q. Do you have any facts that would support a
22 conclusion, any information of any kind that your job
23 assignment was in any way associated with the desire
24 to not have Mr. Bezos or any other potentially
25 important or famous people not see you?

1 A. Yeah, see, I don't have any -- no, no written
2 evidence, no petition. Because of the fact that
3 Amazon don't -- they refuse to have anyone do any --
4 bring anything in as video, camera or your cell
5 phone, couldn't bring that in. I was -- they told
6 me -- I was told when Mr. Griffin fired me, I was
7 told I couldn't go back on the premises to get a
8 petition because I was -- on the day he fired me, in
9 that office, when me and -- head supervisors, I asked
10 him is it possible I could come back here to possibly
11 get, you know, some evidence just in case? He said
12 just in case what? I said just in case I may need it
13 like a petition of people I might have known, I might
14 have talked to, was cool we're here, did work with.
15 He said no, you can't be -- you can't -- you're not
16 allowed on any part of the premises after our meeting
17 other than being only in the area where security is,
18 window, the window.
19 Q. And so it's fair to say --
20 A. He told me the lobby entrance, right.
21 Q. Fair to say as you sit here today with the
22 information that you know today, you're not aware of
23 any information or facts, actual facts, that support
24 your conclusion that your job placement was in any
25 way, and when I say job placement, I mean your

1 physical location assignment within the facility, was
2 in any way related to your age or race?
3 A. I was not aware. I don't have any physical evidence
4 again, no -- I don't have a petition to prove it.
5 Q. And you understand that you have made claims of age
6 discrimination and race discrimination in this case?
7 A. Yes.
8 Q. And who do you claim discriminated against you?
9 A. With age discrimination, I believe it was
10 Mr. Griffin.
11 Q. Okay. And do you claim that Mr. Griffin is also the
12 one that discriminated against you because of your
13 race?
14 A. Not only -- no, because of my age.
15 Q. Okay.
16 A. I believe it's because of my age. He was -- I've
17 seen him be cool with other people that were African
18 American. But I also think HR department is also
19 involved with me being fired because of my age as
20 well because they are in charge to hire and fire
21 which the head woman, the woman that was the
22 supervisor in the office with me and Mr. Griffin, she
23 was in charge, one of the head managers' boss of HR.
24 Q. And did you tell me you can't remember her name?
25 A. I can't remember her name, no.

1 Q. And I don't want to take what you've said out of
2 context. So if I have, please correct me. But as
3 I'm hearing you, I'm hearing that you are not
4 accusing Mr. Griffin of having terminated or Amazon
5 of having terminated your employment because of your
6 race; is that right?
7 A. Yes.
8 Q. So really your claim in this case is that you were
9 terminated because of your age?
10 A. I believe I was terminated because of my age.
11 Q. Okay.
12 A. Because Amazon has now 50 percent African American
13 workers there, 50 percent Caucasian workers and other
14 races. But they have, it looks like they have 10
15 percent of us people that are in their 40s and older
16 and the rest is young people. So a lot of young
17 people working for Amazon.
18 Q. So although you asserted a claim of race
19 discrimination in this case, am I understanding you
20 correctly, and please, again, correct me if I'm
21 wrong, but am I understanding you correctly that
22 based on further consideration, you no longer believe
23 that you were discriminated against based on your
24 race at Amazon?
25 A. Yes, just the age.

28 (Pages 106 - 109)

Veritext Legal Solutions
www.veritext.com                                              888-391-3376
Case 2:16-cv-01056-WED    Filed 08/15/17    Page 28 of 63    Document 28

1 Q. Okay.

2 MS. FITZKE: Why don't we take a short

3 break.

4 (Recess taken.)

5 BY MS. FITZKE:

6 Q. Going back on the record then after our break, so we

7 talked a little bit -- we started talking a little

8 bit about your discrimination claim before the break,

9 and I want to just kind of circle back and say, you

10 know, when was the first time you claim that you were

11 subject to any unfair or discriminatory treatment

12 based on your age while you worked for Amazon?

13 A. It was when the third evaluation came, when

14 Mr. Griffin came to my station.

15 Q. The third evaluation?

16 A. Um-hum.

17 Q. Is that a yes?

18 A. Yes.

19 Q. And was that the one you were describing in late

20 February?

21 A. It would be the first week in March.

22 Q. First week in March?

23 A. It would basically be the first week in March. I'm

24 sorry, the second week in March. No, it would be the

25 second week.

1 Q. Okay. So in terms of the counseling that you might

2 have received before that, you didn't have any reason

3 to disagree or believe that the counseling was

4 motivated by your age?

5 A. In terms of before the second week in March? That

6 way?

7 Q. Um-hum.

8 A. No, I don't think so.

9 Q. We talked before the break about how a couple of the

10 other departments had made complaints about your

11 stowing to Mr. Griffin. Did you understand that the

12 computer system had also flagged some issues with

13 your performance?

14 A. The -- yeah. He showed me -- Mr. Griffin showed me

15 that there was computerized printouts of my

16 performance. And he stated that that's one reason

17 why he go by the evaluation. It's mostly by those,

18 those statements that the computer states which is

19 what the complaints were of the other two departments

20 of my performance.

21 Q. So Mr. Griffin was relaying to you that he placed

22 greater reliance on the computer's reports about your

23 stowing than he did on some of the verbal feedback

24 that he got about your performance, is that what

25 you're saying?

1 A. No, I'm saying that the computer, whatever was on the

2 computer, the printouts, that was also what they

3 stated on there, the departments that the verbal --

4 it was the same thing.

5 Q. Some of the -- I want to make sure I understand.

6 Correct me if I'm wrong, like you did last time, that

7 was good. So the departments that complained that

8 you had stowed incorrectly, they base their

9 conclusions that you had stowed incorrectly based on

10 some computerized reports, and Mr. Griffin then

11 relied on those computerized reports?

12 A. Yes.

13 Q. And -- okay. Well, let's talk then about some of the

14 performance feedback that you got while you worked

15 for Amazon. And we're going to do that by walking

16 through I think some documents that I have in front

17 of me. And we'll -- I'll share them with you as we

18 kind of go through the time sequence here.

19 (Exhibit 3 marked.)

20 BY MS. FITZKE:

21 Q. Ms. Timms, showing you Exhibit No. 3 to your

22 deposition, are you familiar with these -- the format

23 of this document, the supportive feedback document?

24 A. Yes, I am.

25 Q. And when there was occasion for management to talk to

1 you about how you were performing or to give you one

2 of these supportive feedbacks, did your manager have

3 a document that looked like Exhibit No. 3 in front of

4 him?

5 A. Yes, he did.

6 Q. And this document that we've marked as Exhibit 3

7 under communication history identifies that you

8 received a documented verbal warning on January 21 of

9 2016. Do you have any reason to dispute that you

10 received a documented verbal warning on that date?

11 A. No.

12 Q. And were the performance feedback that you received,

13 was it typically related to having stowed items in an

14 incorrect place?

15 A. I believe that might have been. Because he said --

16 every evaluation that's what he stated.

17 Q. Okay. I probably should have started this one in

18 time, but let's go ahead and look at what we're going

19 to mark as Exhibit 4.

20 (Exhibit 4 marked.)

21 BY MS. FITZKE:

22 Q. Showing you now Exhibit 4 which is another supportive

23 feedback document. This one is a documented verbal

24 warning for -- and it indicates quality. On the

25 bottom of the page there is associate signature, and

29 (Pages 110 - 113)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 29 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                888-391-3376

1    it looks like your signature, Athena Timms; is that
2    right?
3 A.  Yes.
4 Q.  And did you sign this document on or about February
5    18 of 2016?
6 A.  Yeah, I did sign that.
7 Q.  And the manager's signature below is kind of
8    impossible for me to read.  Do you recall which
9    manager you reported to at that time or who --
10 A.  This was Integrity Staffing supervisor.
11 Q.  Okay.
12 A.  I can't think of his name.  I visualize his face, but
13    I don't know his name.
14 Q.  Okay.  And this is a documented verbal warning that
15    you received in conjunction with your stowing
16    activities, correct?
17 A.  Yes.  But that was before I was an Amazon employee.
18 Q.  Correct.  So the Integrity folks that were
19    supervising you at the time drew the conclusion that
20    it was necessary to give you a documented verbal
21    warning, correct?
22 A.  This wasn't a verbal warning really.  He told me, he
23    said this is just my -- this is just an evaluation.
24    But all in all, it's excellent.
25 Q.  You were told that this was excellent?

1 A.  Um-hum.  I was told this was an excellent evaluation.
2 Q.  And who was the Integrity Staffing person that told
3    you this was excellent?
4 A.  I can't think of his name.  But he was an Integrity
5    Staff like a supervisor.  He did like a supervisory
6    job, things that a supervisor at Integrity Staffing
7    would do, yeah.  He was Integrity Staffing employee,
8    but I don't know what his position really, really
9    was.  He was informed to get me the evaluation.  He
10    told me he was assigned to come to me, talk to me.  But
11    he said it was an excellent evaluation.  He said I'm
12    doing an excellent job.
13 Q.  Under details of current incident/specific concerns,
14    it's noted that there was -- under the performance
15    column there is a number 1.  Do you know what that
16    means?
17 A.  He told me, but I forgot what it meant.  But he said
18    that it's supposed to be -- it's really a good -- all
19    in all, it's a good -- the evaluation was good.  But
20    he told me, but I forgot what that meant.
21 Q.  Did you understand that the 1 performance, it was an
22    issue of poor performance?
23 A.  Oh, yeah, yeah.  But he said because it was on a
24    point system or something.  But he said that all in
25    all I'm doing a good job.

1 Q.  And under -- above that under communication history,
2    it notes that you received a documented verbal
3    counseling on 11-5 of 2015, do you see that there?
4 A.  Yeah, um-hum.
5 Q.  And you did in fact receive that documented verbal
6    counseling identified in Exhibit No. 4 on November
7    5th of 2015?
8 A.  I did receive it you asked?
9 Q.  I'm asking you, you don't have any reason to dispute
10    that you received a documented verbal counseling
11    relating to your performance on November 5th of 2015?
12 A.  Oh, no.
13 Q.  And that that counseling was critical of your
14    performance?
15 A.  Yeah, right.
16 Q.  And I assume that part of the counseling was to give
17    you information or counseling in term of how you
18    could improve your performance?
19 A.  Yeah.
20 Q.  And in this meeting that you had on February 18 of
21    2016 with the Integrity supervisor, did you also
22    receive feedback in that meeting regarding how you
23    could improve your performance?
24 A.  Yeah.  He told me that, you know, I'm doing a good
25    job, just -- he was trying to tell me, ask me how I

1    stow physically, physically.  So I had to show him
2    physically how I was -- I stow.  And he said -- he
3    gave me some pointers on how I should stow correctly,
4    physically, because you had to -- if it's the low
5    bins, you had to fill in you, you had to stow, fill in,
6    put in retail items.  You would have to bend, not
7    just -- you have to get on your knees and bend and
8    not just bend over to put -- because he was telling
9    me that he didn't want me to hurt my back because
10    there had been issues on the job that a lot of
11    employees had back problems.
12 Q.  And so just to confirm then, when you received the
13    supportive feedback that was documented in Exhibit
14    No. 4 that's identified as a quality documented
15    verbal, you do acknowledge that an incident of poor
16    performance was discussed with you during this
17    meeting?
18 A.  There was no poor performance discussed because
19    Griffin, Jason Griffin, did not give me this.  It was
20    Integrity Staffer employee.
21 Q.  And I thought we had -- under details of current
22    incidents and specific concerns, there is an item
23    there under performance, there is a number 1.  And I
24    thought your testimony earlier was that you
25    acknowledged that that was an issue of poor

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 30 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                              888-391-3376

1  performance that was documented and then discussed
2  with you in this meeting. Is that incorrect?
3  A. Oh, the 1, I understood what the 1 might have been,
4  but that was not -- this was -- this meeting was not
5  really done in this way. I mean the performance was
6  supposed to be good or whatever, but I don't know.
7  Griffin wasn't here. He gave -- some Integrity
8  staffer had to do my evaluation at this day because
9  Griffin couldn't do it. But I don't understand why
10  he -- and the numbers look like they were different,
11  too. It looked like Griffin -- but Griffin might
12  have wrote a new form from what the Integrity
13  staffer, because this does look different than what
14  the Integrity staffer did.
15      And the Integrity Staff employee, he
16  showed -- supervisor, he showed me the form, this
17  form of my feedback on February 18th, 2016. So I
18  don't think --
19  Q. Are you now denying that you signed off on this
20  document that's --
21  A. I did sign on this. But as far as the numbers go and
22  all, that this did not -- this wasn't the same
23  document of the Integrity Staffer employee because
24  he -- the Integrity Staffer employee after he showed
25  me, told me okay, this is something -- tips you can

1  improve your performance of your job. And he showed
2  me physically on what I could do. Bend or -- instead
3  of -- on my knees instead of whenever I -- he was
4  trying to tell me how to stow bins from the bottom of
5  the cart thing and also other pointers of what items,
6  make sure -- telling me make sure I do everything
7  else right that I been doing.
8      Then he showed me a form to sign. And it
9  was in February where he came to my station to sign
10  it on the 18th. I don't remember Griffin coming to
11  see -- because he said he had to take Griffin's
12  place --
13  Q. Okay.
14  A. -- to evaluate me.
15  Q. And I don't want to talk about Griffin, I want to
16  talk about what you heard from this Integrity
17  Staffing manager in your meeting on February 18,
18  2016.
19  A. He was in my face.
20  Q. Who was in your face?
21  A. Integrity Staffing, he was there, physically.
22  Q. Right. And so what I want to talk about is that
23  meeting and what happened in that meeting.
24  A. Okay.
25  Q. Okay. And what I'm not understanding from your

1  testimony is the document that is Exhibit 4 that you
2  signed, are you claiming that the document that you
3  signed did not have the information under the details
4  of current incident/specific concerns or the
5  performance trend information that we have here on
6  Exhibit No. 4?
7  A. What I'm saying is I don't remember seeing these
8  numbers and my performance being 1. Because he
9  pointed it out to me, the Integrity staffer.
10  Q. Pointed what out to you?
11  A. He pointed out to me the detail current
12  incident/specific concern, he pointed out to me,
13  yeah, all sections of this page and the performance
14  trend. And the numbers were different than this.
15  Q. So you're saying that the numbers that are on Exhibit
16  No. 4 are not the numbers that were on the form that
17  you signed?
18  A. Yeah, right. Because he told me okay, I want you to
19  sign this. And I did sign it. So -- and it was
20  February 18th he came to me. So it must be -- and I
21  don't remember Griffin coming because Griffin didn't
22  come to me that day. Griffin probably had to fill
23  this out which I think he did. And I don't think --
24  I might have signed two forms because Griffin -- I
25  didn't see Griffin on this day. I saw the Integrity

1  Staffer supervisor or person that took the place of
2  Griffin because he said I'm coming in place of him
3  because I have to do your evaluation.
4  Q. Okay. I don't want to talk about Mr. Griffin.
5  A. Yeah.
6  Q. I want to talk about the form and the information on
7  the form.
8  A. Okay, that's the form, okay.
9  Q. So it's your testimony if I'm understanding you
10  correctly that you did sign the form that is Exhibit
11  No. 4, and that's your signature, and you signed it
12  on February 18, 2016. But the information in the
13  form you signed was different than the information
14  that's in the form that is Exhibit 4?
15  A. Yeah. It looked different. It is different.
16  Q. Is it your testimony that the numbers were different?
17  A. Yes, my testimony the numbers were different.
18  Q. Can you explain to me how the numbers would get in
19  this form after you signed it?
20  A. Only thing I know is that the Integrity Staffer guy,
21  he was Latino American -- yeah, that was his, I'm
22  just explaining to you as describing him, and he was
23  a supervisor, he was doing supervisory things. And
24  he told me that day I'm coming in place of Griffin
25  because he can't come to do your evaluation at this

31 (Pages 118 - 121)

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 31 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1  time.  So then he told me, he physically did things
2  to tell me things about the job.  Then he showed me
3  numbers that weren't like this at all.  This was --
4  he gave me two forms to sign, and the numbers on this
5  form he did not write.  He wrote in boxes.  He wrote
6  in the boxes, performance and all.  My performance
7  wasn't a 1.  He didn't write it.  That's why I'm like
8  this is weird document I'm seeing of Griffin.  But I
9  remember Griffin can fill out a form, of a blank form
10  of me signing something.  That has happened before.
11  So I don't know how the numbers were like this.
12  Q.  Did you sign a form on an Integrity -- see how on
13      the --
14  A.  Yes.
15  Q.  -- upper right-hand or upper left-hand corner it says
16      Integrity?
17  A.  The answer is yes.
18  Q.  Did you sign a blank supportive feedback document
19      while you were an Integrity employee?
20  A.  As I recall, yes.  Because he showed -- the Integrity
21      Staff Solution showed me that.  He showed me two
22      forms.  And one didn't -- he didn't have --
23      one didn't have the numbers in them yet.  And another
24      one I saw him write in the boxes, physically write in
25      the boxes.

1  Q.  Where did he get the information to write the numbers
2      in the boxes?
3  A.  No, he wrote -- he was writing comments or something,
4      and then a number.  I guess of, you know, performance
5      and all that.  Sometimes supervisors do that.  But
6      that's what I would think.  That's what I remember.
7      And I don't remember these numbers being this --
8      these numbers on this document.
9  Q.  Would you agree with me that the numbers on this
10      document are not reflective of excellent performance?
11  A.  Yes, I agree.  But --
12  Q.  Do you have any reason to dispute that you had eight
13      errors on January 15 of -- excuse me, January 18 of
14      2016 as noted on the performance trend?
15  A.  No, I don't dispute that because he did tell me I did
16      have eight errors.
17  Q.  And did he also tell you that you had eight errors on
18      January 25 of 2016 as noted in this document?
19  A.  I don't remember if he said -- he said more than
20      eight.
21  Q.  Okay.
22  A.  He said more than eight, so the answer is no I guess
23      because he said more than eight.
24          (Exhibit 5 marked.)
25  BY MS. FITZKE:

1  Q.  Showing you, Ms. Timms, what we marked as Exhibit 5
2      to your deposition which is a 5-5-5 stow audit.  Do
3      you remember what the 5-5-5 stow audits were?
4  A.  The 5-5 stow items?  Those probably would have
5      been -- I don't really remember, but it was retail
6      items.
7  Q.  Do you recall there being a process while you were at
8      Amazon, the 5-5-5 process where stowers such as
9      yourself, they would take five minutes to explain
10      something to you, five minutes to show you and then
11      five minutes watching you do something to see if it's
12      done correctly?
13  A.  Oh, yeah, yeah, I do remember that.
14  Q.  And do you understand that the 5-5-5 stow audits
15      would be done with people to help improve and assist
16      their performance?
17  A.  Yes.
18  Q.  And do you recall that a 5-5-5 stow audit was
19      completed with you the day after you signed that
20      performance -- or excuse me, signed that supportive
21      feedback document on 2-18?
22  A.  Yeah, that's true.
23  Q.  And do you recall who did the 5-5-5 stow audit with
24      you?
25  A.  It was a supervisor -- female supervisor.  I can't

1      remember her name.  She was the Amazon staff.  I
2      can't remember.
3  Q.  Okay.  It looks like the trainer is identified as --
4      I can't quite read her name but it looks like --
5  A.  Yeah, it was a female supervisor, right.
6  Q.  Well, okay.  I can't read her name, so you can't
7      either?
8  A.  I don't remember her name.
9  Q.  There is a name on the trainer line.  If you look at
10      that in front of you, can you tell me are you able to
11      recognize her name?
12  A.  E D -- oh, trainer E D Z, Edzale.
13  Q.  Do you recall someone with that name?
14  A.  I don't remember her name.
15  Q.  Okay.
16  A.  But yeah, it was a female supervisor.
17  Q.  Do you recall some of the feedback that you got
18      during your 5-5-5 audit was to put the products in
19      the bin before you scanned it?
20  A.  Yes.
21  Q.  And do you recall getting feedback that you needed to
22      be looking at the computer screen?
23  A.  Yes.  And I've told them I always do that.  I always
24      look at the computer screen before I stowed the item
25      in the bin.

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 32 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                                888-391-3376

1  Q.  Did you also get feedback that you needed to be
2      keeping the scanner in your hand that's closest to
3      the pods?
4  A.  Yes.
5  Q.  Are the pods the same thing as the bins that you're
6      putting the products into?
7  A.  Right.  The pod is in the -- the bin is the big
8      thing, and the pod is the like the inner basket, the
9      input basket, the open sack or however you want to --
10 Q.  Were you given feedback about making sure to utilize
11     the entire pod from the top down?
12 A.  Yes.
13 Q.  Were you given feedback regarding using the bin
14     sweeps, using your hands to look for more space in
15     the bins?
16 A.  Yes.
17 Q.  Were you given feedback at this 5-5-5 audit regarding
18     the pace at which you were stowing?
19 A.  Yeah, they said I was a fast stower.
20 Q.  On the bottom left-hand corner, the box that's down
21     there, there is an item stows -- stow at least 10
22     items per pod, per pod face if possible, and it's
23     checked no.  Did someone talk to you about making
24     sure you were stowing enough items in the pod?
25 A.  Yes.  A supervisor always told me every time.

1  Q.  That you were doing -- that you needed to be sure to
2      put enough items in the pod?
3  A.  No, they told me to make sure that closest to the
4      pod, right, scan your left hand, pod is on the left,
5      yeah, tell me how to hold the scanner while placing
6      it close to me or to it -- to scan the pod.
7  Q.  Did you get feedback from the trainer that the
8      trainer didn't think that you were utilizing all
9      available space in the pod before releasing it?
10 A.  No, I didn't get -- no.  They never said that.  None
11     of them ever said that.
12 Q.  Did you get feedback that you did not keep your hand
13     on the bin until the green banner confirms the stow
14     activity and that you needed to do that?
15 A.  No, because I've done that.  Yeah, I'm supposed to
16     keep it on, keep my hand on and then scan while
17     looking at the screen.  And no, they have told
18     me that.  Because some -- all of them actually told
19     me that they -- that they keep doing that.  What I'm
20     doing is right, that I been doing that right.
21 Q.  Do you know why the trainer checked the box that said
22     that you weren't doing that?
23 A.  No, I do not know why because I was doing that.
24 Q.  You don't have any reason to believe this trainer
25     evaluated you unfairly because of your age, do you?

1  A.  The trainer, the trainers that came to me, I don't
2      know.  I don't know.  Possibility.  They have the
3      mentality I believe like the supervisors, you know.
4      I believe it could have been that, could have been an
5      age thing because they do -- they probably do talk --
6      I haven't seen them talk to the younger stowers based
7      on what they -- when they used to talk to me about
8      the fact that they have -- I have to get a trainer
9      once I get evaluated badly.
10 Q.  Do you have any facts that would support a conclusion
11     that you were evaluated on 2-19-16 unfairly in any
12     way because of your age?
13 A.  I don't have any physical facts, no.
14 Q.  And on this evaluation form, Exhibit 5, on the 5-5-5
15     stow audit form, it notes in the middle of the
16     left-hand side on quality it says:  Turns toward
17     their screen every time they go to slow an item
18     instead of turning toward the pod with their back
19     facing the screen.  This enforces the need to verify
20     their screen.
21         That item is checked no, that you were not
22     engage anything that behavior.  Was that discussed
23     with you?
24 A.  No, that wasn't discussed.
25 Q.  Do you have any -- do you acknowledge that that was

1      something you were not doing correctly?
2  A.  No, I wasn't acknowledged that.
3  Q.  Do you have any reason or do you have any knowledge
4      as to why the trainer checked no for that box?
5  A.  No, I do not.
6  Q.  Okay.  When you did the 5-5-5 stow audit on February
7      19, 2016, do you recall the performance related
8      issues that were worked on with you at that time
9      during that stow audit?
10 A.  Yeah, I do.  I do remember.  I can't recall exactly,
11     but I do remember.
12 Q.  And what was that?
13 A.  What -- I don't have an example or -- but I do
14     remember the time, the you, you know, the contact of the
15     trainer and me.
16 Q.  You just don't recall the specific performance issues
17     that you worked on in that meeting?
18 A.  Yeah, I don't remember all of exactly we all did.
19 Q.  Okay.  In terms of the performance coaching that you
20     received, I'll show you another document to kind of
21     aid our discussion here.
22         (Exhibit 6 marked.)
23 BY MS. FITZKE:
24 Q.  I'm showing you Exhibit 6 to your deposition.  It
25     looks like this is a document you signed on March 10

Veritext Legal Solutions
www.veritext.com                                              888-391-3376

1 of 2016.
2 A. There is a lot of documents I did not sign because I
3 refused to sign it for the fact that my performance
4 was excellent, and I always felt they were excellent.
5 So I did not sign it. I told Mr. Jason Griffin you,
6 know, every time he asked me to sign something, I
7 told him no, I'm not going to sign because I felt
8 that my performance was correct. And it was the
9 second and third and fourth evaluations.
10 Q. Ms. Timms, I do have some documents, and we'll get
11 there, where it was noted that you refused to sign.
12 A. Yeah.
13 Q. But what I want to talk to you about is Exhibit No.
14 6. And it looks like on the associate signature line
15 that that is your signature there?
16 A. I don't know how they get it because I never signed
17 the feedback documents.
18 Q. You're saying you never signed any of them?
19 A. Come March and the third week of March, yeah, because
20 they would ask for me to sign, and I would not sign.
21 Jason would ask me to sign, Mr. Griffin would ask me
22 to sign something, and I would refuse.
23 Q. And like I said, I know there are some, and I have
24 some documents that you in fact refused to sign.
25 A. Yes.

1 Q. And what I'm asking you is is it your claim that that
2 is not in fact your signature here on Exhibit 6?
3 A. That is my signature, but I did not sign this.
4 Q. Do you know how your signature got on Exhibit No.
5 6 --
6 A. No.
7 Q. -- if you did not sign the document?
8 A. No.
9 Q. Do you claim that the company forged this document,
10 Exhibit 6?
11 A. I'm not saying they forged it or not. I don't know
12 if that's what that means.
13 Q. Okay.
14 A. But when -- and in any document that Mr. Griffin
15 wanted me to sign after the third -- the second, the
16 third and the fourth evaluation, I always refused to
17 sign the documents. And in some of these is this, is
18 this form like this that he would give to me to sign.
19 So I don't know how my signature gets there because I
20 told him no, I'm not going to sign it.
21 Q. And I guess my question to you is we know there are
22 other documents like this that you refused to sign.
23 A. Right, yes.
24 Q. And my question to you is do you have a specific
25 recollection of meeting with Mr. Griffin on or about

1 March 10, 2016 and refusing to sign this document, or
2 is it possible that you did in fact sign this
3 document and you started refusing to sign them after
4 this meeting?
5 A. I probably did refuse to sign them. I did -- I don't
6 remember signing this.
7 Q. Okay.
8 A. So that's my answer, no, I don't remember signing
9 this.
10 Q. You don't dispute that you had --
11 A. I dispute this.
12 Q. I understand you dispute that you signed this
13 document.
14 A. Yes.
15 Q. But that you admit that that's your signature on the
16 document, correct?
17 A. Yes.
18 Q. So with regard to -- do you dispute that you were
19 given a final written warning by Mr. Griffin on or
20 about March 10, 2016?
21 A. Yeah.
22 Q. You dispute that?
23 A. I dispute it you say?
24 Q. Correct.
25 A. No, I don't dispute it. He did give me a warning.

1 Q. A final -- you understood you were placed on a final
2 warning on or about March 10 of 2016 due to
3 Mr. Griffin's perception that your performance was
4 not meeting company expectations?
5 A. Yeah, but not a final warning on the 10th. He didn't
6 give me a final warning on the 10th.
7 Q. That was my question.
8 A. Okay, no, he didn't give me a final warning. He gave
9 me a warning.
10 Q. Okay. You acknowledge that you got a performance --
11 a warning related to your performance on or about
12 March 10 of 2016?
13 A. Yeah.
14 Q. And you understood that that performance warning had
15 to do with Mr. Griffin's understanding or belief that
16 you were not correctly stowing items?
17 A. That's what the thing was. That's what the warning
18 was.
19 Q. Okay. And you understood that Mr. Griffin did not
20 believe that you were correctly stowing items based
21 on, in part, the information contained in this form
22 that, for example, on 1-25-16 that there were eight
23 errors?
24 A. No, I'm not disputing that.
25 Q. And you understood that Mr. Griffin at this time had

34 (Pages 130 - 133)

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376
Case 2:16-cv-01056-WED   Filed 08/15/17   Page 34 of 63   Document 28

1    gotten -- was continuing to get reports from the
2    other departments about their belief that you were
3    not correctly stowing items?
4 A.   Yeah, yeah.
5 Q.   Do you have any facts that would support that
6    Mr. Griffin put you on -- gave you a performance
7    warning of any kind on March 10 of 2016 because of
8    your age?
9 A.   No, I don't have any physical footage, video footage,
10    no text message.  I have no evidence, no physical
11    evidence.
12 Q.   Any other information of any kind?
13 A.   No.
14 Q.   And this document, Exhibit 6, also notes that on
15    February 25 of 2016 that you received performance
16    coaching as well.  Do you have any reason to dispute
17    that that occurred?
18 A.   No, I don't dispute that.  That was.
19 Q.   And then I have another document, and we'll get it in
20    the record, but on the day after you received that
21    coaching on February 25 of 2016, you received some
22    additional training from Amazon, do you recall
23    receiving -- being retrained?
24 A.   Yeah, yes.
25       (Exhibit 7 marked.)

1 BY MS. FITZKE:
2 Q.   Showing you Exhibit 7 to your deposition, Ms. Timms.
3    This is a form called retraining results RTR form.
4    Have you seen this document before?
5 A.   No, I have not.
6 Q.   Okay.  You don't dispute, however, that you did
7    receive some retraining on or about February 26th of
8    2016?
9 A.   No, I don't.
10 Q.   Do you recall who completed that training with you?
11 A.   No, I don't.
12 Q.   At the top it says shift trainer, and it says, it
13    looks like My-Mike.  I don't know what that is.  Do
14    you?
15 A.   No, I don't.
16 Q.   Do you recall receiving feedback that you should be
17    stowing with both hands?
18 A.   No, they didn't tell me that.  They said that, you
19    know -- they just said keep doing what I've been
20    doing, keep stowing right and everything.
21 Q.   So you don't recall receiving any advice or
22    encouragement to use both hands while stowing the
23    items?
24 A.   No, I don't.
25 Q.   Did --

1 A.   They must have wrote this after they evaluated me.
2 Q.   During any of your training did you get advice to
3    slow down?
4 A.   Yeah, I did.
5 Q.   What else do you recall?  What other information or
6    tips did you get during your retraining?
7 A.   They -- it was a female that last retrained me.  She
8    told me to -- that, you know, just slow down for the
9    fact that she knew I was stowing real fast because
10    I'm good with the scanner and just quickly just scan
11    the item, scan the bin, you know, and look at the
12    computer.
13       But she told me to slow down a little bit
14    because -- it was something she said why to slow down
15    a little bit.  She thought -- she saw -- she saw that
16    the computer was doing the little, you know, stow the
17    next item, stow the next items real quick whereas it
18    looked like I wasn't -- one item I scanned, it would
19    be in there.  Because when you put the gun laser on
20    the item and keep putting it on the same item, it's
21    not going to -- it's not going to stay.  It's not
22    going to show the quantity.
23       And like if you -- because she thought
24    that I was stowing -- she saw me probably clicking on
25    it twice one item.  And then the computer said stow

1    the next item.  Then she saw what one of my problems
2    might have been.  So she told me -- that's why she
3    told me to slow down.
4 Q.   Okay.
5 A.   Yeah, it was a female who trained me from a different
6    department though.  But she trained -- retrained me
7    for that.
8 Q.   And how was --
9 A.   The previous trainer's evaluation was a guy.
10 Q.   And how was the training done?  Would the person
11    giving you the retraining, would they just watch how
12    you were doing it and then give you advice, or would
13    they show you how to do it?  Like how -- describe for
14    me how the training was --
15 A.   She just gave me advice.
16 Q.   Based on watching you perform?
17 A.   Um-hum, and just -- she just stood and just saw me
18    perform.
19 Q.   Okay.
20       (Exhibit 8 marked.)
21 BY MS. FITZKE:
22 Q.   Showing you Exhibit 8 to your deposition, Ms. Timms.
23    This is another 5-5-5 stow audit.  Do you recall
24    having another stow audit performed or participating
25    again in a 5-5-5 stow audit on or about February 29

35 (Pages 134 - 137)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 35 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                              888-391-3376

1 of 2016?

2 A. No, I don't.

3 Q. Do you dispute that that occurred?

4 A. I don't dispute it because I don't remember. So I

5    don't dispute that though.

6 Q. It looks like this was completed by someone named

7    Steve, a trainer named Steve Olafson perhaps. Does

8    that name sound familiar to you?

9 A. No, it doesn't. But I did have a guy -- sometimes

10    they had -- we had Amazon supervisors that were the

11    trainer. So that could have been an Amazon

12    supervisor.

13 Q. And in the top observations I think this gentleman,

14    to the best I can read it, notes that you had some

15    things to deal with that shift like not having enough

16    product. And he thought -- he notes that in the

17    third line her overall quality looked pretty good.

18    He says but I did coach her extensively on making

19    sure she was checking the screen. Do you see that

20    there?

21 A. Yeah.

22 Q. Do you recall getting some coaching during one of

23    your retrainings about making sure to be checking the

24    screen?

25 A. Yes.

---

1 Q. Before and after scanning your items?

2 A. Yeah. Every trainer did that. Every trainer told me

3    that including the lady trainer. Every trainer told

4    me that.

5 Q. This trainer noted on the stow process, the item

6    utilizes the entire pod from the top bins down to the

7    bottom bins, does not stow only in power zone. This

8    trainer also checked no. Do you recall having some

9    discussions with this trainer about making sure to

10    use the entire bin?

11 A. No, that I don't recall. I probably -- no, I don't

12    think he said that. But he didn't say it in that

13    way, the way it was written. He probably didn't say

14    it in that way.

15 Q. This trainer noted verify the item is correct on the

16    screen. This trainer checked no, that he had

17    observed you not doing that. Do you dispute that?

18 A. That I do dispute because I always checked the

19    screen.

20 Q. You never forgot to check?

21 A. Never forgot to check the screen.

22 Q. Did this trainer, Steve, did he discuss with you his

23    perception that you had not checked the screen and

24    that's something you should make sure to be doing?

25 A. No, he didn't do that.

---

1 Q. Did he discuss with you making sure that you're

2    turning toward the screen every time?

3 A. Yeah. But he saw that I was -- it was good that I

4    still -- I looked at the screen each time I stowed

5    the bin before that and after. So --

6 Q. Do you recall Steve giving you any feedback about the

7    pace of your stowing?

8 A. No. Oh, yeah. I'm sorry, yes. All of them

9    commented nicely about how -- the pace, how fast I

10    stow.

11 Q. Did he also discuss with you -- if you look at the

12    lower left-hand side on pace, there is an item works

13    at a constant pace. Slows items over 8 to 10. On

14    the result column he checks no, that he didn't

15    observe that you did that. And then there is some

16    handwritten comments that I can't read all of them.

17    But did Steve discuss with you why he checked no on

18    that item?

19 A. No, he didn't discuss that.

20 Q. Then I want to go back to Exhibit No. 6 if we can.

21    Exhibit 6, I'm trying to kind of go through

22    chronologically some of the training and performance

23    discussions that were had, but the way the forms are,

24    they don't all roll out chronologically.

25        So Exhibit 6 talks about under the

---

1    communication history that you received a first

2    written warning on March 3rd of 2016. Do you have

3    any reason to dispute that you received a written

4    warning on March 3rd of 2016?

5 A. That I don't dispute, no.

6 Q. And you understood that was a warning due to a

7    perception by the company that your performance was

8    not meeting standards?

9 A. Right.

10 Q. Then the next thing that kind of happened in terms of

11    your employment is I know that you were hired on, we

12    talked about earlier, on March 6th as an Amazon

13    employee. And then what I don't really have

14    documented is you mentioned earlier that you were

15    fired by Amazon in March of 2016, right?

16 A. Right.

17 Q. Do you know what date you were fired?

18 A. Right, March 16th, 2017.

19 Q. It was March 16?

20 A. Yeah, March 16. I believe that would be a Thursday

21    or so. It was a Thursday.

22 Q. Okay. And who communicated to you that your

23    performance was being terminated?

24 A. First person was Jason, Mr. Griffin.

25 Q. And what did Jason tell you?

---

36 (Pages 138 - 141)

1 A. He told me -- he told me let's go to the office. I
2 have to talk to you.
3 Q. And was anybody else --
4 A. Then I asked him is there another evaluation? He
5 said yeah, it's like an evaluation.
6 Q. Was anybody else in the office when you got there?
7 A. Yeah, the lady, she was an African American, tall,
8 light-skinned lady. I can't think of her name. But
9 she was -- he introduced me to her, and I forgot her
10 name. She was one that is the head of HR.
11 Q. And who --
12 A. She was young though. She was a young lady.
13 Q. Who told you that your performance with Amazon was
14 being terminated at that time?
15 A. Mr. Griffin.
16 Q. And what did he tell you?
17 A. He -- first of all, at the office he explained to me
18 why he brought me down to the office, because he got
19 some more evaluations of my performance for the
20 previous week. And he stated that due to low
21 productivity, he thinks that's why I'm getting -- he
22 has to terminate me because that's what one
23 department says was low productivity, low -- not
24 enough items to be stowed in the bin.
25 Q. So it was not enough items, not that the items were

1 being stowed incorrectly?
2 A. No, not incorrectly, just not enough in there. And
3 there are so many that should be -- he explained to
4 me there are so many that should be stowed for so
5 many -- for so much period of time per hour or per 30
6 minutes. And that's what one department does to
7 check all us stowers' performance. Also timing and
8 how much is in each bin. So -- bin cart.
9 So he then stated, you know, I have to let
10 you go due to that. And I was like well, that's not
11 a good reason to fire me because -- and not only
12 that, I have been stowing a lot of product in each
13 bin. How could that be? And he said well, it goes
14 by number count that they were looking for.
15 Something they look for.
16 Q. So did you understand that in part the decision was
17 made to terminate your employment at that time
18 because of the progression of discipline like some of
19 the things we've talked about, the prior verbal
20 warnings and written warnings and things like that?
21 A. Yeah. But I was like well, how could that be that
22 I'm getting fired for that. And a lot of people get
23 evaluated with still warnings and all, and they're
24 still working here. And that's why I asked Mr. Jason
25 Griffin. And he said well, he can't answer that.

1 And I was like well, can I at least defend
2 myself and try to keep my job and try to explain
3 myself in order to keep my job? And he said no, no,
4 because we already spent 10 minutes talking. There
5 is nothing else to say. And I said -- and I was -- I
6 just left it alone because I didn't -- he could
7 not -- if he was not going to be reasonable, there is
8 nothing I could do.
9 Q. Do you have any facts that would support a conclusion
10 that Mr. Griffin or Amazon terminated your employment
11 in March of 2016 because of your age?
12 A. No, I don't. I wish I did, but I don't.
13 Q. And it's my understanding that the decision was made
14 to end your employment because you had a certain
15 number of prior disciplines or counselings within a
16 period of time, did you understand that? Did Mr.
17 Griffin communicate that to you?
18 A. He didn't tell me -- no, Mr. Griffin didn't say
19 that's why I got fired.
20 Q. Okay.
21 A. He didn't say that.
22 Q. And ultimately you were brought back to work at
23 Amazon?
24 A. I was brought back to work at Amazon one time, but it
25 had nothing to do with Mr. Griffin. That time it was

1 another person that was in the office when they tried
2 to terminate -- fire me before, one time. And HR
3 said they made a mistake.
4 Q. I'm sorry, I thought the first time that your
5 employment was terminated was in March and the second
6 time was in May; is that right?
7 A. No, it was in -- it was in -- still in March I
8 believe, and then it was -- yeah, then it was last in
9 March 16th. I didn't stay there past May. I wasn't
10 there all April or May, no. That's not true.
11 (Exhibit 9 marked.)
12 BY MS. FITZKE:
13 Q. Showing you, Ms. Timms, Exhibit 9 to your deposition
14 which is a copy of a letter that you received from
15 Amazon following your termination. Do you recall
16 receiving that document?
17 A. Yes.
18 Q. And you see how it's dated May 17 of 2016?
19 A. Yes.
20 Q. Does that document help refresh your recollection
21 that you were terminated on May 16 and not March 16?
22 A. No, I was fired March 16th.
23 (Exhibit 10 marked.)
24 BY MS. FITZKE:
25 Q. I'm going to show you Exhibit 10 to your deposition.

37 (Pages 142 - 145)

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 37 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                 888-391-3376

1 A. They didn't let me stay --
2 Q. Have you ever seen a document that looks like this
3    before?
4 A. Yeah, I did see this.
5 Q. I think we can get at this a different way actually
6    by looking at your pay records, Ms. Timms.
7 A. All right.
8        (Exhibit 11 marked.)
9 BY MS. FITZKE:
10 Q. Showing you Exhibit 11, Ms. Timms, do you recall that
11    you reported your time while working at the Amazon
12    plant into something called MyTime?
13 A. Yeah, that's the -- another computer they have in the
14    plant for seeing your scores or whatever, seeing your
15    schedule dates of working, payroll, yeah.
16 Q. So if you look at the last page of this document
17    which shows, you know, your time for your final
18    shifts, you'll see it shows you working shifts in
19    April and into May up through May 15 of 2016, on the
20    last page?
21        (Witness peruses document.)
22 A. I don't recall being there in April, but it might
23    be -- might be May. But my termination letter always
24    said March 16th, the week that I got terminated. We
25    get our termination letters or acceptance letters

1    only offline. And the week that I got fired I
2    printed out my termination letter. I wish I have it,
3    but I don't have anything on me now. And it stated
4    March 16th was my termination day. That was all that
5    was there.
6 Q. The letter that you produced to me in this case?
7 A. Right, that I sent to you, it's dated March 16th.
8 Q. I'll represent to you that the copy of the letter
9    that I got from you is identical to the copy of the
10    letter that we've marked in this case.
11 A. Okay. Well, I mean maybe I misread it. But I don't
12    -- really don't remember working there throughout
13    April and May.
14 Q. Did you receive payment for work that you didn't
15    perform at Amazon?
16 A. No, I didn't because I was not there on the premises
17    in April. It was March, March 16th they fired me.
18    He fired me in three weeks after I got fired -- I
19    mean three weeks before my b-day week. That's how I
20    remember, that's when I got fired. Then I could have
21    sworn I seen, read, when the termination -- when I
22    downloaded the termination letter, it's March 16th,
23    that it's dated March 16th. So I don't believe that
24    it was May 16th. It was --
25 Q. Do you have any explanation then for why the company

1    has time records for you working for the company in
2    April and through May 16th?
3 A. No, I don't have any explanations.
4 Q. Do you find that unusual?
5 A. Yeah. But what I sent you all, it's dated March 16th
6    in the termination letter I thought. So I don't
7    know. Maybe I misread it or something. But I
8    don't --
9 Q. Ms. Timms, you were fired twice by Amazon, right?
10 A. Yes.
11 Q. And the first -- what was the date of the first time
12    that you were fired?
13 A. It was in -- around the 8th or something. I forgot.
14    I forgot what day. But it was around the first and
15    second week of March.
16 Q. Is it possible you were fired the first time on March
17    16th?
18 A. Maybe that's it. Okay. Maybe that's it.
19 Q. In any event, we know you were fired. Let's talk
20    about the first time you were fired by the company.
21    Is that the meeting that you described for me with
22    Mr. Griffin and the tall woman from HR?
23 A. No. It was a different guy.
24 Q. Okay. I want to talk about the first time you were
25    fired.

1 A. Okay.
2 Q. Okay. So did Mr. Griffin come get you and take you
3    off the floor?
4 A. Mr. Griffin and another guy was with him.
5    Mr. Griffin did not fire me. It was another -- well,
6    it was him and another supervisor. Another
7    supervisor was talking to me. And he stated again,
8    it's due to low productivity reason why they fired
9    me. And I'm like how could that be low productivity?
10    And I worked so hard. And I -- it put so many
11    products in there.
12        So it was another guy, young guy, looked
13    like he was in his 30s, and it was Mr. Griffin.
14    Mr. Griffin didn't say anything that first meeting in
15    the office that I was fired. It was the other guy.
16    He was a White gentleman like Mr. Griffin except a
17    blond, younger one. No, they both young. And that
18    must have been March 16th.
19        Then I got a phone call from HR of Amazon,
20    and they stated we made a mistake. You wasn't
21    supposed to get fired. It's been a mistake. So a
22    female supervisor from HR or HR employee, a female HR
23    employee called me, and she told me -- I asked her
24    what do I do? Because I'm thinking they don't
25    have -- I don't have my ID. They take my ID. They

38 (Pages 146 - 149)

Veritext Legal Solutions
Case 2:16-cv-01056-WED   Filed 08/15/17   Page 38 of 63   Document 28
www.veritext.com                                          888-391-3376

1    take your ID when they let you go. So I was like
2    what am I supposed to do? She explained to me what
3    all I had to do to get my ID back and all this stuff.
4  Q. Okay. And --
5  A. So I guess, okay, my mistake. So yes, March -- May
6    16th I guess I was last fired.
7  Q. Okay. Did the woman from HR who called you to invite
8    you back to come back to work at Amazon, did she
9    explain to you what the mistake had been?
10  A. Yes.
11  Q. And what did she say to you?
12  A. I wish I had the voicemail. I don't remember exactly
13    word for word, but it was -- some of the content of
14    it was a miscommunication, a misreading of the
15    computers, printouts of their evaluations on people,
16    you know, of the same type of like computer printouts
17    that, you know, Mr. Griffin been doing of evaluating
18    me that they go by. And it was a different person,
19    not me.
20  Q. Was it explained to you that in part it had to do
21    with you becoming a full time Amazon employee and
22    that they shouldn't have counted the discipline and
23    coaching that had occurred prior to determine whether
24    you had reached the threshold?
25  A. No, she didn't say all that. She said it was because

1    of an error in the computer error, and it wasn't your
2    productivity that was poor or bad. That was somebody
3    else's performance. That's what she said.
4  Q. Somebody else's performance she said?
5  A. Yeah, that's what she said. It was a computer
6    mistake, a computer error she said on the phone to
7    me. And it was somebody else's productivity
8    performance. Then I asked her well, what am I
9    supposed to do? I don't have an ID. Then she
10    explained to me how to get my ID back, how to get
11    everything else back.
12  Q. Okay. Did you ever have any discussion beyond that
13    phone call with anyone from Amazon, management or
14    human resources about why you had been discharged the
15    first time in error?
16  A. No, because I felt that it wasn't necessary. I got
17    my job back. I'm happy.
18  Q. So you came back to work. Did you think when you
19    came back to work that Mr. Griffin treated you
20    fairly?
21  A. No, Mr. Griffin did evaluate me weekly and the same
22    way.
23  Q. So other than --
24  A. And not really fair.
25  Q. Other than evaluating you more often than you thought

1    was fair, did Mr. Griffin do anything else that you
2    believed treated you unfairly?
3  A. Just the fact that, you know, he didn't -- for the
4    fact, unfairly -- treated me or for the time --
5    do you mean, are you asking me did he treat me unfairly
6    from the last time that we were in the office when he
7    was about to terminate me?
8  Q. Let's -- before your second termination meeting,
9    okay. After you get back to work and before your
10    second termination meeting, other than to evaluate
11    you more often than you thought was fair, did
12    Mr. Griffin do anything else that you thought was
13    unfair treatment toward you?
14  A. Yes, it was the fact of the matter that he started
15    getting really offensive when I asked him can I
16    explain myself and try to get my job back. Can I --
17    I told him, I asked him when the big girl -- sister
18    girl, the young lady, head HR supervisor and him and
19    me were only in the office of the second time I got
20    terminated, and I asked him can I explain myself so I
21    can get my job back.
22    So what I believe you all should not
23    terminate me, why I should stay here, why I should
24    still be working. And he got offensive and said no,
25    no, no, we already spent 10 minutes talking.

1  Q. And that --
2  A. I felt that was unfair because he didn't give me my
3    word to say.
4  Q. And that was in the meeting when you got terminated
5    the first time, just to make sure our record is
6    clear?
7  A. No, that was in the meeting the second time.
8  Q. The second termination?
9  A. The second termination.
10  Q. Do you have any reason to believe that Mr. Griffin
11    did not hear you out on why you believed you should
12    not be terminated because of your age?
13  A. Do I -- can he explain -- repeat that?
14  Q. You said you thought it was unfair that Mr. Griffin
15    wouldn't listen to you give your side of the story --
16  A. Yes.
17  Q. -- after he had told you that you were about -- that
18    you were going to be terminated, right? You thought
19    that was unfair; is that right?
20  A. I thought it was unfair that he didn't give me the
21    time, the extra time to explain myself of why they
22    should keep me and why I should keep my job.
23  Q. And my question to you is do you have any facts that
24    would support a conclusion that Mr. Griffin refused
25    to hear you out because of your age?

1 A. No, because they don't allow cell phones in the
2    place. And if I did have a cell phone, if I was able
3    to keep it in there, I would -- I would have right
4    now evidence. I would have videoed, I would have
5    recorded him.
6 Q. What would you have recorded?
7 A. I would record him -- our conversation.
8 Q. And did Mr. Griffin say anything in that conversation
9    that referenced your age?
10 A. He did not mention my age.
11 Q. And did Mr. Griffin say anything in that conversation
12    that would support your conclusion that you were
13    treated or being terminated because of your age?
14 A. No, he didn't.
15 Q. And other than the number of times that he evaluated
16    you after you came back to work, did Mr. Griffin do
17    anything else that you thought was unfair treatment
18    of you because of your age?
19 A. Yes, I thought that it was unfair that, like I said
20    before, I've seen him walk past some people that I
21    might have knew that are younger than me working as
22    stowers and those I didn't know that were regular
23    stowers that were younger than me. He just walked
24    past their station. But I sometimes used to be the
25    only one on the floor he would evaluate.

1 Q. And do you know why Mr. Griffin was not evaluating
2    the other stowers as often?
3 A. All the other -- it be a time where I'm on the floor,
4    I'm the oldest stower on the floor. That's why I
5    stated that. And he would not go to their station,
6    just mine, and evaluate.
7 Q. And I guess my question to you is you don't know
8    anything about the performance history of the other
9    stowers that Mr. Griffin was not evaluating with as
10    much frequency?
11 A. No.
12 Q. And --
13 A. And I feel it was unfair because I believe that --
14    usually every stower, usually every stower gets
15    evaluated at the same time, the same day. Because he
16    told me one time he has to do evaluations on more
17    than just me. It's not just me he's picking on. One
18    day he stated that.
19 Q. Do you know who else Mr. Griffin evaluated?
20 A. No, I don't. But he does more than one evaluation he
21    told me when he does evaluations.
22 Q. You don't have any reason to believe that's not true,
23    do you?
24 A. No, I don't believe it's not true, but I believe
25    it's -- I believe it's true that he does -- he

1    probably does have a lot of other people to evaluate.
2    But why would you -- why would he only evaluate if
3    I'm the only stower on the -- if I'm more than -- if
4    there is 20 stowers on the floor or more and I'm the
5    only one he's evaluating, why he's not evaluating
6    other stowers? And they are all younger than me.
7 Q. Let me ask you this. Do you think if you're the only
8    one that's demonstrating the same consistent poor
9    performance there would be reason to watch your
10    performance more closely?
11 A. Can you repeat that?
12 Q. Yup. If you're the only stower -- I'll try to ask a
13    slightly different question.
14       If you're the only stower in that group
15    that's receiving complaints from the other
16    departments that you're stowing items incorrectly, do
17    you agree that it's reasonable that Mr. Griffin would
18    watch your performance more closely?
19 A. Yeah, I believe it. I believe that.
20 Q. So let's kind of get back to what we were doing here.
21 A. You said if he evaluated other performers -- other
22    stowers' performances?
23 Q. No, I didn't say that.
24 A. Is it possible I could ask you again? Or it's not
25    right?

1 Q. My question to you that I thought you had answered
2    was if you are the only stower for whom Mr. Griffin
3    is receiving reports from the quality group that we
4    talked about earlier that you're stowing items
5    incorrectly, do you think it would be reasonable that
6    Mr. Griffin would watch your performance more closely
7    to try to correct those errors?
8 A. First of all, he probably would not, no. He probably
9    would not. I'm going to re-answer that. My
10    correction to the answer is no because he never would
11    stay -- he would always tell me when he evaluated me
12    that he -- by the way, he has to -- he can't stay
13    long. He would tell me that, too, he can't stay long
14    to evaluate me. So we going to make this brief. He
15    used to tell me that. He would then sometimes stop
16    and see -- tell me okay, I'm going to stop and see
17    how you're doing this.
18       I would be stowing and then sometimes I
19    would think it's only 15 minutes, he's gone. He's
20    not around to see me stow. It's a short -- he has a
21    short attention span. So no, answer is no.
22 Q. So you understood that Mr. Griffin could evaluate you
23    in a number of ways, correct? Like one way he could
24    evaluate you is by watching you work?
25 A. Yes, I understand.

40 (Pages 154 - 157)

Veritext Legal Solutions
www.veritext.com   888-391-3376

1 Q. And it sounds like he did that sometimes for up to 15
2    minutes at a time?
3 A. Yeah.
4 Q. And one way to evaluate you might be through the
5    feedback that he got from the quality groups and the
6    other departments, correct?
7 A. Right.
8 Q. And another way he might evaluate you is by the
9    numbers or the metrics that show up on these quality
10   supportive feedback documents, correct?
11 A. Right, yeah.
12 Q. So there are a number of different ways that
13   Mr. Griffin could judge your performance, correct?
14 A. Yes.
15 Q. And you're aware that Mr. Griffin relied on all of
16   those things in judging your performance, correct?
17 A. Yes.
18       (Exhibit 12 marked.)
19 BY MS. FITZKE:
20 Q. Showing you Exhibit 12, Ms. Timms. This is another
21   retrain results form that reflects that you received
22   additional training on March 11, 2016 and that the
23   reason for the training request was quality. Do you
24   recall being trained again on March 11 of 2016?
25 A. Yeah, I do recall.

1 Q. And it looks like My-Mike Nguyen trained you on this
2    occasion, do you recall that?
3 A. Yeah, that's his name, Mike. That's the guy. The
4    other woman, I don't know.
5 Q. And how did Mike go about training you on this
6    occasion?
7 A. He would do the thing -- do my job. He would tell me
8    step back, I'm going to do your job and just observe.
9    And then he would tell me okay, I'm going to step
10   back and do what I just did. Do your job and the
11   same way I just did your job. And then I would do it
12   just like he stated, and it would be -- he's like
13   okay, great.
14 Q. And so do you deny that Mr. Nguyen gave you any
15   feedback about how you could improve your performance
16   as a result of this retraining?
17 A. No, because he gave me one or two pointers of
18   improvement.
19 Q. And what were those?
20 A. To make sure that, you know, I continue holding the
21   bin, the bin when I scan, and to slow down, like the
22   other girl trainer told me.
23 Q. Did Mike share with you his perception that you're
24   easily distracted by other issues when stowing?
25 A. Yeah. He mentioned something about things that I

1    should do to like go closer to the bin as well as
2    close -- be a little bit closer to the conveyor belt,
3    not to watch -- and my shorter pace or shorter time
4    spent walking from here to there while stowing.
5 Q. Do you recall Mike talking to you about the fact that
6    he thought you were spending too much time reading
7    the screen?
8 A. No, he didn't say that to me.
9 Q. Did he talk to you about the placement of your empty
10   totes?
11 A. No, he didn't say that.
12 Q. Do you know that -- were you aware that these
13   retraining forms existed and that this feedback was
14   provided to Mr. Griffin?
15 A. No, I did not because he did not write -- like the
16   Integrity Staffing supervisors and Mr. Jeff Griffin,
17   he didn't write as he told me things and trained me.
18 Q. Did you know that you were receiving that retraining
19   because of your performance -- the company's belief
20   that your performance was poor, that your quality was
21   poor?
22 A. Yeah, I did, because Mr. Griffin would tell me that.
23 Q. That your quality was poor?
24 A. No, he would tell me when the trainer would be
25   coming.

1 Q. So you got like a heads-up that a trainer would be
2    coming to you?
3 A. Yeah, um-hum.
4 Q. And he would explain to you that the trainer was
5    coming to help you improve your performance quality?
6 A. Right, yes.
7 Q. So --
8 A. That he did do.
9       (Exhibit 13 marked.)
10 BY MS. FITZKE:
11 Q. Showing you Exhibit 13, Ms. Timms. And this is
12   another supportive feedback document. And on the top
13   under communication history it notes that your most
14   recent -- that you had a documented verbal warning
15   issued on 3-17 of 2016, do you see that there?
16 A. Um-hum.
17 Q. And you don't have any reason to dispute that you in
18   fact received a documented verbal warning relating to
19   your performance on that date?
20 A. No, I don't. No, I don't.
21 Q. And you don't have any reason to dispute that the
22   performance trend numbers or details of current
23   incident as listed on this form are correct?
24 A. Right, yes.
25 Q. Okay. It looks like after you got the performance

41 (Pages 158 - 161)

Veritext Legal Solutions
Case 2:16-cv-01056-WED   Filed 08/15/17   Page 41 of 63   Document 28
www.veritext.com                                                    888-391-3376

1 warning on 3-17, the documented verbal, that you
2 received some additional training again, do you
3 recall that happening?
4 A. Yes, I do. Because every time I got a training,
5 Mr. Griffin would also state to me -- before I see
6 the trainer Mr. Griffin would come. And it would be
7 that time where it would be times where it wasn't an
8 evaluation, but he would say you're going to get a
9 trainer.
10 Q. Did you understand that you were getting additional
11 training, more training than the other employees, the
12 other stowers were getting?
13 A. No, I didn't know that.
14 Q. Okay. And did you understand that you were getting
15 these retraining opportunities because of the
16 documented coachings and warnings that you were
17 receiving?
18 A. No, I didn't know that.
19 (Exhibit 14 marked.)
20 THE WITNESS: The warning would be he
21 would tell me I'm going to get a trainer, right?
22 That's what you meant for the last question?
23 BY MS. FITZKE:
24 Q. Well, we had gone through on Exhibit 13 how it notes
25 that you had a documented verbal counseling relating

1 to your performance on March 17 of 2016.
2 A. Yes.
3 Q. And then on March 18, 2016 you got some additional
4 retraining, right?
5 A. Yes, right, because every time -- right. Because --
6 and I was informed that. I was aware I was going to
7 get trained by Mr. Griffin.
8 Q. And did you understand or did Mr. Griffin communicate
9 to you that you were being given this additional
10 training or retraining in an effort to help you
11 improve your performance so that you could be a
12 successful Amazon employee?
13 A. Yeah, because he came to me. If it was an evaluation
14 day, he would just tell me yeah, I'm getting a
15 trainer.
16 Q. And Exhibit 14 documents the retraining that was
17 performed again by Mike Nguyen on 3-18-2016. Did Mr.
18 Nguyen talk with you about his perception that you
19 were not reviewing the titles on your screen?
20 A. No, he didn't say that.
21 Q. Did Mr. Nguyen talk with you about his perception
22 that items were hanging over the bins?
23 A. Yeah, that he did talk to me about.
24 Q. And he gave you some coaching on that?
25 A. Yeah. Because no one ever -- they never stated in

1 orientation about that. And no one never told me
2 about the hanging. Neither did Mr. Griffin.
3 Q. Did --
4 A. I thought that was always okay.
5 Q. Did Mr. Nguyen give you any feedback about his
6 perception that you were overstuffing the bins?
7 A. Yeah. And I never knew I was overstuffing the bins.
8 Mr. Griffin never told me that either.
9 Q. Do you know what halo rules are?
10 A. Yes.
11 Q. And did Mr. Nguyen talk to you about his perception
12 that you were not following or using the halo rules?
13 A. Yes. But before I got fired by Mr. Griffin, Amazon
14 gave a meeting, another cafeteria meeting. And they
15 mentioned something about there is no more halo
16 rules.
17 Q. Before this date on 3-18?
18 A. Yeah.
19 Q. What is the halo rule?
20 A. It's when in the bins where there are certain
21 regulations that you cannot do of stowing involving
22 items that are of the same -- the same similarity or,
23 you know, that is in the same family so to speak,
24 category, whatever. You can't go diagonally, you
25 couldn't go like them being next -- stowed next to

1 each other in an angle or awkward like side by side
2 or as a circular, how can I say it, a circular cutout
3 way of bins, you know, forming in a circular form or
4 whatever. So those were the halo rules.
5 Q. Okay. Did Mr. Nguyen talk to you about his belief
6 that your bin etiquette was the reason for low
7 productivity and low quality?
8 A. No.
9 Q. Were you aware that this feedback was given to
10 Mr. Griffin?
11 A. No, I wasn't aware of that either, because the
12 trainers never stated that they would write anything
13 out or will talk back to Mr. Griffin.
14 (Exhibit 15 marked.)
15 BY MS. FITZKE:
16 Q. Ms. Timms, I have another feedback document we've
17 marked as Exhibit 15. And this one notes a quality
18 termination.
19 A. Okay.
20 Q. And it's signed by it looks like Mr. Griffin on March
21 23rd of 2016. It looks like you may have started to
22 sign it and changed your mind and scribbled out your
23 signature. Do you recall that?
24 A. Yeah, I do recall that because I then thought to
25 myself no, I'm not signing anything that I feel is

42 (Pages 162 - 165)

Veritext Legal Solutions
Case 2:16-cv-01056-WED   Filed 08/15/17   Page 42 of 63   Document 28
www.veritext.com                                          888-391-3376

1    not true.
2 Q.  Okay.  And this to me looks to be actually when you
3    were first terminated by Amazon on March 23rd of
4    2015.
5 A.  Yes.
6 Q.  And when you were first terminated by Amazon,
7    Mr. Griffin presented this form to you, and you wrote
8    these comments on here?
9 A.  It was the first time I got terminated you mean?
10 Q.  Yes.
11 A.  No.  It was the other guy.  Mr. Jason Griffin didn't
12    hand that to me.
13 Q.  Okay.
14 A.  He was just standing there at all times.  It was the
15    other Caucasian young guy.
16 Q.  Okay.  And you wrote on here in the associate
17    comments:  I refuse to sign because I feel I should
18    not have gotten fired for the fact that I did stow
19    correctly and the company's computers were mostly in
20    default.  And my boss manager Jason gave me a warning
21    to have my -- is that P tag or tag?  Can you help me
22    read this?
23 A.  P tag?
24 Q.  I'm reading your document, your handwriting here.
25    Can you read it with me?

1 A.  P tag?
2 Q.  I don't know.  That's why I'm asking you if you can
3    help me read it.
4 A.  My tag.
5 Q.  Can you read the rest for me to the end, to have my
6    tag?
7 A.  To have my tag time up and my tag time was up, and I
8    always read what I should stow correctly.
9 Q.  Okay.  And when you say that the computers were
10    mostly in default, what are you saying there?  What
11    do you mean?
12 A.  Because the fact that a lot of supervisors came to me
13    when I also went to not only Mr. Jason Griffin but I
14    also went to some other supervisors to talk about
15    that whenever I stow an item and it keeps saying go
16    to the next bin.  But when ICQA comes and reports to
17    Jason of my evaluation that some things are missing,
18    some items are missing in the bin, it's because of
19    that.  The supervisors would tell me yeah, that's the
20    computer default because everybody is getting that.
21          And then there was something else, too,
22    the computer would stall.  Or when I would try to --
23    when I click onto an item with the laser gun and then
24    quickly click onto the bin number code of the same
25    bin where the computer tell me to stow, it would just

1    freeze, wouldn't say go to the next bin.
2 Q.  Okay.  I want to go back because I don't understand
3    everything you're saying.
4 A.  Okay.
5 Q.  So you're saying that there were supervisors that
6    came by you that you could --
7 A.  No, I went -- whenever -- yes, that came by me but of
8    different days where I tell them the same problem I
9    had.
10 Q.  Okay.  And what I don't understand is what is the
11    problem that you're saying that you had?
12 A.  Of the computer default would be every -- almost
13    every -- it was almost one through two or three, four
14    days in a row of me working that -- and it would be a
15    different supervisor that will come other than
16    Griffin to see how everything is doing.  They would
17    just do that, come and see stowers.  Okay, how are
18    you doing?  How is it going?
19 Q.  Explain to me what the computer problem was.
20 A.  And the computer problem was computer default.
21    That's why I say computer default.  Because the
22    supervisor, I would tell the supervisor, you know,
23    there is another problem I have.  The computer still
24    doing the same thing to tell me okay, stow to the
25    next bin, and they're not -- and it's not picking up,

1    reading the numbers, the item that's connected to the
2    bin.  Or it was the time where it was stalled.
3 Q.  So when you say -- I want to understand what you're
4    telling me.  So you're saying that the computer would
5    tell you to stow to the next bin but it wasn't
6    reading the item.  I don't understand what you mean.
7 A.  It wasn't reading the item code or the item bin
8    because sometimes -- yeah, all the time, which I just
9    thought about it.  When it say that, when it does
10    that, that means the bin number comes up.  If the bin
11    number doesn't come up or -- that means that it's not
12    reading it.  It's stalling.  And it does -- and when
13    I mean stall meaning stay still is that it doesn't go
14    to the next computer question they have -- the
15    computer questions stowers -- or tell us to do, tell
16    us what to do, the next command.
17 Q.  But you're describing for me two separate problems.
18    So I want to focus on them separately so I can
19    understand what they are.
20          So as I understand, I understand what
21    you're saying about the computer freezing, okay.  I
22    understand how you're saying the computer would
23    freeze up.  When the computer would freeze up, how
24    did that cause other departments to believe that you
25    were stowing items incorrectly?

1 A. Because I would go to the P person, I would go to the
2 computer. And you could then get out of that
3 computer mode and go to the computer, click on the
4 function to get help for the computer person to come.
5 Then the computer person would come and they will
6 look at that. And a supervisor would automatically
7 come and say okay. They would sometimes have to call
8 the supervisor.
9 And the supervisor would come and would
10 see that -- how I'm doing. The supervisor would say
11 okay, stow another item. So I stow another item and
12 use the laser gun connected to the computer.
13 Computer would stay in that same computer screen.
14 Understand what I'm saying? It would stay in that
15 same computer screen.
16 Q. It was frozen, right?
17 A. Right.
18 Q. So you weren't able to do your work?
19 A. Right.
20 Q. So when the computer would freeze up, you were no
21 longer stowing items?
22 A. That's what -- and I didn't know that's what that
23 was. And I went to -- yeah. I asked the supervisor,
24 you know, why is it stopping like that and not going
25 to the next command when it says okay, stow your next

1 item?
2 Q. Right. So when it would freeze up and you would have
3 to get help, you were no longer stowing items, so you
4 weren't stowing any items incorrectly, right?
5 A. Right.
6 Q. So I want to talk about the other computer problem
7 then.
8 A. That's when I said computer default because the
9 supervisor would say well, that's the computer
10 default. Every time it was a problem with the
11 computer, any supervisor would tell me oh, that's the
12 computer default. That's what that means when I say
13 computer default.
14 Q. That the computer was freezing up?
15 A. That plus the other computer problems when I stated
16 also where it keeps saying go and stow to the next
17 item, go and stow to the next item.
18 Q. Even though you hadn't scanned and you --
19 A. Even though I have not scanned an item.
20 Q. Okay. And when it kept saying --
21 A. That's another -- that was another thing.
22 Q. And when it would keep saying go to the next item, go
23 to the next item, would you do the same thing, would
24 you stop working and then get help from one of the P
25 people?

1 A. Yeah, it was always that way.
2 Q. Okay. So when it was saying go to the next item,
3 then if you weren't working and you weren't stowing
4 items in the bins, how do you contend that those two
5 computer problems that you described for me that
6 would cause you to stop working and get help, how
7 would those two computer issues result in other
8 departments believing that you had mis-stowed items
9 incorrectly?
10 A. I was surprised because supervisor come to me and
11 they were like oh, yeah, this computer default. I
12 have -- and they told me how -- they told me oh, I've
13 had -- I've had other stowers tell me this.
14 Q. That's not my question though, Ms. Timms. I'm taking
15 you at your word that you had these computer problems
16 and that you stopped working and got help as you're
17 supposed to do.
18 A. Yes.
19 Q. So my question to you is if you're not working and
20 you're getting help like you're supposed to be doing,
21 then how are either of those computer problems
22 resulting in other departments complaining that you
23 had mis-stowed items in incorrect bins?
24 A. Because the supervisor for some reason when I did
25 keep scanning one time, I didn't know what that was.

1 So it would pick up, it will pick up that I am
2 scanning an item, but it will show nothing. It will
3 show the quantity would be very low because I scanned
4 the item more than one time. So that's probably why
5 that was it.
6 Q. So on one occasion you scan an item more than one
7 time and trying to get it to pick up on the computer?
8 A. Yeah.
9 Q. And then that item that you scanned multiple times,
10 did you end up stowing that item, or did you hold it
11 while you waited for help?
12 A. The second time I knew something was wrong, I waited,
13 didn't scan that item, waited for help.
14 Q. Okay. So it's on one occasion that you scan an item
15 multiple times, and then did you stow that item
16 before you realized you were having a computer
17 problem?
18 A. Yeah. And that was the first time I was working with
19 Integrity in October now.
20 Q. Okay.
21 A. Not in March.
22 Q. So that was before you even got hired on by Amazon?
23 A. Yeah, even before I got hired.
24 Q. So while you were an active Amazon employee, there
25 was never an occasion that you had what you call a

44 (Pages 170 - 173)

Case 2:16-cv-01056-WED    Filed 08/15/17    Page 44 of 63    Document 28
Veritext Legal Solutions
www.veritext.com                                                                    888-391-3376

1  computer default where you went ahead and stowed
2  items that were either frozen or not scanning
3  correctly?
4  A.  No, there was computer default meaning that
5  whenever -- I scan the item, and the item would be
6  like -- the computer would say okay, scan another
7  item.  And then I would scan another item but it
8  freeze.  That's when, okay, that happened to me a
9  lot.  It would freeze.  Because it was working right,
10  but then when I scanned another item and the computer
11  says stow and scan another item and I do, and then it
12  should say okay, stow in the bin, scan the bin, stow.
13  That one, that second computer command doesn't come
14  up.  That's when I said yeah, there is -- yeah, there
15  is -- I do have computer defaults.  It still come up.
16  They still was coming up.
17  Q.  And -- right.
18  A.  But I knew what to do.  It's just that when I watched
19  the screen and I watch it and if it does -- that's
20  how I knew because I was watching it carefully when
21  they were telling me even in October, November,
22  December, make sure you watch that screen every time.
23  Q.  Right.
24  A.  That's how I would know it was a computer default.
25  Q.  So, Ms. Timms, I think you're telling me a lot of

1  stuff that's not related to my questions.  So if you
2  can just focus on my question.
3  A.  Okay.
4  Q.  I'm taking you at your word that you scanned items
5  and had these computer defaults.  I'm taking you at
6  your word that when you had a computer problem like
7  that that you called computer default, you called the
8  management or the P folks or whoever it was to get
9  help to correct your computer issues and that you
10  didn't then go ahead and stow items when you knew you
11  were having a computer problem.
12  A.  Right.
13  Q.  So my question to you is if you did not go ahead and
14  stow items when you knew you were having a computer
15  problem and you appropriately waited for help, how is
16  it that you contend those computer problems resulted
17  in other departments complaining that you were
18  mis-stowing items?
19  A.  Because they -- because -- I don't know.  They was --
20  I don't know.
21  Q.  Okay.
22  A.  That's when that -- that's why -- I know, I know what
23  you're talking about.  I'm stowing it right, and I
24  stowing correctly.  And I never scanned twice the
25  morning one time after I was hired, true, right.  Why

1  Jason keep coming to me telling me that ICQA saying
2  I'm having all these invisible quantity where the
3  quantity amount should be in there but there is some
4  missing.
5  Q.  And you told me earlier they would find the missing
6  items in other bins, right?
7  A.  Yeah.
8  Q.  And Mr. Griffin, you understand that Mr. Griffin drew
9  the conclusion or at least he relayed to you that he
10  had drawn the conclusion based on that information
11  that you were responsible for stowing items
12  incorrectly?
13  A.  Yeah, you -- stowers are automatically, we are
14  automatically considered to be responsible.
15  Q.  And you knew that Mr. Griffin, he communicated to you
16  that it was his belief that you had stowed the items
17  incorrectly?
18  A.  Even though it was not true, we always was held
19  responsible.
20  Q.  So you denied stowing items incorrectly, but you
21  understood Mr. Griffin believed that you did for the
22  reasons that he gave you that it was being reported
23  to him that that's what was occurring?
24  A.  According to the computer, only according to the
25  computer, yes.

1  Q.  And when you say that your tag time was up, what's
2  tag time?
3  A.  Okay.  Tag time means what I've been telling you
4  all today that to be a stower, Amazon really wants
5  you to be a good stower is -- what they state in
6  orientation when they first hire you to be a good
7  stower, they look at your speed --
8  Q.  Okay.
9  A.  -- of stowing.
10  Q.  So the tag time is your stowing speed?
11  A.  Is your stowing speed.
12  Q.  Okay.  Simple enough.
13  A.  How fast you can stow.
14      MS. FITZKE:  Let's take a short break.
15      (Recess taken.)
16  BY MS. FITZKE:
17  Q.  I'm going to show you Exhibit 16 to your deposition,
18  Ms. Timms.
19      (Exhibit 16 marked.)
20  BY MS. FITZKE:
21  Q.  This is a quality -- another supportive feedback
22  document.  It's labeled quality final written.  This
23  one looks like you signed this document on 4-7-2016?
24  A.  Yeah.
25  Q.  Do you recall doing that?

45 (Pages 174 - 177)

Veritext Legal Solutions
Case 2:16-cv-01056-WED   Filed 06/15/17   Page 45 of 63   Document 28
www.veritext.com                                          888-391-3376

1  A.  Yeah.
2  Q.  You were advised at that time you were expected to
3     meet the 100 percent quality expectation?
4  A.  Yeah, I was there in April, so May 16th was my last
5     day, yeah.
6  Q.  And this one, this document noted that -- it's a
7     little bit difficult to read, but I've got another
8     copy of it that doesn't bear your signature.  Let's
9     see if we can find that to help us read the comment.
10    If you can agree from the time period 3-28, 5 a.m. to
11    4-4, 5 a.m. you stowed 5,241 units and had 13 errors
12    for a DPMO of 2481 versus a DPMO goal of 600.
13 A.  Yeah, Jason informed me about that.
14 Q.  Okay.
15 A.  And I refused to sign because I really felt that I
16    didn't -- I didn't do all those errors, and they
17    still had computer problems.
18 Q.  It looks like -- I thought you said you did sign this
19    on 4-7-2016.
20 A.  This I did not sign.
21 Q.  Okay.
22 A.  This one I did sign.
23 Q.  Okay.  Do you understand that those are identical
24    copies of the same document, they're just in -- one
25    is more squished together but they contain the same

1     information?
2         (Witness peruses document.)
3  A.  Yeah, this -- but I didn't sign this which he's
4     right, I didn't sign it.  I left it blank.
5  Q.  Okay.  Why don't you just give me that page back.  We
6     won't attach anything to Exhibit 16.  You admit that
7     you signed Exhibit 16 and that Mr. Griffin discussed
8     that with you in his -- the performance errors
9     that are documented in Exhibit 16?
10 A.  Yeah, right.
11        (Exhibit 17 marked.)
12 BY MS. FITZKE:
13 Q.  Showing you Exhibit 17, then after you got the
14    performance, the final warning or final written
15    that's Exhibit 16, after that you got some
16    retraining, do you recall that?
17 A.  Yes, I do.
18 Q.  Looks like you were retrained on April 13 of 2016
19    relating to the quality.
20 A.  Yeah.  It was around that time.
21 Q.  And that the person it looks like that trained you
22    was Amy Tomlinson, do you recall her?
23 A.  Um-hum.
24 Q.  Is that a yes?
25 A.  Excuse me, yes, yes.

1  Q.  Did you admit to Ms. Tomlinson as noted in this form
2     that you had been making halo mistakes?
3  A.  I didn't think I would be making halo mistakes.  She
4     showed the idea.  She pointed out I did because she
5     stepped back, she told me okay, do your job, let me
6     see you stow the bins.  And I did.  And she said
7     everything was right except for you halo one -- I saw
8     you halo more than one time.  So that's how I knew.
9     That's what they told me.
10 Q.  Did you tell Ms. Tomlinson that you were purposely
11    doing that, assuming -- making halo mistakes assuming
12    that a few mistakes wouldn't be a big deal?
13 A.  No, I didn't say that to her.
14 Q.  Were you aware that Ms. Tomlinson indicated to
15    Mr. Griffin that that's what you said?
16 A.  No, I didn't say that.
17 Q.  Ms. Tomlinson notes that Athena did not consistently
18    watch her screen.  Did she talk to you about that?
19 A.  Yes, she told me that, but it was only one or two
20    times she told me that, don't forget to watch your
21    screen.  Because I didn't -- I had my eyes off of it
22    because I was stowing another bin, another item in a
23    bin.
24 Q.  So you admit Ms. Tomlinson talked to you about the
25    importance of watching your screen?

1  A.  Yeah, I do admit that.
2  Q.  And did Ms. Tomlinson discuss with you her perception
3     that you were not consistently watching your screen?
4  A.  Right, she told me that.
5  Q.  Did she talk to you about how important she thought
6     the halo rule was and how it was important to follow
7     it all the time?
8  A.  Yeah, she did.
9  Q.  Okay.  Let's look at Exhibit 18 to your deposition.
10        (Exhibit 18 marked.)
11 BY MS. FITZKE:
12 Q.  This is a supportive feedback document, it's called
13    quality first written.  On the second page it's dated
14    April 20th, 2016, but it also -- I see that you
15    indicate that you refused to sign this document?
16 A.  Yes.
17 Q.  And are those your -- is that your handwriting there
18    in the associate comments?
19 A.  Right, I did fill out the comment form, but I didn't
20    sign.
21 Q.  Okay.  And you understand that on the first and
22    running into the second page where it says error
23    listing that this document is identifying errors that
24    the quality folks or that the computers have
25    identified the stowing mistakes that you made?

46 (Pages 178 - 181)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 46 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                    888-391-3376

1  A.  Yes.
2  Q.  And it looks like in the employee comments you deny
3     that you made stowing mistakes and blamed those
4     errors on the computer?
5  A.  I didn't -- yeah, I refused to agree with Griffin.
6     That's why I didn't sign the thing. But yeah, I'm
7     aware of the errors they stated I did.
8  Q.  Okay. And Mr. Griffin communicated to you that he
9     believed you had committed those errors, right?
10  A.  Right.
11  Q.  And did Mr. Griffin also tell you that no other
12     employees were having the same kind of complaints
13     made about their stowing that you were having?
14  A.  No, he didn't say that.
15  Q.  Did Mr. Griffin tell you that nobody else was having
16     problems with their computers in the way that you
17     were having?
18  A.  No, he didn't say that either.
19  Q.  Okay. In that 4-20 feedback that we just looked at,
20     Exhibit 18, up in the communication history it says
21     that you also were coached on 4-14-2016 regarding
22     your quality. Do you agree that you were coached on
23     4-14 regarding your quality?
24  A.  Yeah, I believe.
25  Q.  And so then the next -- did I have another one for

1     you?
2         (Exhibit 19 marked.)
3  BY MS. FITZKE:
4  Q.  Showing you Exhibit 19, Ms. Timms. This is a
5     termination notice.
6  A.  Yeah.
7  Q.  And Mr. Griffin, did he provide this document to you
8     as well?
9  A.  Yes, he did.
10  Q.  And it looks like it was presented to you for your
11     signature on May 16th of 2016 and that you dated it
12     but did not sign it; is that right?
13  A.  That's right.
14  Q.  And the comments in the associate comment box, those
15     are yours?
16  A.  Yes.
17  Q.  And that's your handwriting?
18  A.  Yes.
19  Q.  And you disagreed that you should be terminated
20     because you thought your quality performance stowing
21     were accurate?
22  A.  Right, yes.
23  Q.  And you said: I should not be fired because of low
24     quality because other people said so.
25  A.  Yeah, that's my exact writing.

1  Q.  Who said you should not be terminated for your poor
2     quality?
3  A.  Other people, I meant like other employees, stowers
4     and a few other maybe supervisors that were somewhat
5     cool with me, thought I was a good worker.
6  Q.  My question was who told you you should not be
7     terminated because of your quality?
8  A.  Like I said, employees, stowers, other employees that
9     were stowers, other employees of other departments
10     and some supervisors that were cool with me.
11  Q.  I want the names. Who are the names of these people?
12  A.  I don't know their names. I don't remember.
13  Q.  What were the other stowers --
14  A.  I didn't know them by their --
15  Q.  What would the other stowers know about your quality?
16  A.  That I was a hard worker and that I did do the job
17     right. And they did stow with me because there were
18     times where -- I mean Amazon would have us team up
19     and do the stowing together, have two, have two
20     employees instead of one stowing together. And they
21     can see my performance, what I do, did on the job.
22  Q.  Okay. They wouldn't be charged with -- if you stowed
23     alongside another employee, they wouldn't be charged
24     with checking your work, would they?
25  A.  No. But they see -- but we see eachother.

1  Q.  The fact, the employees that are charged with
2     checking your work is the quality group, right?
3  A.  Yeah, the supervisors or -- yeah.
4  Q.  Or the quality group?
5  A.  Yeah.
6  Q.  And the quality group was reporting to Mr. Griffin
7     that you were not stowing correctly?
8  A.  They were saying that I wasn't stowing correctly of
9     those errors. But I don't know why. Oh, yeah,
10     because ICQA, quality people do not -- they're not --
11     they can't see how people stow. They go and they see
12     the bins of who -- which stowers stow. They check
13     our work afterwards. So they don't know whose it
14     really is.
15         The supervisors know I believe because --
16     it's probably because every stower's name they know
17     who is at -- who was doing that bin, who stowed that
18     bin. Because in the beginning of the -- work, we
19     always assigned someplace. And the supervisors will
20     tell each stower, you know, where you supposed to be
21     stationed. And the bins are also assigned to -- they
22     know where the bins are going according to the floor
23     and --
24  Q.  And there is a computerized record of who put what
25     products into what bin, right?

47 (Pages 182 - 185)

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 47 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                 888-391-3376

1 A. Yeah, right. But the ICQA or the quality performers,
2 they don't know who is that -- which employee has
3 stowed what.
4 Q. So when they're finding the mistakes, they don't know
5 whose mistakes they are?
6 A. Thank you, yes, that's what I'm trying to say.
7 Q. So when the quality team is reporting that there are
8 missing items, et cetera, in the bins you stowed,
9 they don't even know that they're reporting.
10 A. Right.
11 Q. They're just reporting that errors were found?
12 A. Yes.
13 Q. And Mr. Griffin's job was to go back and see whose
14 mistakes they were?
15 A. Right, yes.
16 Q. Okay. I want to go back to Exhibit 10. It's the
17 termination report that looks like this.
18 A. Okay.
19 Q. If you can find it in your stack there. It's in
20 color like this. It looks just like this, Exhibit
21 10. The little yellow sticker is going to say 10 on
22 it.
23 A. Okay. Got it.
24 Q. So this termination summary identifies the on file
25 corrective actions, and it lists all the corrective

1 actions that we've talked about here and one dated
2 4-28 of 2016 that was a final written warning. You
3 don't dispute you got a final written warning on
4 April 28, 2016?
5 A. Yes, I'm not disputing that.
6 Q. And under summary it says: Athena has received
7 supportive coaching every week from her manager.
8 You don't dispute that Mr. Griffin provided
9 you coaching every week, right?
10 A. No, I don't dispute that.
11 Q. PAs, do you know what PAs are?
12 A. Those are the people I was talking about, the P
13 people.
14 Q. Okay. And PGs?
15 A. They're called problem solver. I forgot what the A
16 stood for.
17 Q. And do you know what the PGs are?
18 A. PGs are the problem solvers.
19 Q. So in addition to the support you got from
20 Mr. Griffin, the people that we can call for your
21 deposition here the P people, they also came by and
22 tried to give you supportive coaching to help train
23 you, right?
24 A. Yes.
25 Q. And they did that on a weekly basis?

1 A. Yes.
2 Q. And you understood the purpose of that was to try to
3 help you meet company standards, right?
4 A. Yes.
5 Q. What are master packs?
6 A. Master packs are small or it could be big but they're
7 boxes or they're in packages. But they're individual
8 packages or boxes you stow other than opening it up,
9 and there is different items in it you have to stow.
10 It's a whole big package, whole small package.
11 Q. Did Mr. Griffin give you any performance feedback
12 about identifying and stowing master packs?
13 A. Yes, he did.
14 Q. What was that feedback?
15 A. That he -- they claimed quality control, ICQA claimed
16 that I didn't stow master packs right, that they were
17 in a different -- somewhere in different bins or
18 whatever.
19 Q. Okay.
20 A. Et cetera.
21 Q. The termination summary says, and this is Mr. Griffin
22 I believe writing: I have given her very clear ways
23 to avoid computer prompts she thinks are errors as
24 well as ways to identify master packs.
25 So let's unpackage that a little bit.

1 A. Right.
2 Q. Did Mr. Griffin talk to you about ways that you could
3 avoid the computer prompts that -- the defaults you
4 were describing?
5 A. Yeah, because he explained to me that whenever I --
6 make sure I pay attention to whenever I stow where I
7 have to scan the -- you scan a big label on the
8 master pack, on a package or the box, you know. And
9 then you scan -- then there is the scan label. Then
10 you scan the bin, you scan the big label which is
11 considered -- the big label is really considered like
12 a cart or something of the whole quantity item or
13 whatever as if you was to scan different items out of
14 a box.
15 He told me just scan the big label, scan
16 the item, scan the bin and then you have to drop.
17 There is a system or a code where I have to scan the
18 empty code and then scan the drop -- scan the big
19 label. So that's what I was explaining, how to scan
20 the master pack. I was scanning them wrong they were
21 saying.
22 Q. Okay.
23 A. Because they would not see a master pack in the bin
24 or something.
25 Q. Did you make changes to your behavior based on the

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1    feedback that Mr. Griffin gave you?
2  A.  No, I never did change my behavior -- well, as far as
3    what things he come to me about and I know that I'm
4    doing my job right or just the overall performance of
5    after each coach come to me?  My performance was
6    still excellent.
7  Q.  It was always excellent?
8  A.  Yeah, always excellent.
9  Q.  So do you have any reason to understand --
10  A.  I was very good.  I'll admit, I'm not perfect, but it
11    was very good.
12  Q.  Okay.  Did other employees that you observed get
13    retraining on four separate occasions?
14  A.  I've seen it happen.  I don't know them.  I didn't
15    know them.  But me walking or just being by one or
16    two stations along with mine, yeah, I've seen other
17    people get trained.
18  Q.  Have you seen people get trained on four separate
19    occasions?
20  A.  Maybe more than that.  Not four, just four, maybe
21    more than that.
22  Q.  You've seen that happen?
23  A.  Yeah.
24  Q.  So you didn't think that there was anything unusual
25    about the amount of training you were getting?

1  A.  No -- yeah, I did, because I only saw it like a few
2    times, several times, seven or eight times.  But for
3    me to be trained every week, and I haven't seen that
4    happen to other people be trained every week, yeah, I
5    thought that was something wrong.
6  Q.  Are you able to identify any of the other employees
7    that you claim got that much retraining?
8  A.  No, I don't know their names.
9  Q.  What facts do you have that would support your
10    conclusion that you were terminated from your
11    employment at Amazon because of your age?
12  A.  I believe it's because of what I've seen, people
13    leave with a supervisor that was -- looked like they
14    were a little older than me or my age.  And they come
15    in, go -- you know, once they leave, they were told
16    or asked to cut off their computer.  And once that
17    happens, you know, I know that they were terminated.
18  Q.  And those are the people we described earlier?
19  A.  Yes.
20  Q.  Discussed earlier that you don't know why they were
21    terminated or what their performance issues might
22    have been?
23  A.  Yes, yes.
24  Q.  And you were told when you were terminated by
25    Mr. Griffin that you were being terminated because of

1    your quality issues, your poor performance?
2  A.  Yes.  Well, he didn't give me a good reason.  He just
3    stated what department say he -- I did.  And that was
4    it.
5  Q.  The departments that said you were stowing
6    incorrectly?
7  A.  Yeah, and the computer errors.
8       (Exhibit 20 marked.)
9  BY MS. FITZKE:
10  Q.  Showing you Exhibit 20 which is the MKE1 PEP Process
11    document.  Have you ever seen this before?
12  A.  Yeah, I've seen this before.
13  Q.  Do you have any reason to believe that the
14    performance management process in place at the
15    Milwaukee -- or Kenosha facility wasn't followed when
16    it came to your discipline and ultimate termination?
17  A.  Could you repeat the question again?
18  Q.  Yeah.  Do you have any reason to dispute that -- or
19    do you have any reason to believe that the company
20    didn't follow its own process when it came to the
21    discipline, progressive discipline and termination of
22    your employment?
23  A.  Yes.  I believe that, you know, they -- there was a
24    lot of computer defaults.  And sometimes I wasn't the
25    problem of how, why, you know, ICQA would state, you

1    know, some things were missing this, this was missing
2    or this was scanned in this bin or that bin, you
3    know.  And --
4  Q.  That's not really my question.  I get that you
5    disagree that you did anything wrong.
6  A.  Okay.
7  Q.  So my question is in terms of the progression.  The
8    warnings that were given, the documented verbal
9    coaching, written warning, final warning and ultimate
10    termination, do you have any reason to believe that
11    the company didn't follow its own progression in
12    terms of its policy?
13  A.  Yeah, yeah, I would agree.
14  Q.  They did follow their policy?
15  A.  No, I disagree.
16  Q.  Okay.  What steps did they not follow?
17  A.  They should have followed the fact that, you know --
18    they should have followed the fact that, you know,
19    every person, every employee that does a job right,
20    they shouldn't -- they should follow more of -- be
21    more emphasis of the other departments.  That's what
22    I believe.
23  Q.  That's not my question, Ms. Timms.  I get that they
24    didn't -- you understood that Jason Griffin believed
25    the other departments and didn't believe you, right?

49 (Pages 190 - 193)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 49 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                              888-391-3376

1  A.  Yeah.

2  Q.  That Mr. Griffin didn't believe that it was the

3      computer, that Mr. Griffin believed the feedback he

4      got from the other departments.  You understood that

5      when you worked for Amazon, right?

6  A.  Yeah.

7  Q.  And you understood that at the time of your

8      termination?

9  A.  Right.

10 Q.  And you understood that's why you were getting all of

11     these performance counselings, coachings and

12     warnings?

13 A.  Right.

14 Q.  And so -- let's just leave it at that.

15 A.  Okay.

16         (Exhibit 21 marked.)

17 BY MS. FITZKE:

18 Q.  Ms. Timms, showing you Exhibit 21 which is a copy --

19     or is this a copy of the charge of discrimination

20     that you filed with the Equal Employment Opportunity

21     Commission?

22 A.  Yes.

23 Q.  And in this you allege that you were terminated from

24     Amazon because of your race and your age?

25 A.  Yes.

1  Q.  And I think we established today that you no longer

2      believe that it was your race, correct?

3  A.  Correct.

4  Q.  And that you don't have any facts that would indicate

5      that you were disciplined or terminated from the

6      company because of your race, correct?

7  A.  Correct.

8  Q.  And I think that you've given me your opinion today

9      that it was your age because you believed that you

10     were older than the other stowers and that you

11     believed that you have seen other older stowers that

12     were terminated leave the company.

13         Other than those two facts, are you aware

14     of any other facts that would indicate that you

15     were -- any of the discipline we discussed today was

16     issued to you because of your age?

17 A.  No, because Amazon doesn't allow anything of

18     technology where I could get more evidence to prove

19     that, you know, it -- they do age discriminate there.

20 Q.  And if you could bring technology into the facility,

21     what kind of evidence do you think that you would get

22     that would be facts to support that you were

23     disciplined because of your age?

24 A.  Definitely I would have brought -- if they would

25     allow us to bring cell phones in, I would have

1      definitely a cell phone of -- with video footage.  I

2      would tape record.  I would record.

3  Q.  Record what?

4  A.  I would record every time the supervisor came to my

5      place, every time I saw a supervisor go to another --

6      another stower's work site, you know, station, I

7      would also do that.  Plus I would have had a petition

8      if they allowed me to be on the premises which I

9      couldn't because Griffin said that after he

10     terminated me, I'm no longer on the premises inside.

11     I would have been able to get a petition of all the

12     people I've just stated that I didn't know their

13     names that I talked to as well as seeing to get

14     terminated that look older than me or like me as well

15     as those that were younger than me that stayed on the

16     job, still got their job today, to this day.

17 Q.  Okay.  Any other facts that you're aware of that

18     would support that your discipline that was issued to

19     you was because of your age?

20 A.  No, I don't have any other facts.

21 Q.  And I want to ask you the same question then with

22     regard to your termination which is a separate

23     employment action.  Do you have any facts that you're

24     aware of other than the fact that you were older than

25     your peers in your belief and that you saw other

1      older people as we talked about leave the company,

2      are there any other facts that you're aware of that

3      would support your conclusion that you were

4      terminated from employment at Amazon because of your

5      age?

6  A.  Well, also the fact that there have been many times I

7      worked on the same floor of stowers that were much

8      younger than me and Griffin would only evaluate me

9      and not them.  They walk -- walk past their station.

10 Q.  Any other facts that support that you were terminated

11     because of your age?

12 A.  No.

13         MS. FITZKE:  We can go off the record?

14         (Discussion off the record.)

15         (Exhibit 22 marked.)

16 BY MS. FITZKE:

17 Q.  Ms. Timms, showing you Exhibit 22 which I understand

18     is a copy of the complaint you filed with the Federal

19     Court in Wisconsin in connection with this matter; is

20     that right?

21 A.  Yes.

22 Q.  So I want you to turn to what is numbered on the

23     bottom page 4 of 13.

24 A.  Okay.

25 Q.  Toward the top of that page the first full sentence

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 50 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1  says:  Griffin would also say that I would be the
2  only one employee to make a lot of mistakes stowing
3  items in bins.
4        Do you see that there?
5 A.  Yes.
6 Q.  Is that what Mr. Griffin told you?
7 A.  Yeah.
8 Q.  Okay.  Down that page, halfway down the page, a
9  little bit more than halfway you say:  He, meaning
10  Mr. Griffin, said that I was stowing items in bins
11  with poor quality, and I know that I did not stow
12  items in bins with poor quality.
13 A.  Yes.
14 Q.  So Mr. Griffin shared with you that it was his
15  opinion that you were stowing with poor quality?
16 A.  Yes.
17 Q.  And that was after your hire on March 6th?
18 A.  Yes.
19 Q.  On the next page, 5 of 13, you relay in your
20  complaint here how your employment was terminated and
21  you say he, Mr. Griffin, rushed me to sign any
22  termination release papers, and then you explain how
23  you refused.
24        My question to you is when you say
25  termination release papers, are you talking about the

1  document that we looked at, Exhibit 19, the feedback
2  form, the quality termination feedback form that you
3  refused to sign and added your personal comments to?
4 A.  Um --
5 Q.  This is what it looks like, Ms. Timms.  Do you want
6  to just look at my copy?
7 A.  What was the question again?
8 Q.  I'm wondering if Exhibit 19 is the form that you were
9  referring to in your complaint when you said Mr.
10  Griffin rushed you to sign a termination --
11  termination release papers.
12 A.  Yeah, right.
13 Q.  It was Exhibit 19?
14 A.  Um-hum.
15 Q.  Okay.  Is that a yes?
16 A.  Yes.  And all the other papers I refused to sign.
17 Q.  Okay.  Were you asked to sign any other papers the
18  day that you were terminated or are you just talking
19  about the previous performance feedback?
20 A.  The previous performances and that one, the one on
21  May 16th.
22 Q.  During your termination meeting did Mr. Griffin tell
23  you that he believed that you were a hard worker?
24 A.  Yes.
25 Q.  And did Mr. Griffin tell you in the termination

1  meeting though that he had to go by the decision of
2  the three departments that also checked the items in
3  the bins?
4 A.  Yes.
5 Q.  And you understood that he was relaying to you or had
6  relayed to you that there were three departments that
7  had reported to him that you were not correctly
8  stowing items?
9 A.  Yes.
10 Q.  And on page 6 of 13 on the bottom quarter of the page
11  you say:  I have always asked people that have to
12  check stowers' items if it okay to put items in the
13  people -- to put items in bins that I stowed, and the
14  people would say yes or they would fix them for me
15  before putting each item that was fixed in the bin.
16 A.  Yes.
17 Q.  Can you explain to me what you mean by that
18  statement?
19 A.  That I stowed -- yeah, that -- let me just -- I have
20  always asked people that have to check stowers' items
21  if it's okay put items in bins that I stowed -- and
22  the people would say yes or they would fix the items
23  for me.  Those people that fixed items for me was the
24  PR people, the people that I call and click onto the
25  feature of the computer and screen and have them --

1  that solve problems, problem solvers.  And they would
2  put the items in, fix them, because that was their
3  job, the problem solver people that I would have to
4  contact by the -- my computer screen and would fix
5  them, they would -- if it needed taping, if it needed
6  fill in of holes or gaps, they would do all that.
7 Q.  Okay.  So when the problem solver people fixed the
8  issue, then you understood that that was a corrected
9  issue and that wasn't part of the complaints that
10  were being made about you?
11 A.  Evidently that was because I meant to say that
12  Mr. Griffin did inform me that, you know, I'm not
13  supposed to stow those items after they're taped.
14  That's what he told me.
15 Q.  Okay.
16 A.  So -- and I thought I was doing it right because
17  problem solvers say yeah, you can stow those, because
18  I asked them.
19 Q.  But you understood there were additional issues that
20  were brought to Mr. Griffin's attention, not just
21  about some taped items that were stowed, right?
22 A.  Yeah.  But that's what -- that's what ICQA stated to
23  him it shouldn't be.  And the problem solvers say
24  yeah, you can do that because in orientation
25  whenever -- when I got hired, all the supervisors,

51 (Pages 198 - 201)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 51 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

1 anybody that was in charge at orientation for the
2 first-time employees would tell first-time employee
3 stowers that, yeah, PR is right, they also -- we need
4 to listen to when we do the job.
5 Q. Okay. But that really wasn't my question. My
6 question to you was some of the complaints that ICQA
7 was making about you had to do with things not stowed
8 in the correct bin which is really a different issue
9 than whether you were stowing taped items or not,
10 correct?
11 A. Oh, yes.
12 Q. So I think halfway down the page you note, and we're
13 still on page 7 of 13: During my employment I was
14 given warnings for low or poor items.
15 A. Yes.
16 Q. And that would be poor stowing; is that right?
17 A. Poor items. Items for stowing.
18 Q. What's that?
19 A. Damaged items like for stowing. That's what poor
20 quality items were.
21 Q. You've attached a number of items regarding Amazon,
22 Inc's financials, and those -- I understand from
23 other things you submitted that you just went and
24 printed some things off the internet?
25 A. Yes, I did.

1 Q. Did you make any attempt to verify the accuracy of
2 that information?
3 A. No, I couldn't because I would have needed a lawyer,
4 and I didn't -- well, I attempted to go and find a
5 lawyer. And I contacted six lawyers, and they said
6 they still couldn't do my case, and they couldn't
7 follow up or try to investigate Amazon's gross
8 profits or whatever.
9 Q. All right. You know you didn't actually work for
10 Amazon, Inc., right?
11 A. I did work for Amazon. I was informed that Amazon,
12 Inc., was Amazon Fulfillment.
13 MS. FITZKE: Can we mark this, please?
14 THE WITNESS: It's still the same company.
15 (Exhibit 23 marked.)
16 BY MS. FITZKE:
17 Q. Showing you Exhibit 23, Ms. Timms, this is a copy of
18 some earnings statements that you produced to me in
19 connection with the case. And I understand these are
20 your paycheck stubs or earning statements that you
21 received from Amazon while you worked there, right?
22 A. Yes, correct.
23 Q. Do you see on the top left-hand corner where it
24 indicates that it's from Amazon.com, DEDC LLC?
25 A. Yes.

1 Q. Did you understand that you in fact worked for an
2 entity called Amazon.com DEDC LLC?
3 A. No, because they will always -- supervisors, they
4 would state Amazon Fulfillment is Amazon, Inc., is
5 the same, the same company, it's Amazon.com DEDC
6 LLC.
7 Q. So you just believe that they were all the same
8 companies?
9 A. I didn't believe it, I asked a supervisor, and they
10 said, told me yes.
11 Q. Do you have any idea how Amazon.com DEDC LLC is
12 related to Amazon.com, Inc?
13 A. Do I believe that?
14 Q. No, do you know how Amazon.com DEDC LLC is related in
15 the corporate structure to Amazon, Inc?
16 A. I did know, but I forgot because they did explain it
17 to us how all Amazon sections of corporations are
18 linked together.
19 Q. Who explained it to you?
20 A. Supervisors at Amazon.
21 Q. And which supervisor?
22 A. I don't know the name, their names. It's like five
23 supervisors that would give -- hear on the speaker in
24 the factory, you know, go to the cafeteria, we have a
25 big meeting.

1 Q. So you know that Amazon.com, Inc., is the entity that
2 you sued, they have some indirect ownership interest
3 in Amazon.com DEDC LLC?
4 A. Yes.
5 Q. But you don't know what that ownership interest is or
6 how the corporations are structured?
7 A. I used to. I am told, but I don't remember because
8 they stated it and they explained it in a cafeteria
9 meeting.
10 Q. That's what I'm asking you. As you sit here today,
11 you can't explain to me how Amazon.com DEDC LLC
12 relates to Amazon.com, Inc?
13 A. No, I can't explain to you right now.
14 Q. And you don't dispute that you received your payment
15 while you worked for Amazon from Amazon.com DEDC LLC?
16 A. No, I don't dispute that. I made a mistake for my
17 first termination which was March 16th, second one was May,
18 May, was in May.
19 Q. Okay. You produced to me in this case, Ms. Timms,
20 some W-2 forms that you received from Integrity
21 Staffing.
22 A. Yes.
23 Q. Do you also have in your possession W-2 forms that
24 you received from Amazon?
25 A. No, I don't.

52 (Pages 202 - 205)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 52 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                                888-391-3376

1 Q. And why don't you have those?
2 A. I just have this from what was stated of Amazon.
3 Q. But at the end of the -- either at the end of your
4 employment, at the end of last year, early this year,
5 did you receive a W-2 form that you could use to
6 complete your taxes?
7 A. Yeah, I received it.
8 Q. Can you produce a copy of that to me, please?
9 A. I don't have that on me today.
10 Q. Correct. But you can mail me one?
11 A. Oh, I'll give you W-2 forms of just me, my presence
12 of Amazon being permanent? From the day that they
13 made me permanent?
14 Q. Do you know what a W-2 form is?
15 A. Yeah, I know what a W-2 form is.
16 Q. Your tax form from the end of the year?
17 A. Yeah.
18 Q. I want the tax form from Amazon.
19 A. From this year and last year?
20 I have the one that you got from Integrity Staffing.
21 A. Okay.
22 Q. It's my understanding that you only worked for Amazon
23 in the calendar year 2016, right?
24 A. Yes.
25 Q. As a direct Amazon employee?

1 A. Yes.
2 Q. So you should only have one W-2 form from Amazon; is
3 that right?
4 A. Yes.
5 Q. And it's that W-2 form that I'd like to receive.
6 A. You'd like it mailed?
7 Q. It's responsive to the discovery request. And
8 I think you should have one from the State of
9 Wisconsin as well relating to your unemployment
10 benefit.
11 A. Of my unemployment benefit?
12 Q. Correct. So you should have a W-2 form for that. If
13 you could send that as well?
14 A. Okay.
15 Q. Other than -- we should just establish for the
16 record, after you were fired from Amazon, you
17 collected unemployment for a period of time?
18 A. Could you repeat the question?
19 Q. Yup. After you were fired by Amazon, you received
20 unemployment for a period of time?
21 A. Yes.
22 Q. And for how long?
23 A. From June through -- I'm sorry, yeah, from June,
24 month, I don't know the exact day, to August, yeah,
25 August, June to August.

1 Q. Did you understand that Amazon.com DEDC LLC was the
2 entity that responded to your employment claim and
3 whose account was charged for the unemployment
4 benefit that you received?
5 A. Yeah, yeah.
6 MS. FITZKE: Mark that, please.
7 (Exhibit 24 marked.)
8 BY MS. FITZKE:
9 Q. Showing you Exhibit 24, this is a document I received
10 from you relating to your unemployment benefits. And
11 on the second page of that document it reflects that
12 Amazon.com DEDC LLC is the corporate entity
13 responsible for your benefit?
14 A. Yes.
15 Q. Is that right?
16 A. Yes.
17 Q. And did you receive $290 was it a week in benefits?
18 A. It was weekly.
19 Q. Okay.
20 A. It was weekly, yes.
21 Q. How much money do you receive from the State of
22 Wisconsin Food Share program?
23 A. It's hard to say, but monthly I receive one -- about
24 $198.
25 Q. A month?

1 A. A month.
2 Q. Do you have any other source of income currently?
3 A. No, not at this time.
4 Q. How did you get to and from work when you worked at
5 Amazon?
6 A. I drove sometimes car rental, sometimes I carpooled
7 but reimburse the car pool. But mostly it was car
8 rental. I drove myself back and forth.
9 Q. Reimburse the car pool from who?
10 A. From my stepfather. We did a deal until I was able
11 to get -- save enough money on the side to start
12 doing car rental to drive myself out there and back
13 here.
14 Q. So you would rent cars to go to work?
15 A. Um-hum, yes.
16 Q. And you produced a number of rental car receipts in
17 this case.
18 A. Yes.
19 Q. And fuel receipts.
20 A. Yes.
21 Q. And are those for the rental cars that you rented to
22 get to and from work?
23 A. Yes, as well as the gas receipts, that was for gas
24 and sometimes lunch, partially lunch.
25 Q. While you were at work?

53 (Pages 206 - 209)

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 53 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                               888-391-3376

1 A. While I was at work or leaving work, yeah.
2 Q. And why do you contend that Amazon should reimburse
3    you for money you spent getting to and from work and
4    for your lunch and gas to get there?
5 A. Because it is a long way. And the fact that they --
6    during their meetings they always state they're going
7    to build a plant to hire more workers, but they never
8    talk about building a plant here in Milwaukee. And a
9    lot of people asked them that throughout the meetings
10   including me. They don't know why, but it's up to
11   the head people. Just supervisors can only state
12   what Amazon is going to do.
13 Q. And how is Amazon choosing not to build a plant in
14   Milwaukee a financial damage to you resulting from
15   your termination of employment?
16 A. If they had a plant here in Milwaukee, I don't think
17   I would have been terminated.
18 Q. Why do you say that?
19 A. Personally because it wouldn't be extra work for me
20   to do to drive back there and here and back which was
21   a little stressful. I wouldn't have had that much
22   stress and why I was stating to the fact -- when I
23   stated to you that I go and see a psychologist to do
24   an analysis of my emotional distress due to working
25   for Amazon, you know, and my blood pressure wouldn't

1   have been so high. You know, I probably would have
2   performed better. But not only that, the supervisors
3   probably would have been more reasonable here in
4   Milwaukee. And not only that, a lot of -- it would
5   be a lot less stress and less evaluations for me
6   because they would have been able to hire more and
7   more people where Jeff Griffin wouldn't have been
8   just targeting me, you know.
9 Q. Why do you believe Jeff Griffin was targeting you?
10 A. I believe because I was older, and I was one of
11   the -- and since I was one of the older workers, I've
12   seen supervisors do what he did with me. Evaluate
13   other workers, may not have been every week, but it
14   would have been like I would see two or three old --
15   workers that were a little older than me probably --
16   or my age get evaluated.
17 Q. But you can't identify for me who those older workers
18   are?
19 A. I just can't.
20 Q. Okay.
21 A. I forgot their names.
22 Q. And these are the same facts we already talked about
23   before, right?
24 A. Um-hum, right.
25 Q. So we don't need to go over that again.

1      MS. FITZKE: Can we mark that, please?
2      THE WITNESS: Plus it was part of my
3   wages. So it came out of my wages. That's why I
4   think I feel and believe Amazon should reimburse me.
5      (Exhibit 25 marked.)
6 BY MS. FITZKE:
7 Q. I'm showing you Exhibit 25 which is a document I
8   understand you put together to help respond to our
9   written discovery requests in this case. And you
10   say: These are receipts of car rentals I paid to
11   drive to work from Milwaukee, Wisconsin, to Kenosha,
12   Wisconsin on work days in a car rental I paid to
13   drive to Kenosha, Wisconsin to Amazon, Inc.,
14   headquarters on the day I gave the defendants a
15   summons court waiver pack to give to their attorneys
16   which reflects the cost of the damages and wages.
17 A. Yes.
18 Q. So my question to you is other than car rentals to go
19   back and forth to work and other than the car rental
20   that you got on the day that you brought down your
21   summons and complaint with your waiver of service to
22   the Amazon facility, have you -- do you claim that
23   there are any other car rental payments or gas
24   payments that are your damages in this case?
25 A. No.

1 Q. Do you claim that other than the lunches that you had
2   the days that you worked at Amazon, are you claiming
3   money for any other kind of food expense in
4   conjunction with this case?
5 A. No.
6 Q. Okay.
7      (Exhibit 26 marked.)
8 BY MS. FITZKE:
9 Q. I'm showing you Exhibit 26 which is an invoice from
10   the ProCare Clinic.
11 A. I'm a little slow now that I'm a little tired.
12 Q. 26 is the invoice from the ProCare Clinic. Is this
13   the invoice that you are seeking to have the company
14   pay because you claim it is for health conditions
15   caused by Amazon?
16 A. Yes.
17 Q. And this is for the treatment with Doctor Vicki we
18   talked about earlier.
19 A. One of the treatments, yes.
20 Q. Okay. Are there other receipts?
21 A. No. I don't have them with me.
22      (Exhibit 27 marked.)
23 BY MS. FITZKE:
24 Q. Showing you, Ms. Timms, Exhibit 27 which is a
25   handwritten note and some receipts that indicates:

54 (Pages 210 - 213)

1  These are the receipts of the banks that I banked at
2  and got the money to xerox copies of documents for
3  filing the lawsuit, papers to open up the case for
4  printing out Amazon's gross profit money that they
5  made from 2015 to 2016 grace period and for traveling
6  to and from Milwaukee to Kenosha, Wisconsin for work
7  and the days to give Amazon lawsuit papers from the
8  courthouse, et cetera.  Okay.
9       So my question to you is are you claiming
10  that all of these -- all the money reflected in these
11  receipts is money that you spent to help prosecute
12  this case?
13 A.  Yeah.
14 Q.  And when you say that some of it is for money spent
15  traveling to and from Milwaukee to Kenosha, Wisconsin
16  for work, would those be the receipts that would be
17  dated before your termination date then?
18 A.  Yes.
19 Q.  And so some of these receipts might duplicate
20  expenses that you spent on, for example, fuel or
21  rental cars?  I guess here is the question.  Some of
22  the expenses that you gave me for fuel and rental
23  cars, was that money paid with some of the cash that
24  you withdrew from the banks on these dates?
25 A.  Just one rental car rental which was to get the

1  summons of this -- of the filing of the starting up
2  of this case going.
3 Q.  Okay.
4 A.  Because I had to go there in person on the premises
5  for that.
6 Q.  Well, you didn't actually.  Did you know you could
7  have mailed that?
8 A.  Yeah, but I had to -- I had to inform them that they
9  were getting mail.  They didn't know.  They didn't
10  know they were getting it.
11 Q.  You understood that in order to effectuate service by
12  waiver like you did, that you could have sent that
13  waiver by mail and waited for the company's response?
14 A.  Yeah, I did.  But they didn't know they had the mail.
15  They didn't know they had it.  HR didn't know they
16  had it.  And then that's when they contacted you all
17  because they didn't know they were getting sued.  So
18  I still had to go up there.
19 Q.  Well, they hadn't responded to your complaint yet,
20  right?
21 A.  No, HR, I talked to two head HR supervisors.  They
22  said no, we didn't know this was -- this lawsuit is
23  going on.  So let's call -- I have to call now our
24  lawyer.  That's what two supervisors told me.
25 Q.  Yeah, they might not necessarily know that.

1 A.  They didn't know.  They didn't know they had mail, I
2  was sending mail to them.
3       (Exhibit 28 marked.)
4 BY MS. FITZKE:
5 Q.  28 I believe, Exhibit 28 to your deposition is I
6  believe a copy of an email that you sent to Matt
7  Kurlinski, my colleague; is that right?
8 A.  Yes.
9 Q.  The second paragraph of this email I think starts
10  identifying the damages that you claim you're
11  entitled to in this case on a monetary basis.  You
12  start off by saying you'd like to claim $7,269.40 in
13  damages, and then you explain you'd like to claim
14  that amount for wages; is that right?
15 A.  Yes.
16 Q.  And how did you go about calculating that, $7,269.40
17  for wages?
18 A.  It would be the same amount of -- the same amount of
19  wages for car rental -- it was car rental purchases
20  and gas and any lunch expenses.  Basically that's it.
21 Q.  What kind of purchases, car rental purchases you
22  mean?
23 A.  Car rental purchases including the day to go up to
24  Amazon, let them know they were getting sued.  And
25  then they got a bunch of mail they never opened up I

1  mailed them, and gas, car gas, expenses and lunches
2  expenses.
3 Q.  Okay.  And I think you explained what the other
4  expenses that you're claiming in this case are.  Are
5  there any other -- other than what you've documented
6  in Exhibit 28 here, are there any other monetary
7  losses that you claim you suffered as a result of
8  your termination from Amazon?
9 A.  No, just what all I state I predict -- I mean I wish
10  to have for damages and wages and for emotional
11  distress.
12 Q.  After you were terminated from Amazon I understand
13  that you would have lost your health coverage with
14  them, right?
15 A.  Yes.
16 Q.  You would have been given the opportunity for COBRA,
17  but I expect you didn't have the money to participate
18  in COBRA; is that right?
19 A.  Yes.
20 Q.  So then did you go back on the Medicaid plan with the
21  State?
22 A.  Yes, that's why I'm on Medicaid.
23 Q.  Did you have any period of time where you were
24  uncovered by a health plan?
25 A.  Yeah, within the two month period of time that I

1  was -- well, actually, the period of time that I was
2  on unemployment comp from June to August, then I was
3  able to get on Medicaid through Food Share program.
4 Q.  And then are you still on Medicaid?
5 A.  Yes, I am.
6 Q.  And have you had any medical expenses that you had to
7  pay for out-of-pocket, out of your own pocket, that
8  you would not have had if you were still on the
9  Amazon plan?
10 A.  No, I don't.
11        (Exhibit 29 marked.)
12 BY MS. FITZKE:
13 Q.  Ms. Timms, as part of this lawsuit are you seeking
14  reinstatement or to be returned to your job at
15  Amazon?
16 A.  I wouldn't mind but for the fact Mr. Griffin informed
17  me and made it clear that the day that he terminated
18  me, fired me, that I could not, even if I applied for
19  any job up at Amazon or tried to get my job back, I
20  couldn't because by their policy, their rule of
21  hiring and firing.  So they wouldn't rehire me.
22 Q.  Right.  But if it was something that was available to
23  you, it's something you would like?
24 A.  To get my job back?
25 Q.  Yes.

1 A.  Yes.  Yes, with wages and damage payback, with damage
2  and payback, expenses payback.
3 Q.  Did you participate in any kind of retirement plan
4  while you worked at Amazon?
5 A.  Yes.  They made us.  You have to do that or else you
6  could face termination.  Two supervisors stated to
7  all employees there.  It was a policy.  That's how it
8  is.  You've got to do that or else they assume --
9  will terminate you.  And they give you two years to
10  do it as long as you're a regular employee.
11 Q.  Had you started participating in the plan by the time
12  you were fired?
13 A.  I did the first week they hired me, the first two
14  weeks.
15 Q.  Did you have -- did the company provide any match to
16  the amount of money that you would put into the
17  401(k)?
18 A.  Um-hum, and they sent me a W-2.
19 Q.  Okay.  And what was the company provided match?
20 A.  I don't remember.  I didn't memorize it, but I got
21  it, and it's at home.  It's at my house.  It's at
22  home.  So I didn't bring it.
23 Q.  So when you copy those other W-2 forms for me, can
24  you please copy that information as well?
25 A.  Okay.

1 Q.  How long after you were terminated from Amazon did
2  you wait before you started looking for another job?
3 A.  Oh, shoot, like a week, three, four days, then I
4  started applying for work, looking for work, going to
5  job interviews, call me back.
6 Q.  So you had identified a number of things in your
7  interrogatory answers like Office Depot and Palermo's
8  Pizza.  Were you only applying to management level
9  jobs at those locations?
10 A.  Mostly, yes, because my future goal is to, like I
11  told you earlier, to own a McDonald's or to -- if I
12  do work someplace else, it will be, it will be
13  probably a manager job.
14 Q.  Okay.
15 A.  Like McDonald's, shift manager.
16 Q.  Other than the CNC jobs that you identified, can you
17  identify for me any of the -- any job that you
18  applied for that was not a management level job or a
19  CNC operator job?
20 A.  Assembler I've been applying for also, that's about
21  it.
22 Q.  Okay.  In your interrogatory answer -- so on the
23  second page of Exhibit A, about a quarter of the way
24  down, it says:  I, the plaintiff, Athena E. Timms
25  could not get witnesses that I asked to be my

1  witnesses of representing me in this case against
2  Amazon.
3        Do you see where I'm reading?
4 A.  Yes.
5 Q.  Were there former coworkers that you talked to that
6  you asked to be your witnesses in this case and they
7  said no?
8 A.  It was like a hypothetical thing.  It was while I was
9  still working for Amazon, if I get fired.  Because
10  this was the week before the week that Mr. Griffin
11  fired me that I talked to three coworkers.  If I get
12  fired, will y'all, you know, could you all, you know,
13  be my witness or anything.  And they told me no, they
14  are too scared.  They might lose their job.  They
15  didn't want to get involved.
16 Q.  Who were those coworkers?
17 A.  See, I don't remember their names.  I don't remember
18  names.  But they were -- but when I see them, then it
19  come to me, their names come to me.
20 Q.  Did any of those coworkers express to you that they
21  believed that you were being treated unfairly because
22  of your age?
23 A.  Yeah, because I talked to them about it.  And they
24  said yeah, they believe it.
25 Q.  So the only thing that they knew about your

56 (Pages 218 - 221)

Veritext Legal Solutions
www.veritext.com                                                                                888-391-3376
Case 2:16-cv-01056-WED   Filed 08/15/17   Page 56 of 63   Document 28

1    performance counseling or discipline was the things
2    that you told them?
3 A.    Right.
4 Q.    Other than yourself and Mr. Griffin, are you aware of
5    any -- the identity of any individual that you
6    believe has information or knowledge regarding your
7    allegations against the company?
8 A.    No, I don't, except for the Marquette volunteers that
9    I've been going to.
10 Q.    What do you mean?
11 A.    The Marquette volunteers that I go to, ask for --
12 Q.    The legal assistant people?
13 A.    Yeah, legal assistant.
14 Q.    And what they know, they know just the things that
15    you've shared with them?
16 A.    Yeah, just questions, answers and questions. They
17    all want to know about this case.
18 Q.    Five pages in there is an item that starts with D.
19 A.    Five pages in, item --
20 Q.    It's got a small D at the top left-hand corner.
21 A.    Of my outline. Okay.
22 Q.    Actually, let's skip that. One of the interrogatory
23    answers, and I can just read it to you. And if you
24    want to find it and read it with me, we can take the
25    time to do that, too. But one of your interrogatory

1    answers says: On May 16, 2016 I was told that I was
2    terminated because three departments reported me for
3    low or poor quality items which was not true.
4 A.    Yes, that's what I said.
5 Q.    And when you say this was not true, are you saying
6    it's not true that you had low or poor quality items?
7 A.    It was true that I was not stowing low poor quality
8    items.
9 Q.    Okay. But it is true that three different
10    departments complained to Mr. Griffin about you?
11 A.    Yes.
12 Q.    And then in response to interrogatory No. 6, you say:
13    The total amount of expenses to file this lawsuit I
14    am doing against the defendant Amazon, Inc., is $796.
15        And then you -- it looks like you go ahead
16    to delineate how you got there. Was that your best
17    effort to kind of identify the expenses that you got
18    in conjunction with filing the case?
19 A.    That's wrong. It should be $7,000 -- oh, wait a
20    minute. No, that's right. $796, you're right.
21 Q.    Okay. And included in that is a $25 parking ticket
22    that you got?
23 A.    Um-hum, yes.
24 Q.    And you got that -- what were you doing the day that
25    you got the parking ticket?

1 A.    It was a car rental for me to go to Amazon. And for
2    some reason I didn't know that I parked in my
3    mother's neighborhood block that you need two
4    permits, you need a night permit and day permit. I
5    only had a night permit, so they gave me a parking
6    ticket for the day permit.
7 Q.    And why should Amazon pay you for that?
8 A.    Because I had to go to let them know that there is a
9    lawsuit going on. And I been sending them mail, and
10    they didn't know anything about it. Or else I would
11    have returned the car rental that same day that I
12    went. And it took awhile for me to get HR to come to
13    their window to let me -- let them -- to have me to
14    let them know they're getting sued. And I sent mail
15    over for the summons.
16        (Exhibit 30 marked.)
17        THE WITNESS: Took almost three hours.
18 BY MS. FITZKE:
19 Q.    Showing you Exhibit 30 to your deposition. I just
20    had a couple of questions. On the third page of this
21    document there was something I didn't quite
22    understand. In response to document request No. 6
23    you have put your answer there on the third page.
24    And you say as part of that answer: I did not file
25    against Amazon, Inc., because I did not meet the

1    deadline to charge Amazon, Inc., also for maybe
2    prejudice against darker complexion women that are
3    age older than 40 years old.
4 A.    Yes.
5 Q.    I didn't understand what you were trying to say
6    there.
7 A.    Well, they do race discriminate I believe, but that's
8    not why I'm suing them. I'm suing them for age
9    discrimination because they do -- they do let go even
10    Caucasian men, Caucasian women along with me. But
11    there is a lot of light skinned black women that
12    still stay on the job that I been told -- they have
13    told me like I told you earlier of the two women,
14    they are very light skinned complected black women
15    that I told them about my evaluation every week. And
16    they said they get evaluated, too, but not every
17    week.
18        And it's the same thing, they come back to
19    them, two or three departments are complaining to
20    them about whatever. But they told me don't worry
21    about it, it's just nothing because they been there
22    for two years. They have been living -- working
23    there for two years.
24 Q.    Can you identify for me any Caucasian people -- well,
25    let me ask you this because I think we already

57 (Pages 222 - 225)

Case 2:16-cv-01056-WED   Filed 08/15/17   Page 57 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                888-391-3376

1   established that you're not suing the company for
2   race discrimination, right?
3  A.  Yes.
4  Q.  So let's focus on age.  Can you identify for me any
5     younger workers who had similar performance issues
6     reported about them who still work for the company or
7     who did not get fired?
8  A.  I can't tell you their names or whatever.
9  Q.  Can you describe anyone that meets that description
10    for me, that being someone who is under the age of 40
11    who had three departments report problems about their
12    stowing who did not get fired by the company?
13  A.  Yeah, they're in their 20s, two women that were in
14    their 30's, the ones that I just mentioned.
15  Q.  You're aware of two women in their 30's who had three
16    departments report problems about their stowing?
17  A.  Well, one woman, she's in her -- sorry, early 20s,
18    and the other one was in her 30s.
19  Q.  And they both had three different departments report
20    problems to management about their stowing?
21  A.  Yeah, they said evaluation was similar to mine, that
22    supervisor coming to them complaining through ICQA
23    and the other two departments.  And but they have
24    been working there for two years.
25  Q.  Okay.  And you can't identify them for me?

1  A.  No, I can't identify them.  I don't know, I don't
2     remember their names.
3  Q.  Do you know what efforts were made to provide them
4     with retraining opportunities like you received?
5  A.  Yeah, they told me the same thing.  I told them
6     everything I get, a trainer, and they tell me the
7     same thing, they get it, too.
8  Q.  So they said after the complaints were made about
9     them, they also got a trainer?
10  A.  Yes.
11  Q.  And did they say that after they got retrained that
12    they didn't get complaints about them anymore?
13  A.  No, they didn't say that.
14  Q.  After they got retrained, did they continue to get
15    complaints about their performance to your
16    understanding?
17  A.  I don't know.
18  Q.  You don't know one way or the other?
19  A.  They didn't say that.
20  Q.  Okay.
21  A.  They didn't say that.
22  Q.  Other than those two women, are there any other
23    younger employees that you're aware of who had three
24    different departments complain about them that
25    continue to work for the company?

1  A.  No, I don't.
2  Q.  You noted in one of your answers that as a result of
3     some of the stress or emotional distress that you
4     claim resulted from your termination that sometimes
5     you take aspirin and cough syrup?
6  A.  Sometimes I do.
7  Q.  Is that to help you sleep or for another reason?
8  A.  It's for pain and -- it's for body pain I have a lot
9     of, and it's for sometimes my chest gets congested or
10    I just can't breathe through my nostrils, like it
11    stuff up, it stuffs up, stuffy nose, stuffy, runny
12    nose.
13  Q.  You believe that you're getting stuffy and runny
14    noses because of your termination from Amazon?
15  A.  After that I got a little sick, yeah, I got a little
16    sick.  I got a little sick.
17  Q.  Right after your termination?
18  A.  Um-hum.
19  Q.  Is that a yes?
20  A.  Yes.
21  Q.  And for how long were you sick?
22  A.  I was sick off and on.  I was feeling better after
23    taking the medicine and aspirin.  Then the pain comes
24    up in my body again.  It's like every three to four
25    weeks.

1  Q.  Has that been consistent every three to four weeks
2     since your termination?
3  A.  Yeah.  With the exception of my nose stopped running
4     and stopped stuffing up.
5  Q.  When did your nose stop running and stop stuffing up?
6  A.  It was around was it January this year basically.  It
7     was this year.
8  Q.  Did any medical doctor ever tell you that you were
9     experiencing problems with your nose, having a runny
10    nose or being stuffy and other sinus problems because
11    of what had occurred at Amazon?
12  A.  No.  But I talk about it with the psychologist.
13  Q.  Okay.  When you say you're having body pain, what is
14    this body pain that you're having?  Can you describe
15    it for me?
16  A.  Pain in my back leg, calves, calves, back, leg,
17    calves, knees, my shoulders started getting in --
18    being in pain.  And I've been going to the doctor,
19    and I've been taking my blood pressure pills.
20  Q.  Have the doctors said that that pain is associated
21    with your high blood pressure?
22  A.  No, they have not associated that, no.
23  Q.  Did they tell you what it's caused by?
24  A.  No, they didn't tell me.  They didn't tell me.
25  Q.  Has any medical provider ever told you that your body

58 (Pages 226 - 229)

Veritext Legal Solutions
Case 2:16-cv-01056-WED   Filed 08/15/17   Page 58 of 63   Document 28
www.veritext.com                                                      888-391-3376

1 pain that you described for me is caused by what

2 happened at Amazon?

3 A. No, they didn't tell me that. But when I talked to a

4 psychologist, she states, you know, it could be a

5 possibility due to the fact of stress. Stress leads

6 to that, bring blood pressure up and make a person

7 sick.

8 Q. You know a psychologist isn't a medical doctor,

9 right?

10 A. No, it is not. No, they're not. Yeah, I know.

11 Q. Do you know who Billy Sisson is?

12 A. Billy Sisson?

13 Q. Yeah, did you have a coworker at Amazon named Billy

14 Sisson?

15 A. I don't recall. I don't remember any coworkers's

16 names.

17 Q. Okay.

18 A. No, I don't.

19 Q. Have you drawn the conclusion or do you believe that

20 your body pain is caused by what happened at Amazon?

21 A. I believe so.

22 Q. Okay. But no medical provider has ever told you

23 that's the case?

24 A. No.

25 Q. Other than your sinus issues that you had and your

1 body pain as you've described it, have you had any

2 other physical or mental problems that you attribute

3 to what occurred at Amazon?

4 A. I'm sorry, I just need some air a little bit. I need

5 some space. Okay. What did you say now? I'm sorry.

6 Q. Other than your body pain and your sinus issues that

7 you described, do you have any other issues or have

8 you had any other symptoms, either physically or

9 mentally, that you attribute to what had occurred at

10 Amazon?

11 A. No, other than emotional distress and the body pain,

12 the coughing, I was constantly coughing crazy and the

13 nose, stopped up nose.

14 Q. Were you coughing at the same time that you were

15 having the sinus issues?

16 A. Yeah, I was.

17 Q. And did that end at the same time as your sinus

18 issues?

19 A. The coughing stopped later, after the sinus issues

20 stopped.

21 Q. So did you have the coughing issues from May until

22 sometime into 20 --

23 A. Up until this month, actually, yeah, February.

24 Q. Has any medical doctor ever told you that your

25 coughing issues are related to what happened at

1 Amazon?

2 A. No.

3 Q. And when you said in addition that you had emotional

4 distress, how has that emotional distress manifested

5 for you?

6 A. Well, I'm still having body pains, my blood pressure

7 still got to get monitored because I wasn't -- I

8 got -- have a confession, haven't told my doctor yet,

9 I have a confession to make, I even when I wasn't

10 working at Amazon, I wasn't taking my blood pressure

11 medicine. And then my blood pressure was like -- has

12 been over 100 and something. So I monitored it.

13 And while I'm still dealing with this

14 case, it went up a little bit more over 100 and -- it

15 was 102, then it went up 105. It goes up like that.

16 So then, you know, she put me on blood pressure

17 pills. It's down now because I'm on blood pressure

18 pills.

19 Q. And did any medical provider ever tell you that your

20 blood pressure went up because of what happened at

21 Amazon?

22 A. No. I have a question. Before we continue, can I go

23 to the washroom?

24 Q. Sure.

25 (Recess taken.)

1 BY MS. FITZKE:

2 Q. So I think, Ms. Timms, before the break what I was

3 asking you about is you had mentioned experiencing

4 some amount of emotional distress following your

5 termination.

6 A. Yes.

7 Q. And I'm wondering how did that emotional distress

8 manifest for you or how did you experience it?

9 A. Like I told you before, I go to a psychologist, not a

10 doctor but she, you know -- but to do the analysis to

11 write about my emotional distress on the job. I

12 think it came up about just being -- having those

13 problems starting last year, since Amazon fired me.

14 My nose started stopping up, and I started getting

15 headaches. And then that's what the aspirins were

16 for, cough syrup was for that. And then also my

17 pain, aspirin was also for my body pain.

18 Q. How often did you experience headaches that you

19 attribute to Amazon?

20 A. It was just only after I -- the week that --

21 Q. The week after your firing?

22 A. Yeah, and then every other, every two weeks.

23 Q. And did they stop at some point?

24 A. They stopped and they come back.

25 Q. So you're still getting headaches?

59 (Pages 230 - 233)

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 59 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                          888-391-3376

1 A. Yeah, I'm still getting headaches.

2 Q. Are you still getting --

3 A. That's one reason I went back to the doctor because

4     of my pains and headaches.

5 Q. Are you getting the headaches every other week still?

6 A. Every two weeks or sometimes four weeks or sometimes,

7     yeah, it varies. It's abnormal times every month.

8 Q. Did you ever go to a psychologist or a mental health

9     professional before you were terminated from Amazon?

10 A. No, no, I didn't.

11 Q. Did you ever seek medical treatment for headaches

12     before your termination from Amazon?

13 A. No, I didn't.

14 Q. Has your -- other than what you've already told me,

15     so I'm not saying you haven't already shared with me

16     some stuff, you shared with me your body pains, your

17     headaches, other than what's already in our record

18     here, were there any other ways that your emotional

19     distress kind of manifested for you, any other

20     symptoms that you claimed to have experienced

21     physically or emotionally because of the distress?

22 A. Well, I think so because I think it was, you know,

23     I'm getting -- I have issues where I have side pains

24     once a month. I'm a woman, so I give off a lot of,

25     you know -- I have the time of my month, my cycle.

1     And I explain, I have a discussion personally, women

2     personally with Mrs. Vicki, my other doctor. So it's

3     an issue that I have to get treatment now to

4     eliminate inside my body which she said might come up

5     as stress sometimes.

6         So I'm going to be taking injections, you

7     know, every two, three months, every three months

8     involving this case, this personal case involving my

9     body once a month. But then I explained to one of my

10     doctors, Ms. Maisee, that, you know, I had issues

11     with fear whenever, you know, Griffin tried to fire

12     me. Fear came about, you know, and I would just

13     panic. So that's why she put me on those mental

14     health pills.

15 Q. Did you start treating with her while you were still

16     working for Amazon or after you were fired?

17 A. No, after I was fired.

18 Q. When you were not working for Amazon anymore did you

19     still experience fear?

20 A. I can't say, panic, fear. She said it's like anxiety

21     because of my situation of looking for work.

22 Q. Is there anything in particular that brings on your

23     anxiety or causes you greater anxiety?

24 A. Just thinking problems I have to solve, yeah, finding

25     work, income.

1 Q. Other than what you've already told me -- let me ask

2     you this.

3         The side problems that you described, did

4     Doctor Vicki tell you that those symptoms you were

5     experiencing were caused by having been terminated

6     from Amazon?

7 A. You mean my doctor?

8 Q. Correct.

9 A. She -- one of them said it's a possibility anxiety

10     can lead to that.

11 Q. I thought you said you were treating for the side

12     issue with doctor -- the doctor you called Vicki that

13     you said is a medical doctor.

14 A. No, I'm getting treated for that plus once-a-month

15     my once-a-month woman issue.

16 Q. Is the side issue separate from your female issue?

17 A. No, that's about the -- that's -- yeah, that's

18     separate. Because when I'm not on my time of the

19     month, for example, I hate to put my business out

20     there, I have side pains. And my side pains get

21     worse.

22 Q. And that's what you're getting the injections for?

23 A. I'm getting the injections for -- no, a personal

24     problem, woman problem.

25 Q. Okay. So let's separate the two then. The women

1     problem, the woman problem that you have that you're

2     getting the injections for, has doctor -- the doctor

3     you call Vicki or any other medical professional told

4     you that that was caused by what occurred at Amazon?

5 A. No.

6 Q. Do you contend that it is?

7 A. No.

8 Q. Okay.

9 A. Because I think the panic attacks started when I was

10     working at Amazon.

11 Q. They started while you were working at Amazon or

12     after you were fired from Amazon?

13 A. Actually, it started when I was working at Amazon,

14     when Mr. Griffin started giving me evaluations,

15     that's when I started panicking, being in fear the

16     second week.

17 Q. Of March, the second week of March?

18 A. Yeah, that would be like the second week in March.

19     Because the first week in Feb -- the last week in

20     February, right, he gave me a first evaluation.

21 Q. With regard to the side pain that you described, is

22     that something that you contend is caused by what

23     occurred at Amazon?

24 A. I don't know because I asked her, I asked one of my

25     doctors, Maisee, which is a licensed doctor, I asked

Veritext Legal Solutions
www.veritext.com      888-391-3376

1    her about -- who prescribed me those mental health
2    pills, she asked about my pain, body pain.  And I
3    told her, you know, I have side pains and I have
4    headaches at times and I, you know, that was going on
5    last year when I was at -- working.  So I -- it's
6    possible in answer to your question, it could be yes.
7    But I don't know.  But it could be.
8  Q.  Has any medical doctor told you that it is caused,
9    that your side pain was caused by what occurred at
10    Amazon?
11  A.  They did not, no.
12  Q.  Okay.  So -- okay.  Other than what you've already
13    told me then, have you experienced any other physical
14    or emotional suffering that you contend was due to
15    what occurred at Amazon?
16  A.  No.
17  Q.  Okay.  Have you told me about all of the witnesses
18    you claim or people you claim would have knowledge
19    about your case to the extent you're able to identify
20    them?
21  A.  Yeah, I've told you all of them.
22  Q.  Have you told me truthfully today all of the facts on
23    which you base your claim of age discrimination
24    against Amazon?
25  A.  Yes.

1  Q.  I'm going to show you one more exhibit here today,
2    Ms. Timms.  It's Exhibit 31 to your deposition.
3        (Exhibit 31 marked.)
4  BY MS. FITZKE:
5  Q.  Do you have a Twitter account still?
6  A.  I do have a Twitter account.
7  Q.  And was your Twitter handle @TimmsAthena?
8  A.  Yes.
9  Q.  Do you still tweet?
10  A.  Yes, I -- no, I don't.  I haven't been.  But yes, if
11    I have time, I do.
12  Q.  It looks like at least in 2014 -- or excuse me, in
13    2013 through March of 2014 there were some tweets
14    that showed up on the internet.  Have you been
15    tweeting since 2014?
16  A.  Yeah, I was doing this.
17  Q.  What's that?
18  A.  Yes.
19  Q.  You've tweeted more recently than 2014, than March of
20    2014?
21  A.  Oh, no, I haven't.  No, I haven't.
22  Q.  In terms of the tweets that are identified here on
23    Exhibit 31, you sent these tweets?
24  A.  Yes, I did.
25  Q.  It looks like they're all to Oprah Winfrey, that you

1    were tweeting to Oprah Winfrey.
2  A.  Yes.
3  Q.  And why were you tweeting to Oprah Winfrey?
4  A.  Because she's one of my favorite celebrities.
5  Q.  Okay.  It looks like on November 2nd you tweeted
6    twice to Oprah.  One time you said:  Oprah, I want
7    you to know that I thank you for telling any rich
8    man/woman you know to come to downtown Milwaukee to
9    meet me in Starbucks.
10  A.  Yeah.
11  Q.  And why did you tweet that to Oprah?
12  A.  Well, this was when I was -- this is another thing I
13    do on the side, I go and I have -- I will have to
14    seek to find people that have wealth in order to get
15    a investor for my future goals.  It was just
16    something I was doing for my future goals.
17  Q.  So you were --
18  A.  And I was -- I always watched her show, and I know
19    that she always did things like that for people,
20    ordinary people, to go and match them up with someone
21    to be friends with that have wealth and then knows
22    about business.
23  Q.  So this was your way of reaching out to Oprah in
24    hopes that she would connect you --
25  A.  With and investor, yes.

1  Q.  Can I finish my question?
2  A.  I'm sorry.
3  Q.  So this was your way of reaching out to Oprah in
4    hopes that she would connect you with a rich person
5    that might want to fund your business venture, your
6    restaurant, for example?
7  A.  For future plans.
8  Q.  Or fast foot restaurant or future plans?
9  A.  Future plans, yeah.
10  Q.  Did you have future plans other than the ones that
11    you described for me to want to open a fast food
12    restaurant or to have a plant of some kind that maybe
13    produced baked goods?
14  A.  Yes.  Other option, future plan I have is -- which
15    I'm also doing in terms of looking for work this
16    year, I'm going to be going -- excuse me.  I'm going
17    to be contacting -- I have done it before one time
18    with them, Brookfield, Wisconsin, flip for houses
19    programs.  So I'll be probably doing some of that,
20    flip for houses.  That's another goal I'm reaching.
21  Q.  And then you tell Oprah, Oprah, on November 2nd:  I
22    will not be going next Monday to my downtown
23    Milwaukee Starbucks outings because some things come
24    up and I have to do this month and December.
25  A.  What page?

61 (Pages 238 - 241)

Veritext Legal Solutions
www.veritext.com                                        888-391-3376
Case 2:16-cv-01056-WED    Filed 08/15/17    Page 61 of 63    Document 28

1 Q. On page 3 of 4.

2 A. Okay.

3 Q. Do you see that tweet there?

4 A. I'm going -- because some things came up I have to do

5     some -- this was the year 2014 you found?

6 Q. It says November 2nd, 2013 right above that.

7 A. Yeah, 2013, yeah.

8 Q. So my question is had Oprah in some way gotten in

9     contact with you and told you she was going to send

10     rich people to you that might want to fund your

11     business venture?

12 A. Not then because I never went back -- I haven't been

13     looking at my Twitter account.

14 Q. So you were just letting her know just in case?

15 A. Yeah. Because I've done this because of the fact

16     that I used to watch her show a lot. She used to

17     help people out like this. One time on her show she

18     helped people out one time like this to hook them up

19     with people that were of wealthiness that could help

20     them reach their goal like open up their restaurant

21     or start their business.

22         And that's why I approached her because

23     she contacts back ordinary people, people who is not

24     famous or well known or rich.

25 Q. Did she ever contact you back?

1 A. I don't know because I've never went back to my

2     account. I've never responded yet at -- go to the

3     reply section or whatever. I never did it.

4 Q. Okay. And you tweeted to Oprah that you've entered

5     the PCH Publishers Clearinghouse Sweepstakes?

6 A. Yeah, I did that.

7 Q. And were you hoping that Oprah would somehow help you

8     win the Publishers Clearinghouse?

9 A. Well, somewhat because there have been times she

10     helped people win sweepstakes on her show. So that's

11     just one thing I just did.

12 Q. And so like in hopes that she would bring you the

13     prize money?

14 A. No, that the Prize Patrol group would come.

15 Q. That the Prize Patrol would come because Oprah would

16     tell them to?

17 A. Yeah, because they usually do. She did that once to

18     a few people. But that was all, yeah. That was,

19     what, a few years ago, 2013, yeah. Ever since I've

20     been doing that, I haven't been on -- I haven't been

21     on Twitter. I haven't had time.

22 Q. Ms. Timms, are there any other facts that you're

23     aware of other than the things we've talked about

24     today that you claim support your claims against

25     Amazon?

1 A. Also the fact that once again, I want to stress they

2     keep refusing to build a plant here in Milwaukee.

3     And whenever I was working there, they always

4     mentioned that in our cafeteria meetings what their

5     future goals were of building plants to hire more

6     people.

7         So, you know, that's one thing that I know

8     for sure they're not going to ever do because I've

9     asked the head supervisors that know the owner or

10     founder of Amazon as well as who all is in charge of

11     building plants to bring in more jobs. They refuse

12     to come here to Milwaukee. And I feel that if I was

13     working here in Milwaukee in one of their plants,

14     none of this would -- I wouldn't be doing none of

15     this. I would have still been working with them.

16 Q. Okay. Do you think that the company has refused to

17     build a plant in Milwaukee because of you personally?

18 A. Not me personally. Not me personally.

19 Q. Are you aware of any other facts that support your

20     claims against the company other than what we've

21     talked about today?

22 A. Am I -- can you repeat the question again?

23 Q. Yup. We've talked about a lot of things. We've been

24     here for a long time today. I just want to know if

25     there is any other facts that you're aware of that

1     you claim support your claim of age discrimination

2     against Amazon other than the things we've already

3     talked about? We don't need to repeat yourself. I

4     just want to make sure there is nothing else you're

5     thinking of.

6 A. No, I don't have anything else because I don't have

7     any physical documents.

8 Q. Okay.

9         MS. FITZKE: Ms. Timms, then I don't have

10     any other questions for you in your deposition here

11     today. Because you're not represented by an

12     attorney, I'm going to let you know that you have

13     the option to choose to read and sign your

14     deposition transcript. So you can get a copy of the

15     transcript and review it and make any necessary

16     corrections or you can waive that right and we'll

17     just accept the transcript as it's prepared by the

18     court reporter and assume that she got it all right.

19     They generally do a very good job of getting

20     everything we say.

21         THE WITNESS: Okay.

22         MS. FITZKE: So the only thing is that you

23     do need to let us know now on the record if you'd

24     like to review the transcript and read and sign it

25     or if you'd like to waive that right?

Case 2:16-cv-01056-WED   Filed 06/15/17   Page 62 of 63   Document 28
Veritext Legal Solutions
www.veritext.com                                                      888-391-3376

1          THE WITNESS:  So if I waive the right, can
2     it be another day I have to -- I could go to the
3     courthouse and look it up?
4          MS. FITZKE:  You don't have to go anywhere
5     either way.  We'll make arrangements off the record
6     to have it sent to your home so you don't have to go
7     pick anything up.  It's just a question of before
8     the transcript is considered final, do you want the
9     opportunity to review it and approve it or not
10     approve it but review it and if you're timely about
11     it, make changes, or do you want to waive that right
12     and accept the transcript as it comes from the court
13     reporter?
14          THE WITNESS:  I would waive it.  Waive it.
15          MS. FITZKE:  So with that, we can go off
16     the record.  We're done.
17          (At 4:33 p.m., the deposition concluded.)
18                *   *   *
19
20
21
22
23
24
25

1          C E R T I F I C A T E
2     STATE OF WISCONSIN )
                          ) SS
3     MILWAUKEE COUNTY   )
4          I, VICKY L. ST. GEORGE, Registered Merit
5     Reporter and Notary Public in and for the State of
6     Wisconsin, do hereby certify that the preceding deposition
7     was recorded by me and reduced to writing under my
8     personal direction.
9          I further certify that said deposition was
10     taken at the offices of LITTLER MENDELSON, P.C., 111 East
11     Kilbourn Avenue, Suite 1000, Milwaukee, Wisconsin on
12     February 17, 2017, commencing at 10:00 a.m. and concluding
13     at 4:33 p.m.
14          I further certify that I am not a relative or
15     employee or attorney or counsel of any of the parties, or
16     a relative or employee of such attorney or counsel, or
17     financially interested directly or indirectly in this
18     action.
19          In witness whereof, I have hereunto set my hand
20     and affixed my seal of office at Milwaukee, Wisconsin,
21     this 23rd day of February, 2017.
22
23          VICKY L. ST. GEORGE
24          Notary Public in and for the
               State of Wisconsin
25          Commission Expires 1/29/2021

63 (Pages 246 - 247)

Veritext Legal Solutions
www.veritext.com                                              888-391-3376
Case 2:16-cv-01056-WED   Filed 08/15/17   Page 63 of 63   Document 28